IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL CREDIT COUNSELING SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:06cv02028 (RBW) |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) | |

**UNITED STATES' MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

This is an action in which plaintiff seeks judicial review of the Internal Revenue
Service's retroactive revocation of plaintiff's qualification for tax-exempt status.

**PROCEDURAL HISTORY**

The Internal Revenue Service conducted an examination of the plaintiff's Forms 990,
Return of Organization Exempt from Income Tax, for the plaintiff's 2000 through 2002 tax
years.  As a result of this examination, the Service proposed that the plaintiff's tax exempt status
be revoked, and it sent the plaintiff a letter on January 15, 2005, which communicated this
proposed revocation and enclosed the Service's examination report.  (Blaskopf Decl. Ex. A.)

In response, the plaintiff submitted an administrative protest of this proposed revocation.
In its protest the plaintiff asserted that the proposed revocation was improper, but it did not seek
to limit the proposed revocation's retroactive effect by asserting it was entitled to such relief
under 26 U.S.C. § 7805(b).  (Id.)

The Service's appeals office sustained the proposed revocation, and it issued a "final adverse determination as to [the plaintiff's] exempt status under section 501(c)(3) of the Internal Revenue Code" to the plaintiff on September 5, 2006.  (Id. Ex. B.) This determination notified the plaintiff that the Service no longer "recognized [the plaintiff] as exempt from federal income tax effective January 1, 2000."  (Id.)

The plaintiff thereafter filed a complaint challenging the Service's determination.  The complaint describes the controversy between plaintiff and the United States as one in which, "the Plaintiff maintains, and the IRS denies, that Plaintiff qualifies as an organization entitled to recognition of exemption from Federal income tax pursuant to Code Section 501(a) as an organization described in Code Section 501(c)(3)."  (Compl. ¶ 21.)

On February 1, 2008, the plaintiff filed a motion for partial summary judgment.  In this motion the plaintiff asserted a hypothetical claim it had not raised in its complaint.[1]  The plaintiff asserted it "is entitled to summary judgment with regard to the issue of whether, in the event it is determined that Plaintiff's tax-exempt status was properly revoked by the IRS, such revocation may me [sic] applied retroactively to be effective as of January 1, 2000."  (Pl.'s Mot. ¶ 11.) The plaintiff's motion also asserted that "Retroactive revocation under the undisputed facts is improper in the instant case."  (Id. ¶ 12.) But the plaintiff's complaint makes no assertion that retroactive revocation would be improper in the event of a determination that the plaintiff's tax-exempt status was properly revoked.

---

[1] *See Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley*, 999 F.Supp. 34, 55 (D.D.C. 1998)(a hypothetical claim is in the form of if-then).

3051073.2

As will be discussed, this Court does not have jurisdiction to consider such a claim–that the Service's revocation of the plaintiff's tax-exempt status should not be retroactive to January 1, 2000--because the plaintiff did not exhaust the administrative remedies available to it within the Internal Revenue Service concerning this matter.  26 U.S.C. § 7428(b)(2).  Specifically, the plaintiff did not administratively request relief from the retroactive effect of the Service's proposed revocation under 26 U.S.C. § 7805(b).  Accordingly, the plaintiff's motion for partial summary judgment should be denied.

## ARGUMENT I

### THE PLAINTIFF DID NOT EXHAUST THE ADMINISTRATIVE REMEDIES AVAILABLE TO IT REGARDING THE ISSUE OF WHETHER THE REVOCATION OF ITS TAX-EXEMPT STATUS SHOULD BE RETROACTIVE

The United States, as sovereign, is immune from suit except upon the terms on which it consents to be sued.  Exceptions to sovereign immunity arise where Congress, through enacting a statute, expressly waives the United States' sovereign immunity.  *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961 (1983).  Such waivers, "to be effective, must be 'unequivocally expressed.'"  *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33, 112 S.Ct. 1011 (1992) (*quoting Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95, 111 S.Ct. 453 (1990)).

26 U.S.C. § 7428 is a circumscribed waiver of sovereign immunity that gives this Court jurisdiction to issue a declaratory judgment regarding the continuing qualification of the plaintiff as a tax-exempt organization.  Section 7428(a)(1) provides:

> In a case of actual controversy involving–(1) a determination by the Secretary–(A) with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) or as an organization described in section 170(c)(2)....

26 U.S.C. § 7428(b)(2), however, circumscribes such jurisdiction.  It states in relevant part:

> A declaratory judgment or decree under this section shall not be issued in any proceeding unless the...district court of the United States for the District of Columbia determines that the organization involved has exhausted administrative remedies available to it within the Internal Revenue Service....

Under section 7428(b)(2), "An organization has not exhausted its administrative remedies until it satisfies all the appropriate procedural requirements of the Internal Revenue Service." *American New Covenant Church v. Commissioner*, 74 T.C. 293, 304 (1980); *see also* H. Rept. 94-658, 1st Sess. (1975), 1976 U.S.C.C.A.N. 2897, 3184; S. Rept. 94-938, 94th Cong. 2d Sess. (1976), 1976 U.S.C.C.A.N. 3438, 4014.

Here, the plaintiff did not exhaust the administrative remedies the Service made available to it with respect to the claim the plaintiff is presenting in its motion for partial summary judgment:  that the Service's determination that the plaintiff's tax-exempt status should be revoked should not be applied retroactively.  Specifically, the plaintiff never notified the Service that it was seeking to limit the retroactive effect of the Service's revocation determination under 26 U.S.C. § 7805(b).  This is a required procedural step for requesting that the Service consider the retroactive effect of its revocation determination.  Because the plaintiff did not satisfy the required procedural requirements the Service afforded it, this Court has no jurisdiction to issue a declaratory judgment regarding the plaintiff's claim.  26 U.S.C. § 7428(b)(2).

Under 26 U.S.C. § 7805(b)(8), the Secretary of the Treasury is granted the authority to:

> prescribe the extent, if any, to which any ruling (including any...
> administrative determination other than be regulation ) relating
> to the internal revenue laws shall be applied without retroactive
> effect.

Pursuant to this section, in Rev. Proc. 2005-4, § 14.02, 2005 WL 23123, the Internal Revenue Service set forth the procedures as to how an organization may make an administrative request to the Service that the retroactive effect of a proposed revocation of tax-exempt status be limited. Included among the procedures is the requirement that the organization's request, "must also–(a) state that it is being made under § 7805(b)." Rev. Proc. 2005-4 § 14.02. Section 14.02 also warns that, "If the taxpayer does not complete the applicable steps, the taxpayer will not have exhausted the taxpayer's administrative remedies as required by § 7428(b)(2)...and will, thus, be precluded from seeking a declaratory judgment under § 7428."

Here, after the plaintiff received the Service's proposed revocation of its tax-exempt status, the plaintiff never informed the Service that it was seeking relief from the retroactive effect of the Service's proposed revocation under 26 U.S.C. § 7805(b). Consequently, the plaintiff did not exhaust the administrative remedies the Service made available to plaintiff to seek limitation of the retroactive effect of the Service's proposed revocation. And as a result of the plaintiff's failure to exhaust its administrative remedies, the court has no jurisdiction to issue a declaratory judgment regarding the claim the plaintiff is presenting in its motion for partial summary judgment: that retroactive application of the revocation of the plaintiff's tax-exempt status would be improper. 26 U.S.C. § 7428(b)(2).

It is well and long-settled in federal tax litigation that a taxpayer may not seek relief in litigation that was not fully and fairly set forth in its administrative claim. *See Real Estate-Land*

*Title & Trust Co. v. United States*, 309 U.S. 13, 17-18, 60 S.Ct. 371 (1940).  Absent a waiver by the government, the taxpayer is precluded in suit from resting its claim for relief on a ground not fully and fairly set forth in the administrative claim.  *Id.*; *Bank of New York v. United States*, 526 F.2d 1012, 1019 (3rd Cir. 1975), *Goelet v. United States*, 266 F.2d 881, 882 (2d Cir. 1959), *Pelham Hall Co. v. Carney*, 111 F.2d 944, 948 (1st Cir. 1940).  This rule is referred to as the "variance doctrine."  In this case, there are no facts establishing a waiver.

The plaintiff may contend that the United States waived its right to assert that the plaintiff did not exhaust its administrative remedies, because the United States admitted in its answer the plaintiff's allegation that the plaintiff "has exhausted its administrative remedies within the IRS as required by Code Section 7428(b)(2)."  (Compl. ¶ 20; Ans. ¶ 20.) Such an argument would be disingenuous.

The plaintiff's complaint *did not raise* the hypothetical claim on which the plaintiff is now seeking partial summary judgment.  The complaint *did not assert* that the Service's revocation determination should not be applied retroactively in the event it is determined that the plaintiff's tax-exempt status was properly revoked.  Thus, there was no allegation concerning this issue to which the United States could have pleaded.  Put another way, the United States was not on notice that plaintiff was claiming exhaustion in this particular.

Because the plaintiff did not assert this claim in its complaint, the United States' admission that the plaintiff exhausted its administrative remedies cannot apply to it.  Accordingly, any argument that the United States waived its right to assert that the plaintiff did not exhaust its administrative remedies must be rejected.

**ARGUMENT II**

## ASSUMING THIS COURT HAS JURISDICTION OVER THE
## PLAINTIFF'S RETROACTIVITY CLAIM, IT IS PREMATURE

But even assuming this Court has jurisdiction over the plaintiff's claim that its tax-exempt status should not be revoked retroactively, the Court *first* must determine whether NCCS's tax exemption was properly revoked under 26 U.S.C. § 501(c)(3) *before* determining whether such revocation should be applied retroactively.  A determination by the court that NCCS is not exempt under 26 U.S.C. § 501(c)(3) is a necessary predicate to any judicial determination that the Service abused its discretion by retroactively revoking NCCS's exemption.

NCCS's revocation would be on a prospective basis only if NCCS had not misstated a material fact in its exempt application or if its operations had not materially changed from what it represented on such application. 26 C.F.R. § 601.201(n)(6)(i).  A material operational change would also affect whether NCCS was a tax-exempt organization under § 501(c)(3).  Therefore, prior to determining whether the revocation of NCCS's tax-exempt status should be prospective only, the Court must first determine that NCCS is not a tax-exempt organization and determine what changes in NCCS's operations caused it to lose its section 501(c)(3) tax-exempt status.

Accordingly, the plaintiff's motion for partial summary judgment that the revocation of its tax-exempt status should not be retroactive is premature.  *See Virginia Education Fund v. Commissioner*, 85 T.C. 743, 751-752 (1985) (deciding exemption question first; "remaining issue for decision is the effective date of such revocation"), *aff'd per curiam*, 799 F.2d 903 (4th Cir. 1986); *Variety Club Tent No. 6 Charities v. Commissioner,* T.C. Memo. 1997-575 ("Our holdings on inurement in the instant case are in effect holdings that, in each of the years in issue, petitioner 'operated in a manner materially different from that originally represented', within the

3051073.2

meaning of section 601.201(n)(6)"); *Stevens Brothers Foundation v. Commissioner,* 324 F.2d

633, 639, 640-642 (8th Cir. 1963) (Finding operations non-exempt before considering § 7805(b)

retroactivity and material omissions from Forms 990 with respect to such non-exempt

operations).

## ARGUMENT III

### THE UNITED STATES IS ENTITLED TO FURTHER DISCOVERY TO ADDRESS THE MERITS OF PLAINTIFF'S MOTION

The plaintiff acknowledges that the Service's determination that its tax-exempt status

should be revoked retroactively to January 1, 2000 is reviewed under an abuse of discretion

standard. (Pl's Br. at 10.) In order to prevail under such a standard, the plaintiff must "clearly

show that the Commissioner's action was arbitrary, capricious or without sound basis in fact."

*Variety Club Tent No. 6 Charities, Inc. v. Commissioner*, T.C. Mem. 1997-575.

The plaintiff acknowledges that it may rely on the Commissioner's ruling that it was tax-

exempt only "so long as there are no substantial changes in the organization's character,

purposes, or methods of operations." 26 C.F.R. § 1.501(a)-1(a)(2). Similarly, 26 C.F.R. §

601.201(n)(6)(i) provides that revocation of NCCS's tax-exempt status may be retroactive if

there were an omission of a material fact on its exemption application or if NCCS operated in a

"materially different" manner from what was represented on its application. Indeed, the

Service's initial ruling that NCCS was tax exempt was predicated on an assumption that "your

operations will be as stated in your application for recognition of exemption." (Pl.'s Ex. 3.)

The plaintiff acknowledges it had a contractual relationship with Amerix, a for-profit company.[2] (Id. ¶¶ 13, 18, 21.) A Senate investigation of Amerix determined that Bernardo Dancel, the founder of NCCS, was Amerix's owner. *See Profiteering in a Non-Profit Industry: Abusive Practices in Credit Counseling: Hearing Before the Senate Governmental Affairs Subcommittee on Investigations,* S. Rept. 109-55 (2005) at 18 (a copy of this Report is attached as an appendix to this memorandum). The plaintiff also acknowledges that Amerix was responsible for a period for processing new debt management plan accounts. (See Money Aff. ¶ 21 ("during August 2000...Amerix stopped processing new accounts").) Because the plaintiff's tax-exempt application stated its purpose was to set up debt management plans where it determined "a family is having financial problems that are beyond the scope of sound budgeting techniques" (Pl.'s Ex. 2, Attachment I Part II B) it would seem that the plaintiff, in effect, contracted out the operations necessary to carry out its purported purpose to Amerix, *a for-profit company* that was owned by the plaintiff's founder.

The plaintiff acknowledges that its contractual relationship with Amerix could represent, "a change in its methods of operations." (Pl.'s Br. at 12.) Because the plaintiff has acknowledged that its relationship with Amerix is a change in its operations from what it represented on its initial application for tax-exempt status, it cannot meet the standard of clearly showing that the Service's retroactive revocation of its tax-exempt status was "arbitrary, capricious or without sound basis in fact."

---

[2]It is noteworthy that the plaintiff did not attach as exhibits any of the agreements it had with Amerix so the Court could consider whether the existence or execution of such agreements constitutes a material change in the plaintiff's operations.

Furthermore, as detailed in the United States' motion under Fed. R. Civ. P. 56(f), which is being filed contemporaneously with this memorandum, the United States requires discovery to obtain the sworn testimony necessary to oppose plaintiff's motion. Such discovery would include: 1) the authentication of documents in the United States' possession; 2) obtaining responses to discovery the United States has served but has not sought to enforce pending settlement discussions; 3) the receipt of documents sought through a *subpoena duces tecum* that the District of Maryland recently enforced; and 4) the deposition testimony of persons and appropriate representatives of organizations who have knowledge regarding the plaintiff's operations. (Weir Decl. ¶¶ 7, 8.)[3]

---

[3]The Declaration of Benjamin J. Weir is filed in connection with the United States' motion under Fed. R. Civ. P. 56(f)(PACER # 26, Attachment 2.).

3051073.2

**CONCLUSION**

For the foregoing reasons the plaintiff's motion for partial summary judgment should be

denied.

Date: February 15, 2008.

Respectfully submitted,


/s/Lawrence P. Blaskopf
LAWRENCE P. BLASKOPF
BENJAMIN J. WEIR
Trial Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 227
Washington, DC  20044
Telephone:  (202) 514-9642
(202) 307-0855
Fax:            (202) 514-6866
E-mail: Lawrence.P.Blaskopf@usdoj.gov

OF COUNSEL:

JEFFREY A. TAYLOR
United States Attorney

3051073.2

| 109th Congress *1st Session* | SENATE | S. Rept. 109–55 |
| --- | --- | --- |

# PROFITEERING IN A NON-PROFIT INDUSTRY: ABUSIVE PRACTICES IN CREDIT COUNSELING

———

# R E P O R T

PREPARED BY THE

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

OF THE

## COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS UNITED STATES SENATE



APRIL 13, 2005

———

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 2005

COMMITTEE ON GOVERNMENTAL AFFAIRS

SUSAN M. COLLINS, Maine, *Chairman*

TED STEVENS, Alaska
GEORGE V. VOINOVICH, Ohio
NORM COLEMAN, Minnesota
ARLEN SPECTER, Pennsylvania
TOM COBURN, Oklahoma
LINCOLN D. CHAFEE, Rhode Island
ROBERT F. BENNETT, Utah
PETE V. DOMENICI, New Mexico
JOHN W. WARNER, Virginia

JOSEPH I. LIEBERMAN, Connecticut
CARL LEVIN, Michigan
DANIEL K. AKAKA, Hawaii
THOMAS R. CARPER, Delaware
MARK DAYTON, Minnesota
FRANK LAUTENBERG, New Jersey
MARK PRYOR, Arkansas

MICHAEL D. BOPP, *Staff Director and Chief Counsel*
JOYCE A. RECHTSCHAFFEN, *Minority Staff Director and Counsel*
AMY B. NEWHOUSE, *Chief Clerk*

———

PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

NORM COLEMAN, Minnesota, *Chairman*

TED STEVENS, Alaska
TOM COBURN, Oklahoma
LINCOLN D. CHAFEE, Rhode Island
ROBERT F. BENNETT, Utah
PETE V. DOMENICI, New Mexico
JOHN W. WARNER, Virginia

CARL LEVIN, Michigan
DANIEL K. AKAKA, Hawaii
THOMAS R. CARPER, Delaware
MARK DAYTON, Minnesota
FRANK LAUTENBERG, New Jersey
MARK PRYOR, Arkansas

RAYMOND V. SHEPHERD, III, *Staff Director and Chief Counsel*
KATHERINE E. ENGLISH, *Counsel*
STEVEN A. GROVES, *Counsel*
ELISE J. BEAN, *Minority Staff Director and Chief Counsel*
LAURA E. STUBER, *Minority Counsel*
MARY D. ROBERTSON, *Chief Clerk*

(II)

# C O N T E N T S

————

                                                                              Page

I. INTRODUCTION ................................................................    1
II. EXECUTIVE SUMMARY .....................................................    2
III. OVERVIEW OF THE CREDIT COUNSELING INDUSTRY .................    4
    A. History of the Credit Counseling Industry .........................    4
    B. Current Law Governing the Credit Counseling Industry ..........    5
IV. DEBTWORKS, AMERIX, AND CAMBRIDGE: THREE CASE
       STUDIES ....................................................................    9
    A. DebtWorks and The Ballenger Group Conglomerate ............   10
        (1) Formation of DebtWorks and The Ballenger Group Conglomerate  .   10
        (2) Control of the Affiliated Credit Counseling Agencies ..........   13
        (3) Private Benefits to the For-Profit Corporations  ...............   14
        (4) Harm to Consumers ...........................................   15
    B. The Ascend One-Amerix Conglomerate ...........................   18
        (1) Formation of the Ascend One-Amerix Conglomerate ..........   18
        (2) Control of the Affiliated Credit Counseling Agencies ..........   20
        (3) Private Benefits to the For-Profit Corporations  ...............   20
        (4) Harm to Consumers ...........................................   22
    C. The Cambridge-Brighton Conglomerate .........................   23
        (1) Formation of the Cambridge-Brighton Conglomerate ........   24
        (2) Control of the Affiliated Credit Counseling Agencies ..........   25
        (3) Private Benefits to the For-Profit Corporations  ...............   26
        (4) Harm to Consumers ...........................................   28
V. REGULATION AND ENFORCEMENT ....................................   32
    A. Industry Self-Regulation .........................................   32
    B. Creditor Standards ..............................................   34
        (1) History of the Creditor-Credit Counseling Agency Relationship ..   34
        (2) Three Creditor Models .......................................   36
        (3) Using Fair Share Payment Standards to End Abuses .........   38
    C. State Regulation and Enforcement ..............................   40
    D. Federal Regulation and Enforcement ...........................   41
        (1) Internal Revenue Service .....................................   41
        (2) The Federal Trade Commission ..............................   43
        (3) Pending Bankruptcy Legislation ..............................   44
VI. POST HEARING CHANGES IN THE INDUSTRY .....................   45
    A. DebtWorks and The Ballenger Group ...........................   46
        (1) AmeriDebt Files for Chapter 11 Reorganization ..............   46
        (2) The Ballenger Group .........................................   47
    B. The Ascend One-Amerix Conglomerate .........................   49
    C. The Cambridge-Brighton Conglomerate .........................   51
    D. Recommendations ...............................................   53

# PROFITEERING IN A NON-PROFIT INDUSTRY: ABUSIVE PRACTICES IN CREDIT COUNSELING

---

## I. INTRODUCTION

In September 2003, the U.S. Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, began an investigation into the credit counseling industry. The investigation focused on new entrants into the industry, the marketing of debt management plans, the relationship between non-profit credit counseling agencies and for-profit service providers, and the quality of the counseling that clients received. The Subcommittee's Majority Staff initiated the investigation at the direction of the Subcommittee's Chairman, Senator Norm Coleman, with the concurrence and support of the Subcommittee Ranking Minority Member, Senator Carl Levin. The information in this report is based on the ensuing bipartisan investigation by the Subcommittee's Majority and Minority staffs.

Credit counseling agencies ("CCAs") have traditionally been non-profit companies that rely upon contributions from creditors and charities and small fees from consumers to cover the operating costs of providing advice, debt counseling, and debt management plans to consumers who have trouble paying their credit card bills. Some new entrants to the industry, however, have developed a completely different business model—a "for-profit model" designed so that their non-profit credit counseling agencies generate massive revenues for for-profit affiliates through advertising, marketing, executive salaries, and any number of other activities other than actual credit counseling. The new model looks to the consumer to provide those revenues.

Many of the new non-profit and for-profit companies are organized and operated to generate profits from an otherwise non-profit industry. Evidence of the new entrants' intention to create profits is indicated in several ways, including: (1) the manner in which the new entrant is organized, (2) the extent of control exercised by a for-profit entity over its non-profit CCA affiliate, and (3) the massive revenues funneled to the for-profit entity from the non-profit agency.

When profit motive is injected into a non-profit industry, it should come as no surprise that harm to consumers will follow. Indeed, the primary effect of the for-profit model has been to corrupt the original purpose of the credit counseling industry—to provide advice, counseling, and education to indebted consumers free of charge or at minimal charge, and place consumers on debt management programs only if they are otherwise unable to pay their debts. Some of the new entrants now practice the reverse—they provide

2

no bona fide education or counseling and place every consumer onto a debt management program at an unreasonable or exorbitant charge.

## II. EXECUTIVE SUMMARY

Consumer debt has more than doubled in the past 10 years.[1] The nation's credit card debt is currently $735 billion.[2] The rapid increase in credit card balances is one factor in the corresponding increase in personal bankruptcies. Since 1996, more than one million consumers have filed for bankruptcy each year, with a record 1.66 million new filings in 2003.[3] As Chairman Coleman stated in his opening statement at the hearing entitled *Profiteering in a Non-Profit Industry: Abusive Practices in Credit Counseling,* March 24, 2004, "The growth in both debt and bankruptcy demonstrates the need for much better financial education. Although the immediate cause of most bankruptcies is a sudden setback such as divorce, serious illness, or unemployment, the amount of debt these individuals carried when faced with this tragic event indicates their poor understanding of credit and finances."

The social need for better financial education is one of the primary reasons why credit counseling has long been recognized as a charitable and educational activity worthy of tax exempt status under Section 501(c)(3) of the U.S. tax code. For the past several decades, consumers in debt regularly turned to the non-profit credit counseling industry for advice and financial education. Consumers who could not afford to make all of their payments often enrolled in a debt management program, which allowed them to consolidate their debts from several credit cards, reduce their monthly payments, and lower their interest rates.

Over the past several years, however, the credit counseling industry has undergone significant changes. The activities of some "new entrants" have resulted in increasing consumer complaints about excessive fees, non-existent education, poor service, and generally being left in worse debt than when they initiated their debt management program. With this in mind, the Subcommittee initiated an investigation to determine the state of the credit counseling industry and whether solutions are available to remedy its problems.

The Subcommittee's investigation included a thorough examination of credit counseling agencies, their for-profit affiliates, major credit card issuers, Federal and state agencies and officials, consumer advocates, and their interrelated relationships. Additionally, current and former credit counselors and CCA clients were interviewed and Subcommittee staff responded to advertisements from various agencies to see what advice was being given. The Subcommittee held a hearing on March 24, 2004 in which the Subcommittee's preliminary findings were disclosed and members of the industry testified.

The hearing illustrated the new entrants' model of credit counseling. High consumer fees and lucrative contracts that benefit the

---

[1] Eileen Powell, "Consumer Debt More Than Doubles in Decade," *The Washington Times,* January 6, 2004.

[2] *Id.*

[3] The American Bankruptcy Institute, available at *www.abiworld.org.*

3

related for-profit company characterize this model. The Subcommittee focused on three debt management conglomerates to illustrate the unfriendly consumer practices eviscerating the industry. These conglomerates were DebtWorks and The Ballenger Group, Ascend One-Amerix, and Cambridge-Brighton. The hearing consisted of four panels representing consumers, and former CCA employees, CCAs, their for-profit affiliates, and Federal regulators.

The first panel included two victims of the new entrants' predatory practices. Jolanta Troy testified about her experience with AmeriDebt, Inc. ("AmeriDebt"). AmeriDebt is a very large CCA with multiple class action suits pending against it with the Federal Trade Commission and the attorneys general of multiple states. The second witness was Raymond Schuck, a former client of Cambridge Credit Counseling ("Cambridge"), another large CCA with suits pending from the Attorneys General of Massachusetts and North Carolina. Two former employees of AmeriDebt and Cambridge also testified. These former "counselors" discussed the sales tactics they were instructed to practice in order to convince debt-ridden consumers to sign onto debt management plans ("DMPs") rather than offering financial education or counseling.

The second panel consisted of CCAs known for high-pressure sales of DMPs in conjunction with their operations as part of a for-profit conglomerate. The witnesses included representatives of AmeriDebt, American Financial Solutions ("AFS"), and Cambridge. These non-profit CCAs provided little to no counseling and education to consumers, poor service, and had a controversial relationship with their for-profit affiliates. For contrast, a member of the National Foundation for Credit Counseling ("NFCC"), an association of CCAs still following the "old school" model, testified about its very different approach to credit counseling.

The for-profit affiliates to the above-mentioned CCAs comprised the third panel. The Ballenger Group, Amerix, and Brighton Debt Management Services provide processing services, marketing and advertising, lead generation, and other services to their non-profit CCAs. The Subcommittee found that these for-profit affiliates use their non-profit CCAs to generate significant revenues that are siphoned out of the non-profit CCAs through contracts at above market prices. Through these contracts, the for-profit affiliates exert a great deal of control over the non-profit CCAs by setting minimum rates for DMP sign ups and fee collections.

Completing the hearing, on the fourth panel, was Commissioner Mark Everson of the Internal Revenue Service and Commissioner Thomas Leary of the Federal Trade Commission. Each discussed their agency's actions to address abuses in the credit counseling industry. The Internal Revenue Service announced the implementation of a new program for reviewing the applications of credit counseling agencies for non-profit status. The IRS has also initiated audits of over 50 CCAs. Commissioner Leary discussed the Federal Trade Commission's concerns about the industry and the actions it has taken against AmeriDebt and The Ballenger Group, as well as generally, to protect the American consumer from deceptive and unfair practices. Commissioner Everson stated in his testimony, "Based on the FTC data and our examinations, it appears that some organizations are operating solely on the Internet and are

4

providing debt management and not credit counseling. In many cases, credit counseling services have been replaced by promises to restore favorable credit ratings or to provide commercial debt consolidation loans." Clearly, something is wrong with the credit counseling industry.

## III. OVERVIEW OF THE CREDIT COUNSELING INDUSTRY

### A. History of the Credit Counseling Industry

The practice known as "credit counseling" was initiated by creditor banks and credit card companies during the mid-1960s in an effort to stem the growing volume of personal bankruptcies. Most, if not all, of the original CCAs were members of the National Foundation for Credit Counseling ("NFCC").[4] NFCC member agencies were generally community-based, non-profit organizations that provided a full range of counseling, often in face-to-face meetings with consumers. Trained counselors would advise consumers about how to remedy their current financial problems, counsel them on budget planning, and educate them as to how to avoid falling into debt in the future. These counseling sessions were traditionally one-on-one meetings in which an educated counselor performed a detailed analysis of an individual's income, expenses, debts, and other budget requirements. A consumer would meet with a counselor more than once and for significant periods of time, often over an hour. After a budget analysis, the counselor might recommend that the consumer readjust his or her budget, utilize a debt management plan, or seek legal assistance, possibly to declare bankruptcy.

From the outset, a popular credit counseling option was the "debt management plan" ("DMP"). In order to initiate a DMP, a consumer would authorize the credit counselor to contact each of the consumer's unsecured creditors—primarily credit card companies. The counselor would then negotiate with each creditor to lower the consumer's monthly payment amount, to lower the interest rate, and to waive any outstanding late fees. All of the consumer's lowered monthly payments were then "consolidated" into a single payment. The consumer would send a single payment to the CCA, which would then distribute payments to each of the consumer's creditors.

DMPs were prevalent because each party involved—the consumer, the creditor, and the CCA—received a tangible benefit. Consumers got their finances under control and received concessions from their creditors, such as reduced interest rates, waiver of late fees, and forgiveness of overdue payment status. Creditors, rather than taking a loss from a bankruptcy, received all of the principal debt owed by the consumer. The CCA, in return for organizing the DMP, would receive "fair share" payments from the creditor to cover their expenses, salaries, and operational costs. The fair share remittance generally amounted to 12–15% of the payments received by the creditor as a result of the DMP.

This mutually beneficial system operated smoothly for several decades. Some NFCC CCAs charged nominal fees or requested contributions from consumers. Such fees or contributions were used to defray their costs for counseling and initiating and maintaining the

---

[4] For more information on the NFCC, visit the organization's website at *www.NFCC.org.*

5

DMP. Such fees and contributions were small in comparison to the creditor concessions received by the consumer. Today, the fees charged by NFCC CCAs remain minimal. The average initial fee to set up a DMP with a NFCC agency in 2002 was $23.09 and the average monthly maintenance fee was $14.[5]

Growth in consumer credit card debt in the 1990s however, brought many new and aggressive entrants into the credit counseling industry. Since 1994, 1,215 CCAs have applied to the IRS for tax exempt status under Section 501(c)(3).[6] Over 810 of these applicants applied between 2000 and 2003.[7] There are currently 872 active tax-exempt CCAs operating in the United States.[8] Many of these new entrants are not centered around community-based, face-to-face counseling, but rather upon a nationwide, Internet and telephone-based model focused primarily, if not solely, upon DMP enrollment. Many of the new entrants are set up on a for-profit model. The for-profit model is designed to provide the maximum benefit to related for-profit corporations, which enter into contracts with non-profit CCAs to siphon off revenue from the CCA. A common method used by the for-profit entity to collect revenue from the CCA is to set itself up as a "back-office processing company," which contracts to provide data entry and DMP payment processing for the CCA. The Subcommittee found that these contracts are often executed by officers or directors of a CCA who have familial ties or close business relationships with the owners of the for-profit entity. The Subcommittee also found that, in many instances, multiple non-profit CCAs would send processing fees to a single for-profit company, which reaped substantial profits.

## B. Current Law Governing the Credit Counseling Industry

CCAs are almost exclusively organized as non-profits under 26 U.S.C. § 501(c)(3). The Credit Repair Organizations Act of 1997 ("CROA") sought to regulate organizations claiming to offer "credit repair services."[9] However, this legislation, which is administered by the Federal Trade Commission ("FTC"), does not apply to Section 501(c)(3) organizations. In fact, the significant increase in tax-exempt CCAs roughly coincides with the passage of CROA, presumably because CCAs organized as non-profits to avoid CROA regulation.[10] Moreover, the provisions of the Federal Trade Commission Act generally do not apply to organizations with tax-exempt status.[11] Section 501(c)(3) status provides protection from scrutiny from many state regulators as well.

Two more recent developments provide additional incentives for companies to enter the credit counseling industry with Section 501(c)(3) status. First, prospective Federal bankruptcy legislation proposes requiring individuals to obtain credit counseling before being eligible to file for bankruptcy. If enacted, most likely the industry would see large increases in persons seeking their services.

[5] NFCC 2002 Member Activity Report, p. 30.
[6] Letter, dated 12/18/03, to the Subcommittee from IRS Commissioner Mark Everson, p. 2 ("Everson letter").
[7] Everson letter, p. 2.
[8] Id.
[9] 15 U.S.C. §§ 1679 et. seq.
[10] Credit Counseling in Crisis, Consumer Federation of America and the National Consumer Law Center (April 2003).
[11] 15 U.S.C. §§ 41 et. seq.

6

Second, in the same vein, the recent "Do Not Call" list, established by the FTC to prevent unwanted telephone solicitations, exempts "charitable solicitations." This exemption means CCAs with Section 501(c)(3) status can continue to make telephone solicitations seeking business.

A corporation may qualify for tax-exempt status under Section 501(c)(3) if it is organized and operated exclusively for certain aims, such as charitable, religious, scientific, or educational purposes.[12] No part of the corporation's net earnings may inure to the benefit of any individual or any private shareholder in the corporation.[13] The corporation may not be organized or operated for the benefit of any private interests, such as the interests of the creator, the creator's family, any shareholders of the corporation, or any persons controlled directly or indirectly by such private interests.[14] Organizations claiming tax-exempt status are required to apply for such status by filing an *Application for Recognition for Exemption Under Section 501(c)(3)* with the IRS.[15] IRS agents review each application and recognize or deny tax-exempt status.[16] Once an organization is recognized as having tax-exempt status, it must operate under the requirements of Section 501(c)(3) or risk losing its tax-exempt status. Each year, the tax-exempt organization must file an information return with the IRS detailing its activities, revenues, and expenses.[17]

Credit counseling organizations have been recognized as proper tax-exempt entities for several decades.[18] In 1969, the IRS affirmed that Section 501(c)(3) tax-exempt status was properly granted to an "organization [that] provides information to the public on budgeting, buying practices, and the sound use of consumer credit through the use of films, speakers, and publications."[19] The ruling noted that such organizations may enroll debtors in "budget plans" where the debtor makes fixed payments to the organization and the organization disburses payments to each of the debtor's creditors.[20] The budget plan services were to be "provided without charge to the debtor."[21] The organization offered education to the public on personal money management through informative tools and provided individual counseling to "low income individuals and families." An aspect of the counseling included the use of debt management plans constructed free of charge. This "free" service was possible because the primary source of funding for the organization was contributions from creditors through "fair share" contributions. Because the organization provided assistance to low income indi-

---

[12] 26 U.S.C. § 501(c)(3).

[13] *Id.*

[14] IRS Publication 557, *Tax-Exempt Status for Your Organization* (Rev. May 2003), p. 17.

[15] 26 U.S.C. § 508(a).

[16] Everson letter, p. 6.

[17] IRS Publication 557, *supra*, at p. 8.

[18] Providing credit counseling is not an inherently charitable activity. Whether an organization providing credit counseling qualifies for exemption under Section 501(c)(3) depends upon whether the manner in which it provides such counseling serves recognized charitable or educational purposes. Treas. Reg. § 1.501(c)(3)–1(d)(2) provides that the term "charitable" is used in Section 501(c)(3) in its generally accepted legal sense, and includes relief for the poor and distressed or underprivileged. "Educational" as used in Section 501(c)(3) includes instruction of the public on subjects useful to the individual and beneficial to the community. Treas. Reg. § 1.501(c)(3)–1(d)(3)(i)(b).

[19] Rev. Rul. 69–441, 1969–2 C.B. 115.

[20] *Id.* at *2–3.

[21] *Id.* at *3.

7

viduals without charge and provided education to the public, it qualified for tax-exempt status under Section 501(c)(3).

In 1978, the U.S. District Court for the District of Columbia expanded the activities a CCA could perform under Section 501(c)(3) in *Consumer Credit Counseling Service of Alabama v. United States.*[22] The "principal activities" of the CCAs were to, without charge, "provide (a) information to the general public, through the use of speakers, films, and publications, on the subjects of budgeting, buying practices, and the sound use of consumer credit, and (b) counseling on budgeting and the appropriate use of consumer credit to debt-distressed individuals and families."[23] As an "adjunct" to those principal activities, agencies could enroll debtors in a "debt management program" for a "nominal" fee which "may not exceed the sum of $10.00 per month" and which is "waived . . . in instances where its payment would work a financial hardship."[24] Only an "incidental" amount of revenue was to be realized by the agency through the debt management programs.[25]

In this case, the IRS had revoked the exempt status of Credit Counseling Services of Alabama because it did not restrict its services to the poor and it charged a nominal fee for its services. The IRS made this decision even though the agency provided free information on credit to the public and would waive its fee if it created a hardship. When CCCS of Alabama challenged the revocation, the court found that the agency fulfilled charitable purposes by educating the public on subjects useful to the individual and beneficial to the community without any fees.[26] The court found the counseling program was both educational and charitable. The court found that the debt management plans were an integral part of the agency's counseling function and thus were charitable and educational as well. The court also found the DMPs were incidental to the agencies' primary function of education because the counselors spent only 12% of their time on the DMPs and the fees were nominal.

Existing case law indicates that an organization may qualify for Section 501(c)(3) status if it is organized and operated for charitable purposes. The term charitable includes the relief of the distressed or poor.[27] The term also includes educational organizations. The term "educational" includes (1) instruction or training of an individual for the purposes of improving or developing his/her capabilities and (2) instruction of the public on subjects useful and beneficial to the community.[28] Thus the two components of education are individual training and public education. Whether a CCA operates exclusively for charitable purposes depends on the application of the operational test set forth in the IRS code:

> An organization will be regarded as "operated exclusively" for [charitable] purposes only if it engages primarily in activities

[22] No. 78–0081, 1978 U.S. Dist. LEXIS 15942 (D.D.C. Aug. 18, 1978); *see also, Credit Counseling Centers of Oklahoma v. United States,* No. 78–1958, 1979 U.S. Dist. LEXIS 11741 (D.D.C. June 13, 1979).

[23] *Id.* at *3.

[24] *Id.* at *3–4.

[25] *Id.* at *5.

[26] Treas. Reg. § 1.501(c)(3)–1(d)(3)(i)(b).

[27] Treas. Reg. § 1.501(c)(3)–1(d)(2).

[28] *Id.* at (3).

8

which accomplish one or more [charitable] purposes specified in Section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of a [charitable] purpose.[29]

An organization is not organized or operated exclusively for an exempt purpose unless it serves a public rather than a private interest. To meet this requirement, an organization must establish "that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests."[30] This prohibition covers "inurement" of earnings to insiders in the form of excessive compensation or other benefits, but it can even apply where the benefit to the private interest is reasonable compensation that is no more than fair market value for the services.[31] An organization may also be considered to serve private interests if it provides a substantial private benefit to outsiders who do not constitute a charitable class.[32]

A charitable organization may operate a trade or business if it furthers an exempt purpose. The regulations under Section 501(c)(3) provide:

An organization may meet the requirements of Section 501(c)(3) although it operates a trade or business as a substantial part of its activities, if the operation of such trade or business is in furtherance of the organization's exempt purpose or purposes and if the organization is not organized or operated for the primary purpose of carrying on an unrelated trade or business. . . . In determining the existence or nonexistence of such primary purpose, all circumstances must be considered, including the size and extent of the trade or business and the size and extent of the activities which are in furtherance of one or more exempt purposes.[33]

This test requires determining "whether the [organization's] exempt purpose transcends the profit motive rather than the other way around."[34] In the context of credit counseling, the regulations require determining whether the goal of the claimed educational activity is benefiting the public or simply generating profits for individuals and related businesses.

Tax-exempt CCAs face harsh penalties from the IRS if they fail to confine their activities exclusively to educational and charitable purposes. If a CCA is held to have conferred private benefits or to have violated the prohibition on inurement, its tax-exempt status

---

[29] Treas. Reg. § 1.501(c)(3)–1(c)(1).

[30] Id. at (ii).

[31] See, e.g., est of Hawaii v. Commissioner, 71 T.C. 1067 (1979) ("Nor can we agree with petitioner that the critical inquiry is whether the payments made to International were reasonable or excessive. Regardless of whether the payments made by petitioner to International were excessive, International and Est, Inc., benefited substantially from the operation of petitioner."); Church by Mail v. Commissioner, 765 F. 2d 1387 (9th Cir. 1985).

[32] See, e.g., American Campaign Academy v. Commissioner, 92 T.C. 1053, 1064 (1989), in which the Tax Court upheld denial of recognition of exemption under Section 501(c)(3) of an organization that provided training to political campaign workers because the organization's services were provided to persons affiliated with a particular political party.

[33] Treas. Reg. § 1.501(c)(3)–1(e).

[34] Elisian Guild, Inc. v. United States, 412 F.2d 121, 124 (1st Cir. 1969), rev'g 292 F. Supp. 219 (D. Mass 1968).

9

is subject to revocation. In lieu of having its exemption revoked, the IRS may instead choose to impose "intermediate sanctions" against the CCA or a related entity. Intermediate sanctions may also be imposed upon certain individuals who are not employed by the CCA but have engaged in an "excess benefit transaction" with the CCA, meaning that the person personally benefited from the CCA through, for example, drawing an excessive salary. An excess benefit transaction is any transaction where a CCA provides an economic benefit to a "disqualified person" that has a greater value than the value of goods or services that the CCA receives from the disqualified person.[35] The tax code provides that, where an individual outside the CCA has substantial influence over the affairs of the CCA and engages in an excess benefit transaction with that CCA, the individual is subject to sanction. The sanction imposed upon such an individual is an excise tax equal to 25% of the excess benefit.[36] Further, if the individual fails to correct the harm caused by the excess benefit transaction within the taxable period, a tax equal to 200% of the excess benefit may be assessed against the individual.[37]

In addition to the serious tax consequences that could be assessed against CCAs and their affiliated for-profit entities, consumer protection laws provide additional protection against improper conduct in the credit counseling industry. The Federal Trade Commission ("FTC") is charged with enforcing Section 5(a) of the FTC Act, which prohibits unfair and deceptive acts or practices in or affecting commerce.[38] Although the FTC generally lacks jurisdiction to enforce consumer protection laws against bona fide non-profits, it may assert jurisdiction over a CCA if the FTC can demonstrate that the CCA is "organized to carry on business for its own profit or that of its members," that it is a "mere instrumentality" of a for-profit entity, or that it is operating within a "common enterprise" with one or more for-profit entities.[39]

The Subcommittee has uncovered alarming abuses of the preceding regulations by three credit counseling conglomerates, as described in the following section.

## IV. DEBTWORKS, AMERIX, AND CAMBRIDGE: THREE CASE STUDIES

As noted above, the "traditional" CCA model has been in operation for several decades. This model was generally a community-based, modest operation with minimal overhead and expenses. There were no large fees, no large executive salaries, no high-priced advertising blitzes, and no expensive marketing campaigns. Day-to-day operations were characterized by face-to-face meetings between consumers and credit counselors that lasted in some cases for several hours. If a consumer enrolled in a DMP, the employees of the CCA would negotiate with the consumer's various creditors,

---

[35] 26 U.S.C. § 4958(c)(1)(A). A "disqualified person" is someone who, at any time during the 5 years preceding an excess benefit transaction, was "in a position to exercise substantial influence over the affairs of the organization."
[36] 26 U.S.C. § 4958(a)(1).
[37] *Id.* at (b).
[38] 15 U.S.C. § 45(a).
[39] 15 U.S.C. § 44; *Sunshine Art Studios, Inc. v. FTC,* 481 F.2d 1171 (1st Cir. 1973); *Delaware Watch Co. v. FTC,* 332 F.2d 745 (2d Cir. 1964).

10

set up the plan, and distribute payments to the creditors until the consumer's debts were paid in full. The traditional CCA did not "outsource" any of its essential functions to for-profit companies, and millions of dollars did not flow through the CCA to for-profit companies.

The "new" CCA model has modified or even reversed the practices of the traditional CCA. The new model is characterized by high consumer fees and lucrative contracts that benefit related for-profit companies. The revenue generated through DMPs is seldom spent on improving or expanding education or counseling, but rather on advertising, marketing, and other activities unrelated to assisting consumers with their financial problems. Although there are likely scores of such new CCAs currently operating, this Report focuses on the following three major debt management groups: (1) DebtWorks and The Ballenger Group conglomerate, (2) the Ascend One-Amerix conglomerate, and (3) the Cambridge-Brighton conglomerate.

## A. DebtWorks and The Ballenger Group Conglomerate

The first case study examines DebtWorks, Inc. ("DebtWorks"), later purchased by The Ballenger Group, LLC ("Ballenger"), which provides DMP processing services to 11 non-profit CCAs, including (1) AmeriDebt, Inc. ("AmeriDebt"), (2) A Better Way Credit Counseling, Inc. ("A Better Way"), (3) CrediCure, (4) Debticated Consumer Counseling, Inc. ("Debticated"), (5) Debtscape, Inc. ("Debtscape"), (6) DebtServe, Inc. ("DebtServe"), (7) Fairstream, Inc. ("Fairstream"), (8) Mason Credit Counseling ("Mason"), (9) Nexum Credit Counseling, Inc. ("Nexum"), (10) The Credit Network, Inc. ("The Credit Network"), and (11) Visual Credit Counseling ("Visual"). The aggregate consumer debt managed by those 11 CCAs has exceeded $2.5 billion.[40]

### (1) Formation of DebtWorks and The Ballenger Group Conglomerate

DebtWorks was organized by Andris Pukke and his wife Pamela Pukke (also known as Pamela Schuster). Andris Pukke entered the credit counseling industry by organizing and operating a for-profit CCA in Gaithersburg, Maryland, called Consumer Debt Resources.[41] In 1996, after the State of Maryland ordered Consumer Debt Resources to cease operations because it was a for-profit company, it began to wind down its affairs. At that same time, however, Pamela Pukke was organizing a non-profit CCA—AmeriDebt—Pamela Pukke acted as vice president, secretary, and director of the new CCA.[42] Although not listed as an officer or director, Mr. Pukke regularly held himself out to be the president of AmeriDebt.[43]

After operating as a non-profit CCA for approximately 3 years, AmeriDebt decided to "spin off" its DMP processing function and turn it into a for-profit entity called DebtWorks, which was wholly

---

[40] Letter from Ballenger to Subcommittee, dated 11/26/03, at Exhibit A.
[41] Subcommittee interview of Ballenger representatives (3/12/04).
[42] Articles of Incorporation, dated 12/23/96 (originally named Consumer Counseling Services, Inc.); AmeriDebt Form 1023, dated 3/19/97.
[43] Subcommittee interview of Ballenger representatives (3/12/04).

11

owned and controlled by Mr. Pukke.[44] DebtWorks was incorporated on July 21, 1999, purchased certain assets of AmeriDebt on September 1, 1999, and signed its first contract with AmeriDebt to provide DMP processing on the same day.[45] AmeriDebt simply moved its DMP enrollment employees to a building next door while the DMP processing function (DebtWorks) remained in AmeriDebt's original office space.[46] AmeriDebt also opened "branch" DMP enrollment locations in New York and Florida. AmeriDebt was initially DebtWorks' sole client, but that was soon to change as AmeriDebt officers, directors, and employees fanned out to form multiple CCAs, each of which subsequently contracted with DebtWorks for DMP processing services.



Most or all of the 11 non-profit DebtWorks CCAs were organized by insiders of AmeriDebt or by friends of Mr. Pukke, including: (1) Edward Catsos, the managing director of AmeriDebt's Florida office and who also organized DebtServe;[47] (2) Edward's brother, James Catsos, who had served as AmeriDebt's secretary and formed Debticated with Mr. Pukke's brother, Eriks;[48] (3) Andrew Smith, who served as interim president for AmeriDebt and formed Fairstream; (4) William Sargent, an AmeriDebt counseling man-

---

[44] Articles of Incorporation of DebtWorks, Inc., Bates DWS 001538–1541.
[45] Id.; Asset Purchase Agreement between AmeriDebt and DebtWorks, dated 9/1/99, Bates DWS 001526–1535; Fulfillment Agreement between AmeriDebt and DebtWorks, dated 9/1/99. AmeriDebt asserts that a "disinterested board" at AmeriDebt chose DebtWorks to be AmeriDebt's DMP processor after reviewing several bids from other entities. Subcommittee interview of AmeriDebt representative (2/27/04).
[46] Subcommittee interview of AmeriDebt representative (2/27/04).
[47] Id.
[48] Id.

12

ager who formed Debtscape;[49] (5) Jeffrey Formulak and Richard Brennan, respectively vice president and general counsel of AmeriDebt who currently operate CrediCure;[50] and, (6) Harold Patrie, an AmeriDebt counseling manager, who formed The Credit Network.[51] Matthew Case, the current chief operating officer of AmeriDebt and long time family friend of Mr. Pukke, acted as president of The Credit Network prior to his employment with AmeriDebt.[52] This proliferation of CCAs served both the interests of DebtWorks and the various former AmeriDebt employees: DebtWorks was affiliated with a larger number of CCAs and could therefore capture a larger market share of the DMP enrollment business, while the former AmeriDebt employees apparently paid themselves higher salaries from their CCAs than they had received at AmeriDebt.[53]

The Subcommittee investigation uncovered significant evidence that these CCAs formed a common enterprise. Spirer & Goldberg, P.C., a law firm with a long-time relationship with Mr. Pukke, filed the Section 501(c)(3) applications for almost every CCA in the current conglomerate, including AmeriDebt, A Better Way, Mason, Nexum, Visual, The Credit Network, and Debticated. Moreover, in its application to the IRS, Mason listed its billing address as 12850 Middlebrook Road in Germantown, Maryland—the address of DebtWorks. In addition, some of these CCAs, such as Debticated, signed a contract with DebtWorks before they were even granted non-profit status.[54] At least two CCAs—A Better Way and Visual—received "start-up" loans from Infinity Resources Group, Inc. ("Infinity Resources"), a private lending institution wholly owned and operated by Mr. Pukke.[55] None of the Section 501(c)(3) applications filed with the IRS by the new CCAs mentioned the fact that the applicant CCA intended to contract with DebtWorks for processing services, although each such CCA did.

At the end of 2002, Mr. Pukke formed Ballenger for the purpose of purchasing the operating assets—the right to service DMP accounts—from DebtWorks.[56] The DebtWorks managers then teamed with industry outsiders to execute a management buyout from Mr. Pukke for $43 million, financed with cash and a promissory note. Ballenger still owes Mr. Pukke and DebtWorks more than $37 million on this promissory note.[57]

Since DebtWorks and The Ballenger transaction, Ballenger has continued the practice of assisting with the organization of CCAs. For example, both Debtserve and Fairstream obtained start-up capital of $250,000 by way of a loan, which Ballenger signed as a secondary guarantor.[58] In addition, both Debtserve and Fairstream

[49] *Id.*, AmeriDebt 1998 Form 990, p. 7.
[50] Subcommittee interview of CrediCure representatives (4/7/04).
[51] *Id.; see also* AmeriDebt 1998 Form 990, p. 7.
[52] Deed of Lease Agreement for The Credit Network, dated 5/13/99.
[53] For example, Eriks Pukke made approximately $51,000 as an AmeriDebt counseling manager, but makes $85,000 as president of Debticated. AmeriDebt 1997 Form 990, p. 7; Debticated 2002 Form 990, p. 4.
[54] Fulfillment Agreement between Debticated and DebtWorks (8/1/00); Letter from IRS granting Section 501(c)(3) status to Debticated (8/16/00).
[55] *See, e.g.,* A Better Way 2000 Form 990, indicating loan of $150,000 from Infinity Resources.
[56] Subcommittee interviews of Ballenger representatives (1/15/04 and 3/12/04).
[57] *Id.*
[58] Subcommittee interview of Ballenger representatives (3/12/04).

13

were extended a functional line of credit by Ballenger for remittance of initial payments that were due to Ballenger.[59]

### (2) Control of the Affiliated Credit Counseling Agencies

DebtWorks exercised control of its affiliated CCAs through certain contracts, termed "Fulfillment Agreements," with each CCA. Basically, the Fulfillment Agreements contracted all functions of the CCAs to DebtWorks except for the actual enrollment of consumers into DMPs: "DebtWorks shall perform all fulfillment, back-office, and customer relations services for budget plan clients of [the CCA], with the exception of intake and counseling services."[60] In effect, the CCA served as a mere "call center" from which consumers could be enrolled into DMPs. All operations from that point forward were contractually turned over to DebtWorks.

After Mr. Pukke sold the DMP portfolio of DebtWorks to Ballenger, Ballenger added a new term to the Fulfillment Agreements that conferred additional control over the CCAs. Specifically, Ballenger added a term that charged each CCA a standard fee of $50 for each new DMP enrollment, and an additional $25 per month for each active DMP.[61] However, if the CCA could not for some reason obtain the standard fee from the consumer, Ballenger required a minimum $20 start-up fee and a minimum $10 monthly fee for each DMP. As a result, each CCA was contractually required to pay Ballenger for each DMP that it initiated and maintained. Each CCA was therefore required to generate income from its consumers or be considered in breach, regardless of the fact that the income it generated from consumers supposedly consisted solely of "voluntary" contributions. The result was that Ballenger required each non-profit CCA to pay it for DMP enrollment and maintenance, even if a new DMP generated no revenue for the CCA. Such control over the CCA's revenue limited the CCA's ability to direct funding toward counseling, education, or other matters.

Other provisions in the Fulfillment Agreement further demonstrated Ballenger's control over its CCAs. For example, Ballenger required exclusive rights to each CCA's consumer trust accounts and reserved the right to withdraw funds electronically as well as draw checks on those accounts. In fact, if the CCA itself accessed its account, it was deemed a breach of the agreement subject to termination and entitled Ballenger to "liquidated damages."[62] Another provision in the Fulfillment Agreement allowed Ballenger to determine, by its sole discretion, that (1) a CCA was in breach of the agreement, and (2) if not cured within 30 days, Ballenger may transfer the CCA's DMPs to another CCA serviced by Ballenger.[63] Thus a consumer that signed up for a DMP with a particular CCA could be transferred to another CCA of Ballenger's choice without consulting the consumer. In effect, Ballenger had total control over the DMP once established.

---

[59] Id.
[60] See, e.g., Fulfillment Agreement between DebtWorks and Mason, dated September 6, 2001.
[61] Id. at ¶ 4.1.
[62] Id. at ¶ 2.3.
[63] Id. at ¶ 6.4.2.

14

### (3) Private Benefits to the For-Profit Corporations

DebtWorks reported gross revenues of $2,160,100 in 1999, $15,411,072 in 2000, $38,066,044 in 2001, and $53,117,661 in 2002.[64] These figures document a 2359% increase in gross revenues over 3 years. In all, between 1999 and 2002, DebtWorks obtained nearly $109 million in gross revenues from its "non-profit" CCA affiliates. Even if those revenues were realized by DebtWorks through arms-length transactions at fair market value, the evidence suggests that the DebtWorks CCAs are not operating exclusively for exempt purposes, and therefore, may be in violation of tax regulations because they are providing excess benefits.[65] If the revenues received by DebtWorks from their affiliated CCAs were the result of excess benefit transactions, then intermediate sanctions may be warranted.[66]

Servicing the DebtWorks portfolio has continued to be lucrative for Ballenger since its transaction with DebtWorks. In 2003, Ballenger realized gross receipts of $37,390,906.[67] Ballenger is owed an additional $10.7 million from affiliated CCAs, most of which are in arrears. Like DebtWorks' revenue, all of the revenue received by Ballenger comes from consumers who enroll in DMPs through the "non-profit" CCAs.

Mr. Pukke also continues to profit from Ballenger's CCAs by offering consumers debt consolidation loans through his company Infinity Resources. Several of the current Ballenger CCAs operate a program where they refer consumers to Infinity Resources, which charges a fee to process a consumer's loan application and then profits from the interest earned on the loan itself. For example, Eriks Pukke's CCA—Debticated—promotes the Infinity Resources debt consolidation loan as a key component of Debticated's program:

> Debticated, Inc. is the *ONLY* company in the country that offers such a unique and beneficial debt consolidation program.
>
> Our "six month" program has revolutionized the debt consolidation industry by providing clients with the benefits associated with working with a non-profit credit counseling company, combined with the opportunity for a complete debt consolidation loan.
>
> If you successfully complete the [six month] program we will attempt to secure a debt consolidation loan for you. . . . This is the ultimate goal of the program.[68]

This advertisement indicates that the stated goal of Debticated is not to provide credit counseling, education, or debt management, but rather to refer consumers to a for-profit entity for a loan consolidation. Additionally, Debticated is hardly the "only" CCA that offers debt consolidation loans with Infinity Resources: A Better

---

[64] DebtWorks 1999–2002 Form 1120S, Bates DWS 005411–5510. DebtWorks was allegedly unable to provide the Subcommittee with executed tax returns. This data was therefore taken from its draft returns.
[65] Treas. Reg. § 1.501(c)(3)–1(a), *see also, Private Benefit Under IRC 501(c)(3),* p. 135.
[66] 26 U.S.C. § 4958.
[67] Ballenger Accounts Receivable, Bates 01241.
[68] Debticated promotional materials faxed to a consumer (name withheld) on February 28, 2001 (emphasis in original).

15

Way, The Credit Network, and AmeriDebt all offer the same serv-ice.[69] Mr. Pukke and Infinity Resources have become the subject of a number of legal actions for their treatment of consumers referred to Infinity Resources by AmeriDebt. In addition to several civil law-suits brought against Infinity Resources, Mr. Pukke pleaded guilty in 1996 to a Federal charge of defrauding consumers by falsely promising to broker debt-consolidation loans while pocketing exces-sive application fees.[70] Nevertheless, between 1999 and 2002, Infin-ity Resources reported gross revenues in excess of $8.3 million.[71]

A referral by a non-profit CCA to a for-profit entity for debt con-solidation loans does not serve any educational or charitable pur-pose. Such referral activities, if more than insubstantial, may con-stitute a private benefit to Infinity Resources that is prohibited under the tax code and could support revocation of the Section 501(c)(3) status of any Ballenger CCA that makes such referrals. If the revenues received by Infinity Resources between 1999 and 2002 were the result of excess benefit transactions, then inter-mediate sanctions may be warranted.[72]

### (4) Harm to Consumers

Consumer Jolanta Troy, who was harmed by AmeriDebt, testified about her experiences at the hearing on March 24, 2004. Ms. Troy was a 46-year-old mother of two children, ages 11 and 16, when she heard an AmeriDebt radio commercial. Ms. Troy had recently been divorced and began accumulating debt soon thereafter. Her job as a behavior specialist consultant working with mentally ill and behaviorally challenged children did not provide her with enough income to repay $30,000 in credit card debt and support her children. Ms. Troy contacted AmeriDebt in 2001, and was in-formed by Vicky, an AmeriDebt "counselor," about the benefits of enrolling in a DMP. Ms. Troy told Vicky that she wanted to think about whether to sign up for a DMP, but soon thereafter received 3 to 4 additional calls from AmeriDebt, pressuring her to enroll.

Ms. Troy agreed to enroll and was told that her first payment would be $783. She was told to rush the payment by Western Union "so that her bills would be paid on time." Vicky told her that she could make a voluntary contribution at a later date when she was more financially stable. Ms. Troy mailed in her $783 payment, but continued to receive calls from creditors. She then called AmeriDebt to inquire about her account and was informed that AmeriDebt had kept her first payment and had sent nothing to her creditors. Ms. Troy requested a refund and was denied, even after complaining to the Better Business Bureau. Ms. Troy then believed her only option was to declare bankruptcy, which she did later that year. Needless to say, she received no counseling or education from AmeriDebt during any of their telephone conversations.[73]

---

[69] A Better Way Form 1023, Tab D, dated January 20, 2000; The Credit Network Form 1023, Tab D, dated September 23 1999; Caroline E. Mayer, "Easing the Credit Crunch?," *The Wash-ington Post*, November 4, 2001.
[70] Caroline E. Mayer, "Easing the Credit Crunch?," *The Washington Post*, November 4, 2001.
[71] Infinity Resources 1999–2002 Form 1120S, Bates DWS 005289–5410. Infinity Resources was allegedly unable to provide the Subcommittee with executed tax returns. This data was therefore taken from its draft returns.
[72] 26 U.S.C. § 4958.
[73] Subcommittee interview with Jolanta Troy (3/15/04).

16

Ms. Troy's experience with AmeriDebt appears to be all too common. Like most consumers with severe financial problems, Ms. Troy was vulnerable to the sales pitch of a company claiming to be a "non-profit" that would solve all her debt problems. She testified, "The counselor said that AmeriDebt was a non-profit—like a charity—and I needed their help. Because AmeriDebt said it was a non-profit, I thought I could trust them." AmeriDebt counselors preyed on her fears and vulnerabilities with high-pressure sales tactics that were intrusive and often belittling.

At the Subcommittee's hearing, Senator Carl Levin questioned Matthew Case, the President of AmeriDebt, about such tactics. Senator Levin asked Mr. Case about an AmeriDebt script that tells employees how to respond to a consumer that says, "I can't afford a contribution right now but maybe I can afford to contribute later." The AmeriDebt script instructs the counselor to respond with:

> If you can afford to make a monthly payment, you can afford to make a contribution. That contribution is not going into our pocket. It is going to cover the costs of setting you up on the program. Would you rather have that payment go to us to help people like you get out of debt or would you like it to go into the creditor's pocket as extra interest? Would you rather support a non-profit company or help a bank get richer?[74]

Senator Levin asked Mr. Case "If you don't call that pressure on somebody to make a contribution how would you label that?" "I would call it pressure," Mr. Case said.

Other examples of instructing AmeriDebt counselors how to quickly make a "sale" are found in the AmeriDebt employee training manual:

- If you can assume a position of authority, you will find that people give it over to you without resistance.[75]

- Create a sense of urgency, "Your creditors want you to get started as soon as possible. The quicker you get started, the faster you will be out of debt."[76]

- Be prepared! If you can't answer questions or make the right point, it could be the difference in a sale or no sale.[77]

By focusing on the sale of DMPs, the consumer misses valuable counseling and education addressing the source of the consumer's financial problems. Senator Mark Dayton asked Mr. Case at the hearing, "Where is the counseling? What is the content of the counseling?" Mr. Case replied, "Right up front, there is a budget analysis done right away because different people are in different situations." The Subcommittee finds that a simple budget analysis solely to determine if a consumer is a candidate for a DMP fails to meet the charitable purpose required of tax-exempt organizations. In addition, the consumer's desperate state generally makes it easier for

---

[74] *Profiteering in a Non-Profit Industry: Abusive Practices in Credit Counseling,* March 24, 2004, Official Hearing Record, Exhibit No. 14, p. 260.
[75] *Profiteering in a Non-Profit Industry: Abusive Practices in Credit Counseling,* March 24, 2004, Official Hearing Record, Exhibit No. 12, p. 258.
[76] *Id.*
[77] *Id.*

17

AmeriDebt, and other companies like it, to persuade consumers to "buy" a DMP at inflated prices with few services. As in Ms. Troy's case, the non-profit status often provides a sense of trustworthiness that lowers the consumer's scrutiny of both the DMP and AmeriDebt.

The Subcommittee's investigation also determined that the fee Ms. Troy was charged bore no relation to the cost of the services that would have been provided to her by AmeriDebt. The initial DMP start-up fee charged by AmeriDebt and the other 10 CCAs serviced by DebtWorks and Ballenger is based upon the consumer's aggregate debt, rather than the actual expense of initiating a DMP. Specifically, the consumer is generally asked to make a contribution equaling 3% of their aggregate debt. For example, if a consumer owes a total of $25,000 the initial "contribution" would be $750 (3% of $25,000). In contrast, the start-up fee at the average NFCC member agency for a consumer who owes $25,000 would be $23.09.[78]

Furthermore, as in the case of Ms. Troy, consumers are often left with the impression that this initial fee amount will be sent to their creditors, when in fact it is retained by the CCA. Ms. Troy testified at the Subcommittee's hearing, "I could not afford to give AmeriDebt almost $800. I thought the money would go to my credit cards to pay down the balances."

Aside from the initial start-up "contribution," Ballenger also charged consumers a monthly DMP maintenance "contribution." Again, the contribution amount was not based upon actual costs or the value of the service to the consumer, but upon the number of credit cards included in the DMP—generally $7 per credit card with a minimum of $20 per month and a maximum of $70 per month. Average monthly fees at NFCC members, in contrast, are $10 per month.

The profit motive of AmeriDebt is also illustrated through its employee management practices. John Paul Allen, a former Ameri-Debt "counselor," testified at the hearing, "I should have seen a red flag during my interview with AmeriDebt when I was asked by my interviewers to sell them a stapler. That is really what AmeriDebt is about—sales." AmeriDebt's objectives are evident through management incentives such as bonuses for DMPs both in quantity and quality—the more DMPs signed up and the larger the first up-front payment, the larger the bonus for the counselor.[79] NFCC and AICCCA member CCAs do not allow incentives tied to DMPs, because it gives counselors a motive to place consumers on DMPs instead of just providing counseling or financial education. In fact, Mr. Allen was reprimanded repeatedly for informing his customers that they did not have to pay the "voluntary contribution." Allen testified, "My managers would say 'Think of all the money you could make if you would collect those voluntary contributions.'" When consumers were hesitant to give a contribution, Allen testified, "We were instructed to say things like 'Don't you want us to

[78] NFCC 2002 Member Activity Report, p. 30.
[79] Subcommittee interview with John Paul Allen (2/21/04).

18

be around for the next person?' or we would tell them that we were a non-profit and thus subject to audit by the IRS." [80]

Customer service was another AmeriDebt issue Allen had concerns with.[81] He testified, "I would get calls from people two and three months after I set them up on a plan, complaining that their creditors still had not received a payment." These situations, like Ms. Troy's, are examples of consumers who were unaware AmeriDebt would keep the first payment. Since their creditors did not receive payment, the consumers accrued monthly late fees, and could end up in a worse financial predicament than when they started with AmeriDebt.

## B. The Ascend One-Amerix Conglomerate

The second case study examines the Ascend One-Amerix conglomerate. Amerix Corporation ("Amerix") provides DMP processing services for five non-profit CCAs: (1) American Financial Solutions ("AFS"); (2) Genesis Financial Management, Inc. ("Genesis"); (3) Consumer Education Services, Inc. ("CESI"); (4) Clarion Credit Management ("Clarion"); and (5) Debt Management Group. The combined consumer debt under the management of these five CCAs exceed $4.1 billion.[82]

### (1) Formation of the Ascend One-Amerix Conglomerate

Amerix is one of four for-profit companies wholly owned by a holding company called Ascend One Corporation ("Ascend One"), 87% of which is owned by Bernaldo Dancel, the President and CEO of Ascend One.[83] An organizational chart of Ascend One and its affiliates is shown below:



In November 1992, Mr. Dancel founded a non-profit CCA called Genus Credit Management ("Genus"). In October 1996, Mr. Dancel split Genus into two parts, dividing the counseling function and DMP portfolio from the processing function. On October 3, 1996, Mr. Dancel incorporated Amerix as a for-profit business to provide DMP processing services for the Genus DMP portfolio. Mr. Dancel severed his management ties to Genus around that same time in order to run Amerix.

Over the next several years, Amerix facilitated the establishment of several CCAs to serve as sources of revenue for Amerix. Amerix

---

[80] *Id.*
[81] *Id.*
[82] Amerix Active Clients and Total Debt as of October 2003, Bates AMX 000001.
[83] Stockholders of Ascend One Corporation, Bates AMX 000008.

19

approached community colleges and universities with the express purpose of proposing a "start-up" CCA.[84] In all, between 1998 and 2003, Amerix made presentations to almost 30 colleges and universities.[85] Under normal circumstances, a new CCA is required to apply to the IRS for Section 501(c)(3) status. The IRS then has the opportunity to review the application of each new CCA and determine whether the applicant qualifies for non-profit status. However, by finding existing Section 501(c)(3) organizations (such as community colleges and universities) that could be used to establish CCAs, Amerix facilitated the establishment of new CCAs while bypassing the scrutiny of the IRS associated with applying for new Section 501(c)(3) status. In this manner, AFS was organized under the Section 501(c)(3) status of the North Seattle Community College Foundation.[86] Other Amerix CCAs such as Clarion and Debt Management Group were similarly organized through pre-existing Section 501(c)(3) entities that did not perform credit counseling services prior to their relationship with Amerix.[87] This practice effectively side-stepped IRS review of these new entrants into the credit counseling industry.

In addition to Amerix (which provided DMP processing services), Ascend One created additional for-profit corporations to serve its CCAs, including FreedomPoint, 3C Inc., and FreedomPoint Financial. FreedomPoint marketed various specialized products such as "prepaid" credit cards and tax settlement products to consumers carrying significant debt.[88] 3C Inc. owned the "CareOne" service mark under which Amerix's CCAs are marketed to the public. FreedomPoint Financial served as a mortgage broker and marketed mortgage-related products to highly indebted consumers. Ascend One also operated a website called "CareOne," which functioned as a referral service, matching inquiring consumers with the closest CCA in the Ascend One conglomerate.

Some of the five CCAs in the Ascend One conglomerate referred consumers to FreedomPoint and FreedomPoint Financial. As noted above, a CCA will not be regarded as tax-exempt "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose."[89] Referrals by a non-profit CCA to for-profit entities selling credit cards, mortgage brokerage services, and other products are questionable because a non-profit must serve an educational or charitable purpose. Such referral activities, if more than insubstantial, may constitute a private benefit to Ascend One that is prohibited under the tax code and could lead to revocation of the Section 501(c)(3) status of each CCA that makes such referrals.

### (2) Control of the Affiliated Credit Counseling Agencies

Although Amerix did not own any of the five CCAs it helped to establish, Amerix exerted control over them through its Service Agreements. The Service Agreements were generally entered into by Amerix and a new CCA as part of the CCA's "start-up" arrange-

---

[84] Subcommittee interview of Amerix representative (1/30/04).
[85] See list of colleges, universities, and non-profits presented with start-up opportunity, Bates AMX 001732.
[86] Letter from AFS to Subcommittee, dated 11/19/03.
[87] Telephone interview of Clarion representative (3/9/04).
[88] Subcommittee interview of Amerix representative (1/30/04).
[89] Treas. Reg. § 1.501(c)(3)–1(c), *see also, Private Benefit Under IRC 501(c)(3),* pp. 135–39.

20

ment. A key term in Amerix's Service Agreement required CCAs to enroll 30% of their callers onto a DMP: "During the Term, [the CCA] agrees to maintain an Assist Rate of not less than 30%" where "Assist Rate" is defined as "the ratio of Client Commitments to First Time Calls per Counselor per month."[90] That meant for every 10 calls received by a CCA, at least three must be placed into a DMP or the CCA was considered in breach of contract. Indeed, Amerix has taken legal action against one of its CCAs—Genesis—for its failure to maintain a 30% "assist rate."[91] Such contractual requirements essentially remove the discretion and judgment of a credit counselor as to which consumers they should enroll in DMPs.

In addition to the "assist rate" requirement, additional provisions in the Service Agreements required each DMP to generate a minimum of $30 each month per DMP, termed the "revenue standard."[92] This requirement meant that each CCA was contractually required to find money from some source for each DMP to meet the "revenue standard" in their Service Agreement. Each CCA was therefore required to generate income from its consumers or be considered in breach, regardless of the fact that all income generated from consumers was supposedly "voluntary."

The control granted to Amerix through the "assist rate" and "revenue standard" provisions indicates that Amerix's CCAs may be operating for a private, rather than public, purpose. Control of a non-profit by a for-profit is not permitted under the Internal Revenue Code due to the potential for abuse of the non-profit agency by the for-profit corporation. If a CCA "is closely controlled . . . by . . . a for-profit management company that operates with a great amount of autonomy" then the CCA must establish that the CCA is not organized or operated for the benefit of private interests, according to the IRS.[93] This analysis is called the "operational test" and is usually conducted during the Section 501(c)(3) application process. Amerix's practice of organizing CCAs through existing Section 501(c)(3) entities, however, deprived the IRS of the opportunity to determine the extent of control that Amerix would possess over associated CCAs when first established.

### (3) Private Benefits to the For-Profit Corporations

On November 1, 2001, Mr. Dancel sold Genus' DMP portfolio to AFS for $17 million. AFS told the Subcommittee that the sale price of the Genus portfolio was based upon the future revenues that would be generated by the portfolio from fees and fair share payments over a period of several years.[94] AFS, however, was already under contract to pay Amerix for processing services on all of AFS's DMP accounts. Therefore, AFS paid $17 million to Amerix for the DMP portfolio itself, and since that time has paid Amerix out of the revenues generated by the same portfolio. For example, in fiscal year 2001, AFS paid Amerix more than $70 million in processing fees for servicing their DMP portfolio and paid back over

---

[90] Service Agreement between Amerix and Genesis Financial Management, Inc., dated 9/9/02, ¶ 14. Amerix's other CCAs are also required to carry an Assist Rate of 30%.
[91] *Amerix Corporation v. Genesis Financial Management, Inc.,* No. 16 Y 181 00463 03, Before the American Arbitration Association, filed on 9/2/03.
[92] *See, e.g.,* Service Agreement between Amerix and AFS, dated 10/18/02, ¶ 15.
[93] *Private Benefit Under IRC 501(c)(3),* p. 136.
[94] Subcommittee interview of AFS representative (1/22/04).

21

$7.4 million of the outstanding loan.[95] Such "double payment" by AFS to Amerix for the same goods and services may constitute an excess benefit transaction under the Internal Revenue Code, and could subject Amerix to excise taxes on any excess benefit.[96]

Amerix and Ascend One have enjoyed great financial benefits from their contracts with the CCAs. Under the terms of Amerix's "Fee Schedule," Amerix was to receive between 50–85% of every dollar received by the CCA. If a consumer contacted an Amerix CCA directly and enrolled in a DMP, then Amerix was to receive 50% of all the non-profit's revenue—enrollment fees, monthly fees, voluntary contributions, and creditor fair share payments—generated by that DMP in exchange for Amerix's processing services.[97] If the consumer contacted and enrolled with the CCA as a result of a referral from Amerix, Amerix was then entitled to 68% of all revenue generated by the DMP.[98] Finally, if a consumer enrolled in a DMP entirely through the "CareOne" website, then Amerix was entitled to 85% of all revenue generated by the DMP.[99] Such pricing levels were based not upon the cost of the processing services provided by Amerix, but rather upon the results of lead generation and marketing activities.

The Service Agreements have, in fact, been lucrative for Amerix. Amerix reported gross revenues of $43,292,677 in 1998, $79,805,084 in 1999, $91,686,853 in 2000, $76,382,167 in 2001, and $95,286,442 in 2002.[100] These figures represent an increase of 120% in gross revenues during this time period. In all, between 1998 and 2002, Amerix received $386 million in gross revenues—all of which was generated by the "non-profit" credit counseling industry. Even if the amounts above had been realized by Amerix through arms-length transactions at fair market value, the absence of any charitable or educational purpose suggests that the Amerix CCAs were not operating exclusively for exempt purposes and therefore may be in violation of tax regulations.[101] If the revenues received by Amerix between 1998 and 2002 were the result of excess benefit transactions, then intermediate sanctions may be warranted against Amerix.[102]

### (4) Harm to Consumers

Like DebtWorks CCAs, some Amerix CCAs charged excessive DMP fees. On the other hand, at least two Amerix CCAs—AFS and Debt Management Group—had capped their fees as a result of their membership in the Association of Independent Consumer Credit Counseling Agencies. As such, the harm caused to consumers from unreasonable DMP fees was greatly mitigated at these two CCAs. Even these Amerix CCAs, however, failed consumers by neglecting to provide adequate counseling and education.

---

[95] AFS 2001 Form 990.
[96] 26 U.S.C. § 4958.
[97] See, e.g., Service Agreement between Amerix and AFS, dated 10/18/02, Schedule B, p. 20.
[98] Id.
[99] Subcommittee interview of Genesis representative (2/24/04). The questionable practice of enrolling on a DMP entirely through the Internet is discussed below.
[100] Amerix/Ascend One 1998–2002 Form 1120S, Bates AMX 001452–1730.
[101] Treas. Reg. § 1.501(c)(3)–1(a); see also, Private Benefit Under IRC 501(c)(3), p. 135.
[102] 26 U.S.C. § 4958.

22

Amerix CCAs provided few services to their clients. Through Ascend One's "CareOne" website and links at each of the Amerix CCA websites, a consumer was permitted to enroll in a DMP without a single contact with a credit counselor at any of the five CCAs in the Amerix conglomerate. Since a CCA's charitable status is largely dependent upon its providing educational services, there is no reasonable reading of IRS regulations or case law that permits a CCA to enroll a consumer into a DMP without the consumers interacting with a credit counselor.[103]

Until March 24, 2004, Amerix employed between 30 and 40 "credit counselors" at its location in Columbia, Maryland. These "counselors" provided DMP enrollment services for Amerix's affiliated CCAs when a particular CCA could not at that moment provide services to a consumer. For instance, if a consumer on the East Coast telephoned AFS (located in Seattle) during the morning hours (before AFS was open for business) the caller was routed to Amerix in Maryland. From there, an Amerix "credit counselor" enrolled the consumer in a DMP. Any CCA that knowingly allowed its services to be transferred to a for-profit company, however, may be placing itself in jeopardy of losing its license in states that allow only non-profit agencies to provide credit counseling services.

Amerix stated that the reason why it approached colleges and universities to pitch CCA "start-up" opportunities was because those organizations could educate consumers about their finances.[104] It does not appear, however, that any Amerix CCAs provide classes to consumers on credit practices or budgeting. Genesis told the Subcommittee that it would like to provide counseling and education, but it was unable to do so due to a lack of funds after making the payments required under its Service Agreement with Amerix.[105]

Consumers who actually enrolled in a DMP with AFS were allowed access to a website that had some form of interactive program regarding spending and budgeting.[106] However, AFS did not permit consumers who did not enroll in a DMP to have access to that website even though AFS's non-profit mission is to provide counseling and education to all consumers in need of such help.

AFS told the Subcommittee that, originally, it had high hopes of raising funds for grants and scholarships for students enrolled at North Seattle Community College. On March 18, 2002, shortly after AFS acquired the DMP portfolio of Genus, the CEO of AFS stated that "we're generating more revenue than the foundation ever did. We anticipate giving (North Seattle Community College) in the multimillions of dollars over the next few years" and expected that their next donation would perhaps be in the million-dollar range.[107] Although AFS obtained gross revenues of $75,165,312 during the following fiscal year, it managed to donate only 0.8% of that amount ($581,766) for the college's grants and

---

[103] *See, e.g., Consumer Credit Counseling Service of Alabama v. United States,* No. 78–0081, 1978 U.S. Dist. LEXIS 15942 (D.D.C. Aug. 18, 1978).
[104] Subcommittee interview of Amerix representative (1/30/04).
[105] Subcommittee interview of Genesis representative (2/24/04).
[106] Subcommittee interview of AFS representative (1/22/04).
[107] Jeanne Lang Jones, "A Strong Foundation: $17M Purchase Makes College's Nonprofit Arm the Largest U.S. Credit Counseling Firm," *Puget Sound Business Journal,* March 18, 2002.

scholarships.[108] Ironically, 2 years prior to the AFS-Genus transaction, when AFS had total revenues of just $4,180,059, it donated 16% of that amount ($673,306) in grants and scholarships.[109]

## C. The Cambridge-Brighton Conglomerate

The third case study examines the Cambridge-Brighton conglomerate, a complex web of interrelated non-profit and for-profit entities with overlapping directorates and ownership. The Subcommittee's investigation has determined that the operations of the Cambridge-Brighton conglomerate were completely integrated and controlled by brothers John and Richard Puccio. Brighton Debt Management Services, Ltd. ("Brighton DMS") provided DMP processing services to three CCAs: (1) Cambridge Credit Counseling Corp., a non-profit CCA based in Massachusetts; (2) Brighton Credit Management Corp., a for-profit CCA based in Florida; and (3) Cambridge/Brighton Budget Planning Corp., a CCA based in New York with a pending application for Section 501(c)(3) status. Debt Relief Clearinghouse Ltd. was the for-profit marketing arm for the conglomerate, and Cypress Advertising & Promotions, Inc. ("Cypress") provided advertising services.[110] Brighton DMS processed DMP accounts amounting to approximately $900 million of consumer debt.



## (1) Formation of the Cambridge-Brighton Conglomerate

The Cambridge-Brighton conglomerate was originally organized by John and Richard Puccio as a for-profit enterprise. Two entities—Cambridge Credit Corporation ("Cambridge Credit") and Brighton Credit Corporation ("Brighton Credit")—were incorporated on April 20, 1993 and October 28, 1993, respectively, as for-profit corporations in New York.[111] The two entities operated out of the same location.[112] Cambridge Credit performed the DMP enrollment function while Brighton Credit performed the DMP processing services.[113] In 1996, after operating for approximately 3 years, the New York Banking Department served a cease and desist order prohibiting the two entities from performing credit counseling services in New York because they were for-profit organizations.[114]

[108] AFS 2002 Form 990, pp. 1–2, Bates AFS 01849–01882.
[109] AFS 2000 Form 990, pp. 1–2.
[110] Subcommittee interview of Cambridge and Brighton DMS representatives (1/20/04).
[111] Cambridge Credit Corporation 1998 Form 1120S, Bates 00297–312; Brighton Credit Corporation 1998 Form 1120S, Bates 00230–243.
[112] Id.
[113] Subcommittee interview of Cambridge and Brighton DMS representatives (1/20/04).
[114] Id.

24

The Puccio brothers moved their principal operations to Massachusetts where they formed several new corporations, including Cambridge Credit Counseling Corp. ("Cambridge") and Brighton Credit Corporation of Massachusetts ("Brighton Mass."), later known as Brighton Debt Management Services ("Brighton DMS").[115] As was the case in New York, one entity—Cambridge—was organized to perform the DMP enrollment function while a for-profit entity—Brighton Mass.—was organized to perform the DMP processing and to lease equipment, personnel, software, and provide "other services" to Cambridge.[116] Cambridge applied for Section 501(c)(3) status, which was granted by the IRS on February 12, 1998.[117] In terms of aggregate debt, Cambridge is currently the largest CCA in the Cambridge-Brighton conglomerate.

Despite the cease and desist order from the New York Banking Department, John and Richard Puccio incorporated another New York entity—the non-profit Cambridge/Brighton Budget Planning Corporation ("Cambridge/Brighton")—on December 6, 1996.[118] Cambridge/Brighton operated in the same space previously occupied by Cambridge Credit and Brighton Credit.[119] Like Cambridge, Cambridge/Brighton was under contract with Brighton DMS for all processing services associated with its DMP portfolio. A third CCA was organized as a for-profit corporation in Florida—Brighton Credit Management Corp. ("Brighton Credit Management"). Like Cambridge and Cambridge/Brighton, Brighton Credit Management outsourced all of its DMP processing services to Brighton DMS.

In addition, the Puccio brothers created two other wholly-owned and controlled, for-profit entities that conducted business with the three Cambridge-Brighton CCAs. On July 17, 1996, Cypress Advertising & Promotions, Inc. was created by the Puccios to "procure advertising space/time" for the Cambridge-Brighton CCAs. On January 27, 2000, another for-profit company named Debt Relief Clearinghouse, Ltd. ("Debt Relief") was created by the Puccios to "produce television infomercials" and operate a call center to screen calls for the Cambridge-Brighton CCAs.[120] Both Cypress and Debt Relief operated from the same location as Cambridge/Brighton in New York. Each of the Cambridge-Brighton CCAs paid Debt Relief and Cypress for their services. In sum, although credit counseling is supposedly a "non-profit" industry, only two entities within the Cambridge-Brighton conglomerate were organized as non-profits. All of the revenue realized by the conglomerate was generated by consumers who enrolled in DMPs.

### (2) Control of the Affiliated Credit Counseling Agencies

Unlike the Amerix and Ballenger conglomerates that exercised control over their CCAs through the terms of complex service con-

---

[115] Brighton Mass. 1998 Form 1120S, Bates 00423–435 (Brighton DMS, incorporated on March 21, 2003, was originally incorporated and did business as "Brighton Credit Corporation of Massachusetts").

[116] Cambridge 1997 Form 990, p. 16, Bates 00175; Subcommittee interview of Cambridge and Brighton DMS representatives (1/20/04). Brighton DMS was incorporated on March 21, 2003 to perform DMP processing for all Cambridge-Brighton CCAs.

[117] Letter from IRS to Cambridge, dated 2/12/98, Bates 00002–4.

[118] Cambridge/Brighton Attachment to Form 1023, Bates 20698.

[119] Cambridge/Brighton 2002 Form 990, Bates 20643–65.

[120] Debt Relief 2000 Form 1120S, Bates 00333–340; Cambridge/Brighton Attachment to Form 1023, Bates 20701.

25

tracts, the principals of Brighton DMS actually owned or controlled each of their three CCAs, Cambridge, Cambridge/Brighton, and Brighton Credit Management, as well as all of the affiliated for-profit entities, Brighton DMS, Debt Relief, Cypress, Cambridge Credit, and Brighton Credit. The Cambridge-Brighton non-profit CCAs (Cambridge and Cambridge/Brighton) were controlled by John and Richard Puccio through their positions as directors, officers, and "key employees." John and Richard Puccio have served as directors of Cambridge since its inception.[121] John Puccio served as president and director of Cambridge/Brighton, and Richard Puccio served as "strategic planner." [122] Additionally, the for-profit entities in the Cambridge-Brighton conglomerate were wholly or collectively owned by John and Richard Puccio:

| CAMBRIDGE-BRIGHTON FOR-PROFIT ENTITIES | JOHN PUCCIO (% Ownership) | RICHARD PUCCIO (% Ownership) |
|---|---|---|
| Brighton Credit Management [123] | 100% | 0% |
| Brighton Mass.[124] | 50% | 50% |
| Brighton DMS | 50% | 50% |
| Debt Relief [125] | 100% | 0% |
| Cypress [126] | 100% | 0% |
| Cambridge Credit [127] | 50% | 50% |
| Brighton Credit [128] | 50% | 50% |

Through their joint ownership and control of each entity in the Cambridge-Brighton conglomerate, John and Richard Puccio directed all operations and executed all contracts. Almost every possible operation of Cambridge, for example, was contracted out to a related for-profit entity. Cambridge paid Brighton DMS to provide processing for Cambridge's DMP portfolio.[129] Cambridge paid Brighton Mass. to lease its equipment, personnel, and software.[130] Cambridge paid Debt Relief for referrals of consumers [131] and paid Cypress to place advertising.[132] The level of control over the Cambridge-Brighton entities by John and Richard Puccio is illustrated by the fact that some of the entities within the conglomerate conducted millions of dollars of business with one another without any written contract. For example, Brighton Credit Management (the CCA based in Florida) had no contract with Brighton DMS or Debt Relief, but they have conducted business with one another for al-

---

[121] Cambridge Schedule of Officers and Directors, Bates 01120–01125.
[122] Cambridge/Brighton 2002 Form 990, p. 4, Bates 20646.
[123] Brighton Credit Management 2002 Form 1120S, Schedule K–1.
[124] Subcommittee interview of Cambridge and Brighton DMS representatives (1/20/04); Brighton Mass. 1998 Form 1120S, Bates 00432.
[125] Debt Relief 2000 Form 1120S, Bates 00339.
[126] Cypress 2000 Form 1120S, Bates 00364.
[127] Cambridge Credit 1998 Form 1120S, Bates 00309.
[128] Brighton Credit 1998 Form 1120S, Bates 00240.
[129] Administrative Services Agreement between Cambridge and Brighton DMS, dated 6/1/03.
[130] Cambridge 2001 Form 990, p. 19, Bates 00085.
[131] Client Subscription Services Agreement between Cambridge and Debt Relief, dated 1/1/03.
[132] Advertising Services Agreement between Cambridge and Cypress, dated 4/1/99.

26

most 3 years. Such control of CCAs by for-profit organizations, whether under contract or not, may violate the "private benefit" prohibitions of the tax code.[133] To illustrate this point, Senator Levin asked Chris Viale, the general manager of Cambridge, at the Subcommittee's hearing, "And the people who control the non-profit also control the for-profit, is that fair to say?" Mr. Viale replied, "Yes, that is fair to say."[134]

### (3) Private Benefits to the For-Profit Corporations

The for-profit entities in the Cambridge-Brighton conglomerate have realized great private benefits from the Cambridge-Brighton CCAs they control. These benefits have been realized in two principal ways: (1) the two original New York for-profit entities (Cambridge Credit and Brighton Credit) created and executed a windfall transaction by selling their "intangible assets" to the non-profit Cambridge, and (2) the for-profit entities in the current structure (Brighton DMS, Brighton Mass., Debt Relief, Cambridge Credit, Brighton Credit, and Cypress) have obtained large amounts of money from the non-profits, Cambridge and Cambridge/Brighton, through various service contracts.

When Cambridge was organized in Massachusetts, John and Richard Puccio executed a transaction between Cambridge and their two original New York corporations (Cambridge Credit and Brighton Credit) in which the New York corporations "sold" their "intangible assets" to Cambridge for $14.1 million. These "intangible assets" included "trademarks and goodwill in the marks utilizing 'Cambridge' and 'Brighton' . . . copyrights, general business goodwill, business plans, creditor contacts and relationships, referral source contacts and relationships, business 'know-how,' trade secrets and proprietary information."[135] Since Cambridge had no money (being a newly-formed, non-profit organization), the two New York entities "loaned" Cambridge the necessary $14.1 million. John and Richard Puccio therefore created an artificial, "paper" debt that Cambridge would be obligated to pay back to them for purchasing the "intangible assets" of Cambridge Credit and Brighton Credit. In effect, John and Richard Puccio sold their "business goodwill" and "know-how" to John and Richard Puccio.

As a result of this artificial sale, the Puccios required a non-profit agency (Cambridge) to pay two for-profit corporations (Cambridge Credit and Brighton Credit) $14.1 million plus interest instead of spending that money on improving education, expanding community outreach programs, or any other activity for which Cambridge had been granted tax-exempt status. Cambridge Credit and Brighton Credit have received repayments on the $14.1 million "loan" over the past several years from revenue realized by Cambridge from DMP fees paid by consumers. Although Cambridge has 50 years under the terms of the "loan" to repay the two New York entities, over $11.5 million has been paid back over the past 5 years alone. This $14.1 million transfer may constitute an "excess

---

[133] *Private Benefit Under IRC 501(c)(3)*, pp. 135–39.

[134] John Puccio was invited to testify at the Subcommittee's hearing, however the night before the hearing, Mr. Puccio informed the Subcommittee of health problems that would prevent him from appearing. Mr. Viale, general manager for Cambridge, testified in his place.

[135] Intangible Assets Sale Agreement between Cambridge, Cambridge Credit, and Brighton Credit, dated 11/27/96, Bates 00038–46.

benefit transaction" prohibited by the tax code.[136] Indeed, the IRS may determine that Cambridge was arguably created in part for the purpose of generating $14.1 million for two related for-profit corporations, and may not have been organized exclusively for non-profit purposes.[137]

Beyond the revenue generated by the 1996 "intangible assets" sale, the Subcommittee's investigation determined that Cambridge has generated substantial additional revenues for the other for-profit entities in the Cambridge-Brighton conglomerate. In the Ascend One-Amerix and DebtWorks and Ballenger conglomerates discussed previously, all revenues generated by the CCAs streamed to a single entity. Specifically, in the Ascend One-Amerix conglomerate, all of the revenue from the CCAs streamed to for-profit Amerix, while in DebtWorks and Ballenger conglomerate all revenues streamed to for-profit DebtWorks or Ballenger. In contrast, the revenue streams were more diversified in the Cambridge-Brighton model. The three CCAs (Cambridge, Cambridge/Brighton, and Brighton Credit Management) have distributed their revenues to three or four for-profit entities, all owned and controlled by the Puccio brothers. The bulk of the funds generated by the three CCAs were allocated to Brighton DMS (formerly Brighton Mass.), Debt Relief, and Cypress.

The primary function of for-profit Brighton DMS/Brighton Mass. was to provide DMP processing services, as well as to lease equipment, personnel, software and other goods and services to the Cambridge-Brighton CCAs. While it is not unusual in the credit counseling industry for a CCA to lease equipment, pay for potential leads, or pay for advertising, such payments are usually made as a result of arms-length transactions between unrelated parties at market rates. In the Cambridge-Brighton model, however, the revenues were transferred among related entities.

Since 1998, Brighton DMS/Brighton Mass. has realized gross receipts in excess of $40.5 million.[138] Since 2000, for-profit Debt Relief has produced television "infomercials" and operated a call center to screen calls for the Cambridge-Brighton CCAs. Debt Relief was paid $750 for each consumer it transferred to a CCA and who enrolled in a DMP.[139] Through 2002, Debt Relief referrals have resulted in gross receipts of over $25 million.[140] Cypress has served as an advertising agency for the Cambridge-Brighton conglomerate since 1999, and has realized gross receipts in excess of $6.5 million.[141]

While purportedly operating non-profit, educational entities, the individuals that own and operate the Cambridge-Brighton conglomerate have grown extremely wealthy from their activities. The IRS Form 990s submitted by Cambridge state that Richard and John Puccio each received a salary in 2001 of $624,000 for managing its operations. In addition they received compensation from related organizations of more than $600,000 in that same year. The Sub-

---

[136] 26 U.S.C. § 4958(c)(1)(A), (f)(1)(A).
[137] Treas. Reg. § 1.501(c)(3)–1(a).
[138] Brighton Mass. 1998–2002 Form 1120S, Bates 00423, 00412, 00400, 00388, and 00375.
[139] *See, e.g.,* Client Subscription Services Agreement between Cambridge and Debt Relief, dated 1/1/02, at ¶ 4(b).
[140] Debt Relief 2000–2002 Form 1120S, Bates 00333, 00324, and 00313.
[141] Cypress 1999–2002 Form 1120S, Bates 00369, 00359, 00350, and 00341.

28

committee elicited some of this information related to Puccio's salary through testimony at the March hearing from Chris Viale, the general manager. By way of contrast, Senator Mark Pryor asked the representative of a NFCC agency, "What is your salary at your non-profit?" The witness replied, "My annual salary is sixty thousand dollars." As noted above, organizations do not qualify for non-profit status under Federal regulations if they are organized or operated for the benefit of individuals associated with the corporation.

The Subcommittee has been told that the IRS has initiated an audit of Cambridge.[142] As part of that audit, the IRS should determine whether the revenues received by Cambridge Credit and Brighton Credit from the sale of their "intangible assets" amounted to an excess benefit transaction and to what extent, if any, excise taxes should be assessed.[143] Additionally, the IRS should determine whether Cambridge was organized or now operates for private benefit and, if so, whether its Section 501(c)(3) status should be revoked.[144] Finally, the IRS should examine the organization and operation of Cambridge/Brighton, whose Section 501(c)(3) application is currently pending. Since Cambridge/Brighton was designed to operate in a similar manner to Cambridge, the IRS should fully scrutinize its application in order to determine whether it is organized and operated for the public benefit and to ensure that its assets do not inure to the benefit of any private individual.[145]

### (4) **Harm to Consumers**

The Subcommittee interviewed a former client of Cambridge, Raymond Schuck, to evaluate the CCA's services. Mr. Schuck told the Subcommittee that, in the summer of 2001, he had $90,000 in debt distributed among nine credit cards.[146] After hearing about Cambridge on the radio, he called them and spoke with a counselor. Mr. Schuck said that the counselor suggested a debt management plan, and promised him a reduction in interest rates. After answering a list of questions about his various credit cards. Mr. Schuck said that the counselor told him that his monthly payment would be $1,946 and that Cambridge would charge him 10% of his monthly payment for their services, or $194 a month. Mr. Schuck testified at the hearing, "I thought that $194 was high, but I knew very little about the industry and what were appropriate fees. I made the apparently naïve assumption that because it was a non-profit agency, I could trust them."

Mr. Schuck said the counselor told him to hurry and send the first monthly payment to Cambridge to get the program started. He immediately sent in a cashier's check. Although he had already sent in the check to Cambridge, Mr. Schuck said that he started getting calls from some of his creditors asking why he had not made any payments. As in Ms. Troy's situation with AmeriDebt, the creditors told him that they were unaware that he was on a

---

[142] Subcommittee interview of Cambridge and Brighton DMS representatives (1/20/04).
[143] 26 U.S.C. § 4958.
[144] Treas. Reg. § 1.501(c)(3)–1(a) ("[A]n organization must be both organized and operated exclusively for [tax exempt] purposes" or "it is not exempt."
[145] Treas. Reg. § 1.501(c)(3)–1(c)(2).
[146] Subcommittee interview with Raymond Schuck (2/24/04).

29

DMP with Cambridge and told him that no payments had been received.

Mr. Schuck said that he called Cambridge to find out what was going on. He said he found it very difficult to contact someone in customer service who could tell him about his account. Mr. Schuck said at the hearing, "Getting in touch with someone who knew about my debt management plan and the status of my payments was an exercise in frustration." When Mr. Schuck did speak with Cambridge, he was informed that the first payment he had sent was a fee for initiating his DMP. He testified, "I was absolutely shocked by this information. Had I known this policy in advance, I would have searched for a different credit counseling agency." Mr. Schuck continued, "I would not have agreed to give Cambridge $2,000 when that money could have gone to my creditors."

Ultimately, Mr. Schuck declared bankruptcy. Mr. Schuck said that he felt that if Cambridge had done a reasonable analysis of his financial circumstances, the proper recommendation would have been to seek legal assistance and declare bankruptcy. In addition, because Cambridge kept his first payment without his knowledge, Mr. Schuck missed payments to nine creditors. As a result, Mr. Schuck's credit rating now bears the consequences of missed and late payments as well as the bankruptcy. Unfortunately, Mr. Schuck's experience was very consistent with current and former clients interviewed by the Subcommittee.

The fee structure of the Cambridge-Brighton CCAs was the highest of any CCA that the Subcommittee investigated.[147] The fees were clearly excessive and bore no relation to the actual expense of initiating and maintaining a DMP. At the hearing, Senator Levin questioned Chris Viale, the general manager of Cambridge, "Shouldn't it [the fee] relate to the services rendered?" Mr. Viale, said "No." Senator Levin went on to ask, "But you keep that first monthly fee regardless of what subsequently comes in terms of benefits to that consumer, is that correct?" Mr. Viale said, "That is correct."

The Subcommittee determined that the initial start-up fee charged to a consumer by the Cambridge-Brighton conglomerate—the "Payment Design Fee"—was typically an amount equal to the consumer's monthly payment. The vast majority of these monthly payments were several hundred dollars, and many were in excess of $1000 or even close to $2000. The result was that the Cambridge-Brighton CCAs routinely charged a consumer $500 or $1000 for merely setting up a DMP. Like AmeriDebt and Ballenger CCAs, the Cambridge-Brighton CCAs retained this fee instead of sending it to creditors. Also like AmeriDebt, the Cambridge-Brighton CCAs too often failed to adequately disclose that fact to clients. Like many other consumers who dealt with Cambridge, Mr. Schuck was not informed that his "Payment Design Fee" of $1,946 would not go to his creditors, but would in fact be kept by Cambridge. The monthly DMP "Program Service Fee" charged by Cambridge-Brighton CCAs was also high. The amount had no relation to Cam-

---

[147] Unfortunately, Cambridge's fee schedule is not unique in the industry. The Subcommittee's investigation identified several other CCAs who charged an initial fee equal to one month's payment, including Express Consolidation, Inc. of Delray Beach, Florida, and CreditCare Credit Counseling, Inc. of Boca Raton, Florida.

bridge's actual expenses but was instead set at 10% of the monthly DMP payment. Therefore, a consumer who was already paying an $800 monthly payment would also be required to pay an $80 maintenance fee each and every month. By contrast, the average NFCC agency's monthly DMP maintenance fee in 2002 was $14.[148]

A related problem uncovered by the Subcommittee is that the initial 10% fee does not reflect payment for actual services rendered. Cambridge gets the "Payment Design Fee" (10% of total debt) upfront (as well as their monthly service fee). However, Chris Viale testified at the Subcommittee's hearing that, although its plans are designed to last 60 months, "The average length of time for a consumer on the plan is 23 months. We have a little over a thirty percent completion rate [for their program]." This data is clear evidence of Cambridge's understanding that although they were charging a financially-strapped consumer in advance for 60 months of service, the likelihood that the consumer would actually require Cambridge's services for the full term of their plan was less than one-third. The fact that two-thirds of their client base failed to finish the plan, cutting short any services obligated by Cambridge, was not evident in their fee structure.

Still another problem identified by the Subcommittee involves the bonuses paid to CCA employees. The "credit counselors" in the Cambridge-Brighton CCAs were given bonuses for enrolling consumers on DMPs and could accumulate bonus money equal to as much as 25% of their clients' aggregate start-up fees for the month.[149] Additionally, counselors could earn 2-week trips to Florida and other prizes by placing consumers on DMPs.[150] At the same time, like the counselors at other new CCAs, Cambridge-Brighton "credit counselors" appeared to provide minimal credit counseling. Mr. Schuck told the Subcommittee that he was on the phone with his "counselor" for a mere 20 minutes before he was convinced to mail a cashier's check for $1,946 to set up his DMP. When asked by Chairman Coleman at the Subcommittee's hearing about how many people received face-to-face counseling, Mr. Viale responded, "Approximately 10 to 20 a day." Unfortunately, most Cambridge clients do not receive face-to-face counseling. They receive, as Mr. Schuck did, a sales pitch over the telephone.

John Pohlman, a former Cambridge credit counselor, testified at the Subcommittee's hearing about his experiences at Cambridge. Mr. Pohlman offered a unique perspective having worked for a NFCC agency for 11 years before going to work for Cambridge.[151] Mr. Pohlman described a "boiler-room" mentality at Cambridge. He testified that on his first day he was forced to pick a fake name to use when dealing with consumers. He also testified, "There was an electronic board at the front of the room that reminded me of the leader's board in a golf tournament. It had the names of the counselors who had the top sales for the month flashing in red and yellow lights." Incentives like this, the bonuses, and the free trips and other gifts exhibit an obvious emphasis on the DMP. Con-

---

[148] NFCC 2002 Member Activity Report, p. 30.
[149] Subcommittee interview of former Cambridge employee (2/2/04).
[150] Id.
[151] Id. John Pohlman worked at the Consumer Credit Counseling Services of Southern New England prior to working at Cambridge.

31

sumers unfit for a DMP could fall prey to counselors with self-serving motives who fail the consumer in need of education or counseling, or perhaps, as in Mr. Schuck's case, an attorney to file bankruptcy.

Mr. Pohlman also testified about his dissatisfaction with the level of scrutiny Cambridge gave consumers' financial circumstances. Through his experience working at NFCC agencies, Mr. Pohlman believed a worthwhile counseling session should last an hour to an hour and a half in order to get all necessary information. Mr. Pohlman said that at Cambridge, this process was expected to last 10 to 15 minutes. He testified, "This was all the time we needed, however, because the only information we got from the consumer was account information. There was no true budget analysis done for the consumer, just an analysis to determine whether their creditors would allow the consumer to enroll in a debt management plan." He went on to say, "I was uneasy with the fact that I did not know anything about a person's mortgage payment, health care costs, car insurance, etc. . . . I knew nothing about them except they were in debt."

Mr. Pohlman admitted that with the limited amount of time he spent with the consumer, he had little confidence that they understood that the first payment went to Cambridge and not to their creditors. Mr. Pohlman testified, "The goal was to authoritatively take them (the consumer) through the process of getting signed up on a plan as quickly as possible so they did not have time to consult a spouse or family member." Mr. Pohlman said, "I was even instructed by one member of management to quote 'Treat them like alcoholics.' In other words, they know they need help—make them get it. I truly believe that Cambridge preyed on consumers' desperation."

Mr. Schuck's and Mr. Pohlman's testimony offers a great deal of insight into Cambridge's profit-driven approach to credit counseling. Their experiences suggest that when profit motives are injected into a traditionally non-profit industry, harm to consumers may follow. When Senator Pryor asked Mr. Viale, "Why did you choose to operate under a non-profit label?" Mr. Viale responded, "Well, I don't have a specific answer for that, but I know the industry forces us to be a non-profit."

## V. REGULATION AND ENFORCEMENT

The credit counseling industry is currently governed by a patchwork of professional, state and Federal standards, some of which are mandatory and others of which are voluntary. They include standards issued by credit counseling professional associations, guidelines issued by creditors, state statutes, and Federal tax and fair trade laws.

### A. Industry Self-Regulation

The credit counseling industry has two major membership associations, the NFCC and the Association of Independent Consumer Credit Counseling Agencies ("AICCCA"), each of which has issued

32

mandatory membership standards for their members.[152] The NFCC standards, adopted through the Council on Accreditation for Children and Family Services ("COA"), are the more restrictive of the two. COA is an independent third-party not-for-profit accrediting body that has reviewed or accredited more than 1,400 international social service programs.[153]

If applied throughout the industry, these professional standards could significantly address the abusive practices identified in this Report. For example, agencies seeking COA accreditation are reviewed in eight specific areas:

- **Mission and Purpose**—determines whether consumer needs and preferences guide the organization in its design and delivery of services.

- **Quality Assurance**—evaluates the effectiveness and efficiency of services provided and corrects any observed deficiencies.

- **Governance and Administration**—determines whether the organization is governed and administered according to legal requirements and sound principles of effective management and ethical practice, evaluated by neutral oversight through a diversified board.

- **Human Resources**—evaluates the organization's ability to deploy personnel and foster efficient, effective service delivery for clients.

- **Service Environment**—ensures safe, accessible, and appropriate delivery for the needs of clients, employers, and other stakeholders.

- **Financial Management**—ensures that an organization manages its fiscal affairs according to sound financial practices and applicable statutory and professional requirements.

- **Professional Practices**—determines whether services are conducted with due regard to ethical and professional requirements and protects confidential information regarding clients.

- **Service Delivery**—ensures that an organization focuses its services on identifying the needs and problems of clients.[154]

In addition, to obtain and maintain accreditation, all NFCC member agencies must adhere to a rigid set of COA standards specific to the credit counseling industry. The standards include the following:

- Agencies must have annual audits of operating and trust accounts.

- Agencies must be licensed, bonded, and insured.

- Agencies must support and provide a variety of consumer education programs.

---

[152] Another organization, the American Association of Debt Management Organizations ("AADMO"), is a trade association that does not maintain membership standards.
[153] NFCC information production to the Subcommittee, 9/10/04.
[154] *Id.*

33

- Agencies must comply with consumer disclosure requirements.

- DMPs must include a detailed review of current and prospective income, as well as present and anticipated financial obligations.

- Funds are disbursed to creditors on behalf of the clients at least twice per month.

- Clients have a variety of deposit options including electronic methods, and are offered immediate correction of improper postings.

- Each client receives counseling, including an assessment of how he/she got into trouble, and a written comprehensive financial action plan.

- Clients receive a statement, at a minimum, every quarter.[155]

All agencies must be re-accredited by COA every 4 years. Additionally, all NFCC agencies are required to abide by strict Member Quality Standards.[156]

On August 18, 2004, the NFCC announced that it had tightened its member standards to prohibit questionable practices.[157] The NFCC enhanced seven existing member quality standards and added four new member quality standards.[158] With the additions and modifications, the NFCC specifically prohibited the payment of bonuses to credit counselors, announced that public relations and marketing activities do not qualify as educational activities, and prohibited charging fees in advance of services.[159] Additionally, the NFCC required all members to complete their submission for COA certification within 9 months of their application to COA (which is half the time previously required) and to establish a formal system of addressing consumer complaints. It also specifically prohibited the practice of "pre-screening" consumers for DMPs.[160]

AICCCA maintains similar standards as part of the code of practice to which its members must adhere. For instance, AICCCA sets a maximum initial fee of $75 for setting up a DMP and a maximum $50 fee for monthly maintenance.

Several CCAs have pointed to their compliance with an industry standard named ISO 9000 as ensuring that they adhere to high standards. ISO 9000 is a generic set of quality assurance standards that are followed by many large businesses, but it is not specific to the credit counseling industry.[161] Pursuit of ISO 9000 standards may be helpful as a first step toward improving performance, because it requires careful documentation of business procedures. But ISO 9000 does not address business products or services. For instance, nothing in the ISO 9000 standard provides guidance to an

---

[155] *Id.*
[156] *Id.*
[157] NFCC information production to the Subcommittee.
[158] NFCC 2004 Member Quality Standards.
[159] *Id.*
[160] *Id.*
[161] *The ISO 9000 Quality Systems Handbook, Fourth Edition,* David Hoyle, Butter-Heinemann, 2001.

34

entity on how much it can charge, what services it should offer, or what should be done with excess funds.

Self-regulation also has limitations. First, although NFCC and AICCCA standards are mandatory for members, joining the association itself is voluntary. CCAs that wish to operate pursuant to lower business standards or no standards can simply refuse to join. Unrestrained by strict standards of practice, these CCAs may even obtain a competitive advantage over those who adhere to more ethical conduct. Second, it is unclear whether the associations have the resources and mechanisms needed to monitor and consistently enforce compliance with their standards. Weak enforcement reduces the efficacy of even strong standards.

### B. Creditor Standards

A second source of credit counseling standards lies not with the CCAs themselves, but with the large creditors, such as banks and credit card operating companies, which interact with CCAs on a regular basis. Large creditors often support CCAs by providing them with a percentage of the payments made by the debtors that the CCAs counsel. Often referred to as "fair share," these payments are intended to reimburse some operating costs in exchange for the CCAs' positive work in helping debtors repay their debts. Many of the largest creditors have developed standards to determine which CCAs are eligible to receive fair share payments. If well developed and carefully enforced, the Subcommittee believes these standards could play a major role in reducing abuses and encouraging best practices within the credit counseling industry.

### (1) History of the Creditor-Credit Counseling Agency Relationship

In the late 1950s, credit card issuers played a key role in developing what we refer to today as the credit counseling industry. Originally, they helped establish local offices, known as Consumer Credit Counseling Services ("CCCSs"), which offered face-to-face counseling related to an individual's finances. These counseling sessions were viewed as comparable to other social services available at the time such as substance abuse or family counseling. These CCCSs took a comprehensive approach to treating a consumer's financial instability. Through tools such as debt management plans, referrals to other social agencies (to address other problems associated with the symptoms of the financial stress), and adequate financial education and counseling, these CCCSs nursed debt-ridden consumers back to financial health.

The NFCC is the parent organization of the CCCSs and historically has worked with creditors to operate and fund these non-profit credit counseling agencies through fair share payments.[162] The purpose of these fair share payments was to provide funding for the non-profit agencies to establish educational programs, implement debt management programs, and assist with operating ex-

---

[162] The creditors interviewed by the Subcommittee typically viewed fair share payments as a form of voluntary contribution to a non-profit agency, rather than as payment for a contracted service. However, many creditors apparently treat these payments as ordinary business expenses rather than take charitable deductions for them on their tax returns.

penses.[163] This funding afforded CCAs the financial freedom to offer their services to customers without charge or to make payment of a modest fee voluntary. The consumers' voluntary contributions were relatively small amounts and were waived when necessary for hardship cases.

Fair share payments are typically paid by creditors on a monthly basis on the aggregate debtor payments managed by a CCA. Until the mid-to-late 1990s, this payment was typically 12–15% of the aggregated debtor payments. In recent years, the expense associated with fair share payments has increased, at times taking up 25–30% of the budgets of the collections departments at major creditors.[164] This increase has caused some creditors to reduce their fair share payments to a lower percentage. In addition, to improve the debt management plans they receive, some creditors have moved to performance-based fair share models. These models link the percentage of fair share payments each credit counseling agency receives to the success rates of the DMPs that the creditor receives from each CCA.[165]

In addition to their historic funding relationship with non-profit CCAs, major creditors have traditionally acted in an advisory role for the NFCC through membership on the NFCC's board of directors. The close ties between creditors and NFCC members, however, led to the filing of two legal actions. In 1994, a number of independent CCAs filed an antitrust suit against the NFCC, its member agencies, and the Discover Card. The plaintiffs alleged that the NFCC members and the creditors were operating to prevent new agencies from offering certain credit counseling services. The parties eventually entered into a settlement agreement which, in part, removed the creditors from the NFCC's national board of directors.[166] In 1996, the NFCC entered into an agreement with the FTC to require its members to disclose the fact that they receive fair share payments from creditors. It is noteworthy that non-NFCC members are not required to disclose this information, even though they receive the same payments.

In the mid-1990s, the rapid increase in consumer debt dramatically increased the number of potential clients. Some new CCAs began using more technologically advanced practices to implement their DMPs through innovative software. Some also launched heavily funded advertising and marketing campaigns using late night television infomercials and the Internet. Through these practices, these new entrants to the credit counseling market were able to reach hundreds of thousands of potential clients. The ability to reach and serve a national market has gradually shifted the industry from a local, community-based, client-specific operation to include nationwide, mass-marketed sales operations.

As consumer debt reached new heights during the late 1990s and early 2000s, the DMP became the method of choice recommended

---

[163] Historically, 60% of NFCC funding came from creditors and 40% came from charities. Subcommittee interview of NFCC representatives (1/12/04).

[164] Subcommittee interview with Citigroup representatives (3/9/04); Bank One operating expenses spreadsheet, Bates BO 253–254.

[165] Common ways to measure success rates are: (1) retention rate (the length of time a consumer stays on the DMP), (2) declination rate (the number of proposed DMPs declined by the creditor), and (3) a combination of those two measures as well as other factors.

[166] Individual NFCC members may still have representatives from the local banking community on their board of trustees.

36

to consumers by many of the new CCAs to resolve unsecured debt problems. These CCAs used DMPs to generate two streams of revenue, one from creditors providing them with fair share payments, and the second from consumers charged DMP start-up and monthly maintenance fees.

Even without some CCAs' aggressive advocacy of DMPs, the rapid increase in consumer debt over the last decade would likely have produced a sharp increase in the use of DMPs.[167] At the same time, as fair share payments also increased, it should not surprise anyone that creditors began to examine the nature of this growing expense. Some creditors apparently concluded that the wrong consumers were being placed on DMPs. For example, consumers who could afford to pay their debts but were looking for a break in interest rates were unnecessarily and incorrectly placed on DMPs. As a result, the creditors heightened the level of scrutiny of proposed DMPs. Some creditors also began issuing more detailed CCA and DMP standards, in effect becoming a regulator of credit counseling practices.

### (2)  Three Creditor Models

The Subcommittee interviewed three major creditors to gain an understanding of the industry as well as of actions taken by the creditors towards CCAs. These creditors were Bank One Delaware, N.A. ("Bank One"), MBNA America, N.A. ("MBNA"), and Citigroup, Inc. ("Citigroup"). The Subcommittee found that all three have promulgated standards for CCAs seeking fair share payments, and that all three have recently revised and tightened their standards to eliminate abusive practices.

### (a)  Bank One

Bank One utilizes a combination of a minimum standards model[168] and a performance-based model when deciding whether to make fair share payments to a particular CCA. Bank One told the Subcommittee that before it will even consider making fair share payments, a CCA must be equipped to make debtor payments and submit debtor proposals electronically, and it must not be involved in any pending litigation. The agency's business eligibility is then assessed, and Bank One said the CCA must meet the following minimum standards:

- The CCA must be accredited;[169]

- The counselors employed by the CCA must be certified;

- Any fees charged to consumers must meet Bank One guidelines; and

- The CCA's marketing budget and content must be approved by the CCA's board.

---

[167] The Subcommittee's concern is not with DMPs per se, but whether distressed consumers are inappropriately placed onto DMPs instead of receiving counseling or education to address the financial problem.

[168] A minimum standards model requires that certain minimum criteria be met before any fair share payments will be made to a credit counseling agency.

[169] Industry-accepted accreditation organizations include COA, BSI, BVQI, and ISO 9000 with an accepted "Code of Practice." NFCC and AICCCA have each developed a code of best practices for their members that set accreditation standards.

37

Once these criteria were met, Bank One told the Subcommittee that it would make a maximum of 9% fair share payments to the CCA. It said that a CCA which meets the business eligibility requirements received a minimum of 2%, and the CCA may receive up to an additional 7% depending upon the performance of its portfolio of DMPs.[170] Bank One explained that its performance criteria measure the average fixed payment and the default rate of the agency, both equally weighted to provide a maximum of 3.5% in additional fair share payments for each criteria. In addition, Bank One said that it measures a CCA's performance in meeting a "New Inventory Criteria" which measures whether the agency is continuing to sign up new Bank One card members or just administering existing Bank One accounts.

### (b) MBNA

MBNA told the Subcommittee it also utilizes a minimum standards model coupled with a performance-based model.[171] MBNA said that it had set minimum requirements that must be met before a CCA qualifies for any fair share payments:

- The CCA must be accredited;

- The CCA must have non-profit status under Section 501(c)(3);

- The CCA may not be affiliated with any entity that is not a Section 501(c)(3) agency;[172]

- All DMP proposals and debtor payments must be transmitted electronically;

- A complete budget disclosure must be attached to all DMP proposals;

- No DMP start-up fee may exceed $75, no monthly fee may exceed $50, and there can be no fee assessed for early termination of the DMP;

- At least 90% of the CCA's consumers must have completed a full budget disclosure; and

- At least 85% of the DMP proposals submitted by the CCA must meet MBNA's criteria for establishing a DMP.

Upon meeting these criteria, MBNA said that it assesses a CCAs' DMP portfolio to measure its payment volume and portfolio vintage. MBNA explained that the older the DMP account, the larger the percentage of fair share available, starting with 2% for brand new accounts and rising to a maximum of 15% for accounts that last 36 months or more.

---

[170] Subcommittee interview of Bank One representatives (2/10/04). The new model was implemented in July 2003.
[171] Subcommittee interview of MBNA representatives (2/17/04). MBNA's new model was implemented in February 2004.
[172] MBNA allows outsourcing only for payment processing.

38

### (c) Citigroup

Citigroup told the Subcommittee that it had recently introduced a fair share model new to the credit counseling industry.[173] In fact, Citigroup indicated that it had abandoned the fair share model altogether in favor of a new "Grant Program." Under this program, Citigroup said that it will pay CCAs according to Citigroup's "perception of the agency's needs and the benefits they provide to the customer and the community."[174] Citigroup explained that these payments will be made in quarterly advances of a lump sum contribution,[175] and the amount of payment will reflect Citigroup's judgment of the value that the CCA is delivering to consumers, based on a 29 question "application." The questions in the Citigroup application address many of the same issues utilized by other industry leaders to assess CCAs, including whether the CCA has non-profit status, appropriate business practices and structure, and low start-up and monthly fees. CCAs must also submit to and pass an audit by Citigroup.

Citigroup said that its new grant program took effect in 2004. Citigroup said that, since it began, approximately one-third of the agencies who previously received fair share from Citigroup did not qualify for grant funding under the eligibility criteria.[176] However, those agencies that did qualify for grant funding received a higher payment than they historically received under the former fair share model, according to Citigroup.[177]

### (3) Using Fair Share Payment Standards to End Abuses

The collective impact on the credit counseling industry of the minimum and performance-based standards issued by major creditors such as Bank One, MBNA, and Citigroup could be substantial. Since many CCAs depend upon fair share revenue as a major source of income, they are obligated to comply with creditor standards. Creditors may therefore play a major role in eliminating some of the abusive practices examined in this Report. Standards setting limits on fees, for example, directly attack the problem of CCAs' charging excessive fees unrelated to costs. Standards restricting or prohibiting CCAs from affiliating themselves with for-profit entities addresses the core of the profiteering problem. Some of the performance-based requirements also encourage CCAs to initiate only DMPs that set realistic goals for consumers.

As with the professional standards set by credit counseling associations, the effectiveness of the creditor standards will depend in large part upon the extent to which the creditors monitor compliance and discontinue fair share payments to CCAs that do not comply with their standards. Creditors informed the Subcommittee that they felt limited in their ability to police the industry, and some expressed reluctance to condition the concessions they provide to a debtor upon the debtor's choice of a particular CCA. Some creditors also worry about appearing to favor some agencies over

---

[173] Subcommittee interview with representatives of Citigroup (2/20/04). Citigroup's new model was implemented on January 1, 2004.
[174] Citigroup model letter to CCA, dated November 4, 2003, Bates CC 00073–74.
[175] *Id.*
[176] Information provided by Citigroup 8/24/04.
[177] *Id.*

39

others, although choosing to do business with some entities and not others is a routine business decision encountered every day in the marketplace.

CCAs are less sanguine about the creditor standards. A common CCA complaint is the absence of uniformity among creditor standards that can translate into higher costs and administrative burdens for agencies.[178] Creditors respond that, while uniformity in criteria for fair share payments may be desirable, current antitrust laws prohibit creditors from collectively agreeing on common standards. Another common CCA complaint is that creditors retain the right to change their criteria without notice and may apply changes retroactively. CCAs also contend that sudden changes to creditor criteria leave them with little time to respond. This complaint applies not only to the amount of fair share payments the creditor will pay, but also to the terms a creditor will offer debtors under a DMP.

CCAs also assert that the ambiguous tone of some fair share policies and an inability to obtain creditor clarification complicates the job of administering DMPs. For example, Citigroup announced its new "grant" program on November 4, 2003.[179] Some CCAs complained that the criteria for determining fair share payments under this program are subjective, leaving agencies unsure of how to operate in order to maximize their Citigroup fair share payments. Citigroup also required CCAs to respond by November 24, 2003, only 20 days after receiving notice of the change in policy,[180] which some CCAs complained left them with little understanding of what to expect from Citigroup and an inability to plan their operating budgets.[181]

These developments suggest that bad actors have had a disproportionate impact on the credit counseling industry. As the Report has detailed, some new entrants have heavily marketed DMPs and failed to properly scrutinize the consumers placed on DMPs. In turn, creditors were forced to react to the increased volume of DMPs for which they were paying fair share. After finding inappropriate consumers placed on DMPs, many creditors reduced their fair share. Although an appropriate reaction to the activities of some new entrants, it is an unfortunate result for the CCAs that have traditionally provided quality services with careful selection of candidates for DMPs. Subcommittee Chairman Coleman questioned James Kroening, the director of an NFCC agency, Family Means, about this phenomenon at the Subcommittee's hearing. Mr. Kroening testified, "It is my belief that we have seen a major decrease in creditor support for our type of counseling and debt management work that we do related specifically to the number of new entrants and the number of folks that they are putting on plans. Specifically, I believe it is related to the fact that many people are being put into debt management plans that simply do not need it and creditors have seen their line item expense go [through] the

---

[178] Subcommittee interviews with NFCC and AICCCA representatives (10/16/03, 10/9/03).

[179] Citigroup model letter to CCA, dated 11/4/03, Bates CC 00073–74.

[180] *Id.*

[181] A CCA may request a quarterly payment in advance; however, the weight Citigroup affords any such request is unknown, since Citigroup pays CCAs according to a perception of their needs and the benefits provided to customers and the community. Subcommittee interview of Citigroup representatives (2/20/04).

40

roof." This is another negative side effect of the new entrants profit-driven practices.

Ultimately, CCAs concede that creditors have no obligation to make any fair share payments to them. Many smaller creditors, in fact, do not typically provide fair share payments to CCAs. Thus, they recognize that creditors have the right to condition these payments as they see fit. Since having debtors pay their debts is in the best interests of the creditors, and many CCAs provide worthwhile counseling and debt management services that assist debtors in meeting their financial responsibilities, major creditors indicate they are likely to continue making fair share payments. Thus, creditor standards related to fair share payments continue to provide a valuable mechanism for curbing abusive practices in the credit counseling industry.

### C. State Regulation and Enforcement

Although many states have statutes concerning the credit counseling industry, effective regulation at the state level is hampered due to the wide variety of differing state requirements and inadequate resources for monitoring compliance. In addition, many states still lack legislation directly applicable to the credit counseling industry. In these states, general laws against false advertising and fraud provide the only protection for consumers. In other states with laws that at least partially relate to credit counseling, the statutes were written when the industry generated few complaints, and therefore, either limit credit counseling to non-profit agencies or provide non-profits with an exemption from mandatory requirements. This type of exemption is the primary reason why many of the CCAs discussed in this Report applied for Section 501(c)(3) status. In recent years, a few states, such as Maryland, have passed more comprehensive laws dealing specifically with the debt management industry.

The widespread use of the telephone and Internet by CCAs to contact and service consumers also inhibits effective state enforcement. Many CCAs assert that they do not need to be licensed in a state unless they maintain a physical presence in that state. Under this interpretation, a company located in Maryland could contact and serve consumers in every other state without obtaining separate state licenses or being bound by laws of the states in which its consumers reside. Those CCAs that attempt to comply with the laws of each state in which they serve consumers are burdened by a mix of different regulations and bonding requirements.

Currently two alternatives offering model legislation for states to adopt are available. In February 2004, the National Consumer Law Center and the Consumer Federation of America jointly issued a Model Consumer Debt Management Services Act.[182] In March 2004, the National Conference of Commissioners on Uniform State Laws discussed a draft of the Consumer Debt Counseling Act.[183] Both laws would impose much tighter licensing and business practices on all credit counseling agencies.

---

[182] Available at *www.law.upenn.edu/bll/ulc/UCDC/Feb2004modelbill.pdf*.
[183] Available at *www.law.upenn.edu/bll/ulc/UCDC/Mar2004mtgdraft.htm*.

41

In many states, the most significant regulatory action has come from suits filed by state attorneys general. In addition to an earlier action brought by the District of Columbia,[184] the attorneys general in Illinois,[185] Minnesota,[186] Missouri,[187] and Texas[188] have each filed lawsuits against AmeriDebt over the past few years. These suits have typically charged AmeriDebt with consumer fraud and deceptive business practices such as false advertising, misrepresentation, non-disclosure of fees, and failure to obtain the proper licenses. The Subcommittee believes that these suits have convinced AmeriDebt to stop enrolling new consumers into DMPs. Nevertheless, they do not necessarily prevent the same business model from being used by other CCAs or conglomerates.

### D. Federal Regulation and Enforcement

On the Federal level, two key agencies, the U.S. Internal Revenue Service and the Federal Trade Commission, are aware of the major problems in the credit counseling industry, and have taken steps to enforce the tax code and the Federal Trade Commission Act, respectively.

#### (1) The Internal Revenue Service

As the Report notes, CCAs typically apply for non-profit status under Section 501(c)(3) of the Internal Revenue Code. The IRS has recognized more than 850 credit counseling organizations as tax exempt under Section 501(c)(3).[189] The non-profit status of CCAs arose mainly by historical pattern, rather than pursuant to any specific decision by Congress. When creditors established the first CCAs, they set them up as non-profits, presumably because of the tax savings and because this status harmonized with their original purpose of providing debtors with general financial education in exchange for little or no fee. State laws often made non-profit status a legal requirement to conduct debt proration activities within their borders.

As the recent problems in the credit counseling industry began to surface, the IRS has taken several steps to address the problems both retroactively and prospectively. Retroactively, the IRS has initiated audits of 50 CCAs, including nine of the fifteen largest CCAs in terms of gross receipts.[190] The IRS Commissioner informed the Subcommittee that the Service will not hesitate to revoke the Section 501(c)(3) designation of any CCA that has abused its non-profit status.[191] The process for revoking non-profit status is fairly lengthy. The IRS must conduct a full audit of the agency's finances and make a formal finding that it does not qualify as a Section 501(c)(3) organization under the statute. The non-profit can appeal

---

[184] *District of Columbia v. AmeriDebt, Inc. and Andris Pukke,* Superior Court of the District of Columbia.

[185] *State of Illinois v. AmeriDebt, Inc.,* Circuit Court of the Seventh Judicial Circuit, Sangamon County.

[186] *State of Minnesota v. AmeriDebt, Inc.,* District Court, Fourth Judicial District.

[187] *State of Missouri v. AmeriDebt, Inc.,* Circuit Court of St. Louis City.

[188] *State of Texas v. AmeriDebt, Inc., et al.,* District Court of Travis County, Texas.

[189] Testimony of Commissioner Mark Everson before the House Ways and Means Committee, Subcommittee on Oversight (11/20/03).

[190] Everson letter, p. 1. Section 6103 of the Internal Revenue Code prevents the IRS from publicly revealing the identities of the CCAs currently under audit.

[191] *Id.* at p. 7.

42

this decision both within the IRS and in the courts. In addition, the IRS is considering giving more explicit guidance on what the law requires of non-profits, which would put CCAs on formal notice of the standards they should follow.

Prospectively, the IRS has taken measures to subject new CCA applications for Section 501(c)(3) status to greater scrutiny. It has formed a specialized group within the IRS called the Consumer Credit Service Compliance Team to develop and pursue strategies to address: (1) inurement and private benefit issues, and (2) issues related to CCAs that operate as commercial businesses.[192] The Compliance Team currently has 12 staff members, including technical specialists, examination agents, and attorneys from the Office of Chief Counsel.[193] These individuals review the applications, including budgets and outsourcing contracts, of new CCAs to ensure that they plan to operate as bona fide non-profits.

Since the Subcommittee's hearing on March 24, 2004, the IRS has identified 59 CCAs for examination.[194] It has contacted 39 of the selected CCAs and has begun examinations.[195] It has already proposed revoking the tax-exempt status of one Section 501(c)(3) credit counseling agency.[196] In June 2004, it filed a $15 million suit against AmeriDebt in anticipation of revoking its Section 501(c)(3) status.[197] The IRS has also sent denial letters to four applicants for exempt status because the organizations were operating for the substantially non-exempt purpose of marketing and selling debt management plans for the private benefit of insiders and related commercial entities.[198]

As a result of these efforts, the IRS will have about 50% of the total revenues of the credit counseling industry under examination.[199] For those CCAs under examination, the IRS has identified individuals and businesses that are involved in a scheme to create CCAs as a front for related for-profit businesses.[200] Referrals have been made to investigate these abusive tax shelter promotions. The referrals include the promoter, all related entities and individuals, as well as the attorney and the CPA.[201]

To combat such violations, the IRS has announced revisions of its Form 990, Return of Organization Exempt from Income Tax, and the Form 1023, Application for Tax Exempt Status Under Section 501(c)(3).[202]

On July 30, 2004, the IRS also released a memorandum of legal analysis related to the revocation of Section 501(c)(3) status for credit counseling organizations.[203] This can be viewed as a sign of the IRS bracing for litigation ahead as it implements its more

---

[192] *Id.* at p. 4.
[193] *Id.*
[194] Internal Revenue Service information production to the Subcommittee 9/1/04.
[195] *Id.*
[196] Everson letter to the Honorable Amo Houghton, dated 7/15/04, p. 1.
[197] Proof of Claim for Internal Revenue Taxes, In the Matter of AmeriDebt, Case No. 04–23649, filed 6/5/04.
[198] Everson letter to the Honorable Amo Houghton, dated 7/15/04, p. 1.
[199] *Id.* at p. 3.
[200] Internal Revenue Service information production to the Subcommittee 9/1/04.
[201] Everson letter to the Honorable Amo Houghton, dated 7/15/04, p. 3.
[202] *Id.*
[203] Office of the Chief Counsel, Memorandum No. 200431023.

43

stringent practices, most likely leading to the revocation and denial of exempt status for existing organizations.

### (2)  The Federal Trade Commission

The FTC is charged with enforcing Section 5(a) of the FTC Act, which prohibits unfair and deceptive acts or practices affecting interstate commerce.[204] The FTC lacks jurisdiction, however, to enforce consumer protection laws against bona fide non-profits. Nevertheless, the FTC may assert jurisdiction over a CCA if it demonstrates that the CCA is "organized to carry on business for its own profit or that of its members."[205] Alternatively, the FTC may assert jurisdiction over a non-profit CCA if it is a "mere instrumentality" of a for-profit entity, or if it operates through a "common enterprise" with one or more for-profit entities.[206] Even with these jurisdictional issues to contend with, the FTC has made inroads in enforcing the FTC Act against CCAs who may be abusing their non-profit status and engaging in unfair or deceptive practices.

At the Subcommittee's hearing, FTC Commissioner Thomas Leary testified to a number of practices that have come to the agency's attention that may violate the FTC Act. For example, Commissioner Leary listed the following as concerns with some existing CCAs:

- Misrepresentations about fees or "voluntary contributions."

- Promising great savings they often cannot deliver.

- Abuse of non-profit status.

- Failure to pay creditors in a timely manner or at all.

- Failure to abide by telemarketing laws.

- Noncompliance with the privacy and security requirements of the Gramm-Leach-Bliley Act, which restrains unauthorized use of personal financial information.[207]

On November 19, 2003, the FTC filed a complaint in Federal court against AmeriDebt, DebtWorks, Andris Pukke, and Pamela Pukke, and a second complaint against The Ballenger Group alleging these types of unfair and deceptive practices.[208] The first complaint seeks to enjoin AmeriDebt, DebtWorks, and Mr. Pukke from making false and deceptive claims about the nature and costs of the services provided by AmeriDebt. That suit is ongoing. The FTC has settled the second case against Ballenger, which agreed to pay a $750,000 fine and change its practices, as described later in this Report.

In addition to its joint efforts with the IRS to inform consumers of the deceptive practices of some CCAs, at the hearing, the Honorable Commissioner Thomas Leary told the Subcommittee: "the Commission is also currently conducting several non-public inves-

---

[204] 15 U.S.C. § 45(a).

[205] 15 U.S.C. § 44.

[206] *See Sunshine Art Studios, Inc. v. FTC,* 481 F.2d 1171 (1st Cir. 1973); *Delaware Watch Co. v. FTC,* 332 F.2d 745 (2d Cir. 1964).

[207] Testimony of Commissioner Thomas Leary at Subcommittee hearing, *Profiteering in a Non-Profit Industry: Abusive Practices in Credit Counseling,* March 24, 2004.

[208] *FTC v. AmeriDebt, Inc., et al.,* Case No. PJM 03cv3317, United States District Court for the District of Maryland; *FTC v. The Ballenger Group, LLC, et al.,* United States District Court for the District of Maryland.

44

tigations of additional CCAs, debt negotiators, and related enti-
ties." Most likely, such investigations will result in the FTC taking
additional action against existing CCAs and their for-profit affili-
ates.

### (3) Pending Bankruptcy Legislation

Another factor affecting Federal oversight of the credit coun-
seling industry is the possibility that Congress may enact bank-
ruptcy reform legislation requiring greater use of credit counseling.
In the 108th Congress, for example, Section 106 of H.R. 975 would
have amended Federal bankruptcy law to require that all con-
sumers receive "an individual or group briefing . . . that outlined
the opportunities for available credit counseling and assisted that
individual in performing a related budget analysis." The briefing
would have to come from an approved non-profit budget and credit
counseling agency within 180 days prior to filing a petition for
bankruptcy. The bill would have also required debtors to complete
"an instructional course concerning personal financial manage-
ment" after filing for bankruptcy under either Chapter 7 or Chap-
ter 13.

Moreover, the bill would have required the clerk of each bank-
ruptcy district to maintain a public list of CCAs and instructional
courses approved by the United States Bankruptcy Trustee or the
bankruptcy administrator in the district. CCAs and instructional
courses would have had to meet the following criteria:

- Provide qualified counselors;
- Maintain adequate provision for the safekeeping and pay-
  ment of client funds;
- Provide adequate counseling with respect to client credit
  problems; and
- Deal responsibly and effectively with other matters as they
  relate to the quality, effectiveness, and financial security of
  counseling programs.

Although the bill leaves these requirements to the Bankruptcy
Trustee or the bankruptcy administrator for the individual districts
to define, it does spell out certain minimum criteria. To be ap-
proved, a credit counseling agency must, among other require-
ments:

- Be a non-profit agency;
- Have a board of directors, the majority of which are not em-
  ployed by the agency, and will not directly or indirectly ben-
  efit financially from the outcome of a credit counseling ses-
  sion;
- Charge a "reasonable" fee and provide services without re-
  gard to the debtor's ability to pay the fee;
- Provide full disclosure to clients regarding funding sources,
  counselor qualifications, possible impact on credit reports,
  any costs that will be paid for by the debtor, and how such
  costs will be paid;

45

- Provide adequate counseling that includes an analysis of the debtor's current situation, what brought them to that financial status, and how they can develop a plan to handle the problem without incurring negative amortization of their debts; and
- Provide trained counselors who receive no commissions or bonuses based on the counseling session outcome and who have adequate experience and training.

The bill also spelled out minimum requirements for instructional courses on personal financial management. These courses, among other requirements, would have had to:

- Provide experienced and trained personnel;
- Provide relevant learning materials and teaching methodologies;
- Provide adequate facilities: instruction may occur over the telephone or the Internet if it is effective; and
- Demonstrate after the probationary period that it has been or is likely to be effective in assisting "a substantial number of debtors" to understand personal financial management.

The bill would have allowed CCAs and courses to be approved for a 6-month probationary period and for 1-year terms thereafter. The bill also would have allowed "interested parties" to seek judicial review of these approvals. The bill also would have allowed a district court to investigate any credit counseling agency and remove it from the list.

## VI. POST HEARING CHANGES IN THE INDUSTRY

Since the Subcommittee's hearing in March of 2004, a number of reforms have taken place throughout the credit counseling industry that may benefit consumers. Most notably, the three credit counseling agencies chronicled in this Report have undergone drastic changes ranging from bankruptcy to complete reorganization. The Internal Revenue Service has tightened its application process for Section 501(c)(3) status and heightened their scrutiny of current CCAs with tax-exempt status. Trade associations have tightened their member standards and educated their members on the current scrutiny and the need to comply with the requirements of Section 501(c)(3). Creditors have similarly tightened their standards for making fair share payments. The industry has a long way to go; however, with each improvement, consumers are one step closer to a service they can rely on.

### A. DebtWorks and The Ballenger Group

Ballenger performed DMP processing for 11 non-profit CCAs, including AmeriDebt. Representatives of DebtWorks, Ballenger, and AmeriDebt were invited to testify at the Subcommittee's hearing. Matthew Case, chief operating officer of AmeriDebt, testified on behalf of AmeriDebt. Andris Pukke who was subpoenaed to appear on behalf of DebtWorks, invoked his Fifth Amendment privilege to remain silent. Michael Malesardi, the chief financial officer for Ballenger, testified in his place on behalf of Ballenger.

46

At the time of the hearing, the FTC had filed complaints against AmeriDebt, DebtWorks, Andris Pukke, Pamela Pukke, and Ballenger.[209] Currently, AmeriDebt's action is still pending, while Ballenger settled with the FTC on November 19, 2003, agreeing to pay a $750,000 fine and change its business practices.

### (1) AmeriDebt Files for Chapter 11 Reorganization

On June 5, 2004, AmeriDebt filed a petition for relief under the Chapter 11 reorganization provision of the Bankruptcy Code.[210] Eight months earlier, AmeriDebt had stopped enrolling clients on DMPs.[211] However, Federal and state enforcement actions have not been stayed by AmeriDebt's bankruptcy petition.[212] On June 24, 2004, the U.S. Bankruptcy Court in Maryland directed the United States Trustee to appoint an Examiner for AmeriDebt in order to determine if a trustee should be appointed to manage AmeriDebt operations.[213] The court ordered the Examiner to assess Ameri-Debt's financial status, assess AmeriDebt's connection or relationship with Ballenger (including the officers, directors, and employees), and perform a preliminary preferences analysis.[214] On August 11, 2004 Raymond Peroutka, Jr. was appointed as the Bankruptcy Examiner in the matter.

AmeriDebt currently manages 57,000 DMPs all serviced by Ballenger.[215] The remaining nine employees at AmeriDebt provide "credit counseling" to AmeriDebt's existing clientele via the telephone. The service processing provided by Ballenger makes up AmeriDebt's largest monthly expense. In the first 7 months of 2004, AmeriDebt earned a net profit of approximately $1.5 million.[216] Despite earning a net profit each month excluding May, the AmeriDebt management informed the Examiner's staff they do not anticipate reorganizing and emerging from Chapter 11.[217]

In assessing AmeriDebt's finances, the Examiner took issue with the transfer of AmeriDebt's servicing rights to DebtWorks in 1999. The Examiner pointed out that AmeriDebt transferred to Debt-Works, for virtually no consideration, servicing rights that would generate $107 million in fees over the next 4½ years.[218] Using the January 2003 sale of 51% interest in the company owning the servicing rights and the profitability of the current owner of the servicing rights, Ballenger, the Examiner deduced that had this transfer been properly priced, AmeriDebt would have earned net profits for 2003 of $9.1 million.[219] Even with such profitability, the Examiner noted the pending state and Federal suits against AmeriDebt seeking restitution as a concern. Most important of these suits is

---

[209] *FTC v. AmeriDebt, Inc., et al.*, Case No. PJM 03cv3317, United States District Court for the District of Maryland; *FTC v. The Ballenger Group, LLC, et al.*, United States District Court for the District of Maryland.
[210] AmeriDebt letter to the Subcommittee, dated 8/23/04. *In Re: AmeriDebt Inc.*, Case No. 04–23649–PM, In the District Court of Maryland, Greenbelt Division.
[211] AmeriDebt letter to the Subcommittee, dated 8/23/04.
[212] *Id.* at p. 2.
[213] Report for Examination, Case No. 24–23649-PM, United States Bankruptcy Court, District of Maryland, Greenbelt Division, p. 1.
[214] *Id.*
[215] *Id.* at p. 3.
[216] *Id.*
[217] *Id.*
[218] *Id.* at p. 7.
[219] *Id.*

47

an IRS claim for $15 million in anticipation of a finding that AmeriDebt violated its Section 501(c)(3) status. Ultimately, the Examiner recommended appointing a trustee and on September 20, 2004 the court approved Mark D. Taylor as trustee.[220]

On January 23, 2005 the Federal bankruptcy judge approved the sale of roughly 60,000 remaining accounts to Money Management International, a large Houston CCA. This sale paves the way for the eventual dissolution of AmeriDebt as a company. The judge had earlier determined that, given the number of suits pending against AmeriDebt, dissolution was the best option.

### (2) The Ballenger Group

Since the Subcommittee's hearing and the settlement of the FTC lawsuit, Ballenger has made a number of reforms to conform to the laws governing tax-exempt organizations and is also working as an advocate of for-profit CCAs. Among its reforms, Ballenger has modified its Fulfillment Agreement, changed its fee structure, and renegotiated its debt to Andris Pukke.

Of the 11 CCAs that the Report described Ballenger as previously serving, only five currently have agreements with Ballenger for future DMP processing. Ballenger has executed Fulfillment Agreements with Debtscape, Debtserve, Fairstream, The Credit Network, and Visual Credit Counseling. According to Ballenger, it has made the following modifications to its Fulfillment Agreement with these CCAs:[221]

(1) The agreement between Ballenger and each CCA is now an "at will" contract. Either party may terminate the agreement at any time for any reason.[222]

(2) Ballenger has eliminated the right to transfer consumers' DMPs from one CCA to another Ballenger CCA for any reason.

(3) The rights to exclusive access to the CCAs' consumer trust accounts (consumers' monies designated for payment to creditors) have been eliminated. However, Ballenger maintains the right to access CCA escrow accounts in the event of non-payment.

(4) An automatic fee increase of 3% annually was eliminated.

(5) Ballenger's right to market CCAs' consumers for goods and services in exchange for a revenue sharing agreement with the CCA has been eliminated.

(6) All non-competition and exclusivity clauses requiring the CCA to do business only with Ballenger have been removed.

(7) A clause requiring each agency to comply with all rules and regulations issued by the IRS has been added. In particular, Ballenger requires each CCA to certify that all nec-

---

[220] *Order Approving Appointment of Trustee,* Case No. 24–23649 PM, United States Bankruptcy Court, District of Maryland, Greenbelt Division, 9/20/04.

[221] Subcommittee interview with Ballenger representatives (9/29/04).

[222] The "at will" contract comes with two requirements: (1) from date of notice, Ballenger will process the CCA's DMPs for 90 days and (2) the CCA must have a zero balance for their receivables with Ballenger or a "mutually agreeable plan" for resolving them.

48

essary steps have been taken to comply with section 4958 which guards against excess benefit to a third party.[223]

Ballenger has also reduced its fees to each CCA from $25/$30 per DMP per month (depending on electronic submission) to $16/$19 per DMP. Ballenger has reduced the monthly fee by 10% on pre-2003 DMPs. Such reductions make Ballenger's fees competitive with the lowest in the industry.[224]

As the Report detailed, on October 2003 Andris Pukke sold the rights to service various CCAs to Ballenger for $43 million with an outstanding note to Pukke for $37 million. Ballenger has renegotiated this debt, settling with Andris Pukke for $500,000 plus another payment to Pukke of $250,000 for an agreement not to compete with Ballenger.

At the same time it has reformed its practices, The Ballenger Group has recently started and funded a new group called the Coalition for Responsible Credit Solutions ("CRCS"). CRCS aggressively advocates the for-profit CCA model and has launched a well-funded campaign to influence the pending language of a state model law regulating the credit counseling industry to allow for-profit CCAs. The CRCS criticizes the creditors and the NFCC and its CCAs, asserting that a CCA that accepts money from a creditor is working only for the creditor's interests.

The CRCS's website includes a checklist for consumers on how to pick a CCA.[225] This list suggests that face-to-face counseling is unnecessary and that a consumer should be able to get all needed education and counseling from the Internet. Additionally, CRCS suggests the IRS may revoke CCAs' tax-exempt status for accepting fair share payments from creditors, leaving few financial options for debtors and causing "a bankruptcy explosion."[226]

For-profit CCA advocates have apparently convinced the National Conference of Commissioners on Uniform State Laws ("NCCUSL") to incorporate a place for for-profit CCAs in their model law. As mentioned, the Consumer Federation of America and the National Consumer Law Center have also prepared a model law, which allows for-profit CCAs. However, in a letter to NCCUSL, the groups expressed reservations about the for-profit model's ability to survive with the imposed fee limits they are suggesting.[227] The CFA and NCLC maintain that they are neutral on the issue and have neither "endorsed" nor rejected the for-profit model.[228] They also state: "We note with concern that some of the credit counseling entities that have been most aggressive in insisting that creditors and legislators endorse the for-profit model, like The Ballenger Group, are the very same companies who have been investigated, sued or sanctioned for deceptive acts by state and Federal regulators or lawmakers." They go on to say, "In our opin-

---

[223] Ballenger Fulfillment Agreement with The Credit Network executed September 1, 2004 ¶ 2.10.

[224] Fair Market Value Evaluation prepared for The Ballenger Group, April–June 2004.

[225] Available at *www.responsiblecredit.com/index.php. See also,* "New Debt Counseling Group Draws Fire; Doubts: A Consumer Advocacy Group is Accused of Being a Creature of the Growing Debt Counseling Industry," *The Baltimore Sun,* July 21, 2004.

[226] "Consumers for Responsible Credit Solutions Warns of a Future Bankruptcy Explosion if Most States or Congress Don't Act to Change Current Credit Counseling Laws," *PR Newswire,* August 26, 2004.

[227] NCLC/CFA letter to Commissioner William C. Hiloman, dated 8/3/04.

[228] *Id.* at p. 5.

49

ion, this means that their claims that the for-profit model would be the salvation of the credit counseling industry completely lack credibility." [229] The CFA and NCLC support a non-profit presence as vital to the credit counseling industry and its future. [230]

## B. The Ascend One-Amerix Conglomerate

As the Subcommittee's investigation proceeded, both AFS and Amerix notified the Subcommittee that each intended to modify its business practices. At the hearing, Cuba Craig, president and CEO of AFS, described the reforms that AFS had undertaken to conform to the letter and spirit of the law. It should be noted that AFS did not charge up front fees and had capped its monthly fees at $50 per month even prior to the Subcommittee's investigation. Criticisms of AFS operations were confined to its outsourcing and service agreement with Amerix. Cuba Craig testified, "Since the Subcommittee began its investigation, we have stepped up our efforts to ensure that AFS meets all applicable requirements."

To that end, AFS told the Subcommittee that it had implemented the following changes to its operations:

    (1) Origination, counseling, and all DMP enrollment are now done in- house. [231]

    (2) The service agreement requirements to enroll 30% of all first time callers on DMPs (the "assist rate") and to generate $30 revenue per month in consumer fees for each DMP (the "revenue standard") were eliminated in April 2004. [232]

    (3) AFS terminated both the FreedomPoint Strategic Marketing Agreement and the the FreedomPoint Mortgage Brokerage Prospect Lead Agreement on May 1, 2004, which meant that AFS was no longer required to make client referrals to these for-profit companies. [233]

    (4) On May 5, 2004 AFS gave notice to Amerix that it would not renew the Amerix Benefits Package Marketing Agreement at the end of its initial term, and that AFS wished to cease marketing the Member Benefits Package. AFS was released from its marketing obligations in mid-August. [234]

    (5) AFS solicited information about competitive bids for marketing services and conducted an analysis of the back office servicing in order to assess the fair market prices of such services. AFS issued a request for proposal for back office services in mid-September. [235]

---

[229] *Id.*
[230] *Id.*
[231] Second Addendum to Service Agreement between Amerix and American Financial Solutions, dated 4/12/04.
[232] *Id.*
[233] AFS letter to the Subcommittee, dated 8/31/04.
[234] Letter from AFS to Amerix, dated 5/5/04.
[235] *Id.*

50

(6) AFS scripts regarding voluntary contributions have been revised to ensure that consumers are clear that any contribution is voluntary. [236]

(7) The AFS website has been changed to provide educational resources to all visitors, not just AFS clients. [237]

(8) In August 2004, AFS opened a community learning center in the poorest neighborhood school in the Bremerton School District, near an AFS call center in Washington state. The Learning Center offers classes, tutoring, counseling and other financial and credit education to anyone who wishes to participate, free of charge.[238] In addition, AFS has created an internship where the students work with the AFS Education Manager conducting surveys of the community to identify financial education needs.[239]

(9) In an effort to ensure that appropriate consumers are on DMPs, AFS has assigned three counselors to follow up with consumers who miss payments to determine whether the consumers should remain on the DMP and provide additional counseling if needed.[240]

Amerix, which provides debt servicing to CCAs in the conglomerate, has also made a number of significant changes in its operations. Bernaldo Dancel, president and CEO of Ascend One, the holding company of Amerix, said at the hearing, "We recognize that we can always do better, and this investigation has played quite a constructive role for our company in helping us." Mr. Dancel noted, "I think, frankly, the area where I believe there is particular room for improvement is in seeing the CCAs we serve offer good education and counseling to all consumers seeking assistance, whether they are suitable for a DMP or not." Amerix told the Subcommittee that its reforms include the following:

(1) Amerix has enlisted "Enhanced Standards" that will be required of every non-profit CCA wishing to do business with Amerix. Amerix told the Subcommittee that these enhanced standards include all of the requirements of AICCCA or NFCC membership, and require CCAs to conduct community outreach of 1,000 hours per year, perform individual client assessments regardless of whether clients choose to enroll in a DMP, prepare budgeting worksheets with tips for the client, and partner with an educational institution to increase educational offerings and consumer financial awareness.[241]

(2) Amerix ceased providing overflow origination services to American Financial Solutions on March 15, 2004 and determined not to provide such services to any other CCA.[242]

---

[236] AFS letter to the Subcommittee, dated 8/31/04.
[237] Id.
[238] AFS received partial funding for the learning center from the Association of Independent Consumer Credit Counseling Agencies. 2004 AICCCA Consumer Education Grant 7/13/04.
[239] AFS letter to the Subcommittee, dated 8/31/04.
[240] Id.
[241] Ascend One letter to the Subcommittee, dated 8/23/04.
[242] Second Addendum to Service Agreement between Amerix and American Financial Solutions, dated 4/12/04.

51

(3) Amerix eliminated any assist rate or revenue standard from its service agreement with its CCAs so there are no minimum DMP enrollment or monthly fee generation, as explained earlier with respect to AFS.[243]

(4) Amerix worked with its CCAs to review and modify all scripts used by counselors when assisting clients with credit counseling.[244]

(5) Ascend One has provided funding of $500,000 and pledged over $5 million over 10 years to the Ascend One fund for financial literacy. In addition, on July 21, 2004, Ascend One made a $24,000 grant to Junior Achievement to provide financial literacy education in the Baltimore City Schools, and another grant on July 28, 2004, of $50,000 over a 5-year period to the Maryland Council on Economic Education.[245]

(6) Amerix also agreed to negotiate in good faith the fee structure for the services Amerix provides for AFS to reflect actual costs and the value of services provided.[246]

## C. The Cambridge-Brighton Conglomerate

Cambridge representatives were invited to testify at the Subcommittee's hearing on March 24, 2004. Mr. Viale was invited to represent Cambridge, the non-profit CCA. Mr. Puccio was invited to represent the back office service provider for Cambridge and Brighton Debt Management. On the eve of the hearing Mr. Puccio informed the Subcommittee of health concerns that would prevent him from testifying. Mr. Viale attended the hearing and provided testimony on the CCA part of Cambridge's operations. A deposition of Mr. Puccio took place on July 1, 2004 and is included in the hearing record.[247]

Since the Subcommittee hearing on March 24, 2004, Cambridge has taken steps to overhaul its entire corporate structure. Discussed below are changes that the Cambridge-Brighton conglomerate told the Subcommittee it was making to transition from a profit-driven group of companies to a system of operations driven by non-profit motives.

Cambridge-Brighton told the Subcommittee that a new non-profit holding company will be created called "Cambridge Credit Non-Profit Holding Company" that will function as the parent company.[248] This company will be the sole owner of each non-profit CCA and the sole shareholder of two of the for-profit companies, Cambridge Index and Brighton Credit Management Corp.[249] In addition, the for-profit service companies still wholly owned by John and Richard Puccio, Brighton DMS, Debt Relief Clearing House Ltd., and Cypress Advertising & Promotions, Inc. ("the servicing

---

[243] Id.
[244] Ascend One letter to the Subcommittee, dated 8/23/04; CESI Financial Counseling Session Guidelines and Disclosure Requirements; AFS Scripts.
[245] Ascend One letter to the Subcommittee, dated 8/23/04; Ascend One, Concentration Account, bank statement March, 2004.
[246] American Financial Solutions letter to the Subcommittee, dated 8/31/04.
[247] *Profiteering in a Non-Profit Industry: Abusive Practices in the Credit Counseling Industry,* March 24, 2004, Exhibit No. 18, p. 264.
[248] Cambridge letter to the Subcommittee, dated 8/31/04.
[249] Id.

52

companies"), will become wholly owned subsidiaries of a new for-profit holding company called "Cambridge Credit For-Profit Holding Company," whose stock will be wholly owned by the non-profit CCAs, Cambridge and Cambridge Budget Planning.[250] As a result, Cambridge-Brighton told the Subcommittee that any and all profits of the servicing companies and the for-profit Cambridge Index and Brighton Credit, the for-profit CCA, will inure to the benefit of the non-profit CCAs and the non-profit holding company.

The Subcommittee was also told that officers and employees of Cambridge will transfer the capitol stock of Brighton DMS, Debt Relief Clearing House, and Brighton Credit (the for-profit CCA) to the non-profit holding company.[251] Pursuant to these changes, the non-profit CCAs will control through the non-profit holding company, Cambridge Credit Non-Profit Holding Company, 100% of the stock of each of the servicing companies. The non-profit holding company will also own all of the stock of the servicing companies and the for-profit CCA, Brighton Credit. Consequently, all profit generated by the for-profit companies will be in the control of and available for use by the non-profit companies.

Cambridge-Brighton said that with the reorganization, the board of directors of the non-profit CCAs and the non-profit holding company will be expanded to include nine members, eight of whom will be independent directors who may not be officers, employees, or independent contractors of the non-profit CCAs or the non-profit holding company.[252] For the for-profit companies, the governing board will consist of three directors, two of whom will be independent.[253]

Cambridge-Brighton told the Subcommittee that as of June 1, 2004 all of its CCAs—Cambridge, Cambridge/Brighton Budget Planning, and Brighton Credit—had modified the fees charged to consumers for the construction and maintenance of the DMP.[254] The maximum fee charged for initiating a DMP will be $75 and the maximum monthly fee for maintenance is $50 per month.[255] Additionally, Cambridge has instituted a new refund policy allowing consumers to cancel the DMP at any time in the first 90 days of enrollment with a full refund available.[256]

Cambridge-Brighton told the Subcommittee that its CCAs have introduced a system called "post counseling" in which their counselors follow up with consumers placed on DMPs to ensure that they are utilizing the budgeting tools provided to track their finances. Three scheduled calls are supposed to be completed within the first 90 days of entering the DMP and the goal is to emphasize the need to develop savings.[257]

For the community, Cambridge told the Subcommittee that it has committed $4 million over the next 3 years for the program "Learn Now or Pay Later,"[258] working with high school students across the nation to educate them on the responsibilities that ac-

---

[250] Id.
[251] Id.
[252] Id.
[253] Id.
[254] Id.
[255] Id.
[256] Id.
[257] Id.
[258] Id.

53

company credit. Students achieving excellence in the program will be awarded scholarships. Additionally, Cambridge works with a local Job Corp program to educate at-risk youths about the importance of responsible financial habits.[259] Speaking engagements at local colleges and information booths at local shopping malls are also part of their community outreach.[260]

If implemented, these and other reforms should help resolve the abusive practices documented in this report.

## D. Recommendations

Based upon its investigation of the credit counseling industry, the Subcommittee makes the following recommendations:

(1) **Complete Industry Cleanup.** The IRS and FTC should complete their ongoing reviews of the credit counseling industry to eliminate abusive conduct by credit counseling agencies that have been operating in violation of restrictions on non-profit charities or using unfair or deceptive trade practices.

(2) **Establish Five-Year Review.** In light of past industry abuses, the IRS should require each credit counseling agency exempt from Federal taxation under Section 503(c)(3) to submit every 5 years, for IRS review, return information establishing its charitable activities and a certification that the agency is not providing a private benefit to any individual or entity. The IRS should review these materials to ensure each credit counseling agency is operating as a charitable organization and in compliance with the law for non-profit entities. Congress should consider enacting legislation conditioning a credit counseling agency's tax exemption on the submission of this documentation and the IRS's renewal of its tax-exempt status for 5-year periods.[261]

(3) **Provide Consumer Education.** To address rising consumer debt and bankruptcy rates, each credit counseling agency should provide affirmative financial counseling and educational programs designed to reduce excessive indebtedness within the populations they serve, and should evaluate, improve, and document the effectiveness of these programs.

(4) **Continue Creditor Support and Standards.** Major creditors should continue to provide financial support to appropriate, non-profit credit counseling agencies, conditioned upon the agencies' achieving specified standards that contribute to the public good, including standards requiring agencies to maintain good standing and accreditation status within the industry, assess reasonable fees based upon actual costs, provide individualized debt coun-

---

[259] *Id.*
[260] *Id.*
[261] The United States Senate Finance Committee has circulated a Discussion Draft of proposals for reforms and best practices in the area of tax-exempt organizations. The Committee suggests a five-year review of tax exempt status by the IRS, including the filing of current articles of incorporation and by-laws, conflict of interest policies, evidence of accreditation, management policies regarding best practices, a detailed narrative about the organization's practices, and financial statements.

54

seling to clients, and avoid conduct or transactions that generate or create the appearance of generating a private benefit for any individual or entity. Creditors should carefully screen credit counseling agencies to ensure they provide funds only to reputable agencies that comply with their standards.

(5) **Clarify Federal Standards.** The IRS and FTC should work together to clarify the standards that credit counseling agencies must meet to maintain tax exempt status under Section 501(c)(3) and avoid deceptive or unfair trade practices, including by making it clear that a non-profit credit counseling agency must:

(a) **Accreditation**—maintain good standing and accreditation status within the credit counseling industry, such as by meeting the accreditation standards of the Council on Accreditation for Children and Family Services;

(b) **Independent Board**—maintain an independent Board of Directors that includes representatives of the community served by the agency and that includes no more than a minority of directors who are employed by the agency, a related entity, or any other person who stands to gain direct or indirect financial benefit from the agency's activities;

(c) **Public, Not Private Benefit**—avoid conduct or transactions that generate or create the appearance of generating a private benefit for any individual or entity;

(d) **Full Disclosure**—disclose to each client the existence and nature of any financial relationship that the agency has with a creditor of the consumer or with a for-profit entity that provides data processing, marketing, or financial services to the agency or the client;

(e) **Reasonable Fees**—assess clients reasonable fees that are based upon the agency's actual costs and charged as services are provided, rather than substantially in advance of such services; and

(f) **No Improper Incentives**—refrain from accepting compensation for referring clients to any service or organization, and refrain from paying compensation to any employee based upon the number of clients enrolled in debt management plans or the amount of client debt managed by the agency.

○

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL CREDIT COUNSELING SERVICES, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:06cv02028 (RBW) |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF LAWRENCE P. BLASKOPF

Lawrence P. Blaskopf states the following pursuant to 28 U.S.C. § 1746(2):

1. I am employed as a trial attorney with the Tax Division of the U.S. Department of Justice, and I am one of the attorneys that have litigating responsibility for the above-captioned case.

2. I received the Internal Revenue Service's administrative files concerning its examination of the plaintiff's Forms 990, Return of Organization Exempt from Income Tax for the plaintiff's 2000 through 2002 tax years.

3. Attached as Exhibit A is a document from those files. It is written on the letterhead of plaintiff's counsel and states it is the plaintiff's "Appeal/Protest of Proposed Revocation of Tax-Exempt Status."

4. Attached as Exhibit B is a copy of the Internal Revenue Service's "final adverse determination as to [the plaintiff's] exempt status under section 501(c)(3) of the Internal Revenue Code."

3055896.1

I declare under penalty of perjury that the foregoing is true and correct.


2/17/08
Date

LAWRENCE P. BLASKOPF
Washington, District of Columbia

3055896.1

WHITEFORD, TAYLOR & PRESTON
L.L.P.

210 WEST PENNSYLVANIA AVENUE
TOWSON, MARYLAND 21204-4515
TELEPHONE 410 832-2000
FAX 410 832-2015

SEVEN SAINT PAUL STREET
BALTIMORE, MARYLAND 21202-1626
TELEPHONE 410 347-8700
FAX 410 752-7092

20 COLUMBIA CORPORATE CENTER, SUITE 495
10420 LITTLE PATUXENT PARKWAY
COLUMBIA, MARYLAND 21044-3528
410 884-0700
Fax 410 884-0719
www.wtplaw.com

1025 CONNECTICUT AVENUE, NW
WASHINGTON, D.C. 20036-5405
TELEPHONE 202 659-6800
FAX 202 331-0573

1317 KING STREET
ALEXANDRIA, VIRGINIA 22314-2928
TELEPHONE 703 836-5742
FAX 703 836-0265

JONATHAN Z. MAY
DIRECT NUMBER
410 347-8781
jmay@wtplaw.com

March 14, 2005

**VIA FEDERAL EXPRESS**

Internal Revenue Service
EO Examination – Stop 7954
7850 S.W. Sixth Ct., Room 306
Plantation, FL  33324

ATTN:    Mr. George Poskitt, Group Manager
         Mr. Eric B. Thomas, Agent – EO Specialist

Re:    **National Credit Counseling Services, Inc. (EIN 52-1799746) ("NCCS")**
       **Appeal/Protest of Proposed Revocation of Tax-Exempt Status**

Dear Messrs. Poskitt and Thomas:

NCCS[1] is in receipt of the Internal Revenue Service's letter to NCCS dated January 15, 2005, and the report of the examining Agent on IRS Form 886-A attached thereto (collectively, the "30 Day Letter"). A copy of the 30 Day Letter is attached hereto at Tab 1. As you know, it was agreed that the response date for this appeal/protest is extended to March 16. This extension was confirmed, in writing, to Mr. Ron Prowler of your office. This appeal/protest has been submitted within that extension period.

The purpose of this letter is to appeal/protest the proposed revocation of NCCS's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code retroactive to January 1, 2000, as is proposed in the 30 Day Letter. The following information is provided in accordance with the instructions for Regional Office Appeals in IRS Publication 892 (Rev. 7-85), Part I (Adverse Determination, Revocation, or Modification Letter).

---

[1]  NCCS was formerly known as "Genus Credit Management." Accordingly, there are references to "Genus" or "Genus Credit Management" in some of the materials attached hereto.

GOVERNMENT
EXHIBIT
A

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 2

1.    **Name and address of organization and employer identification number:**

> Name:      National Credit Counseling Services, Inc.
> Address:   2101 Park Center Drive, Orlando, Florida 32835
> EIN:       52-1799746

2.    **Statement appealing/protesting the proposed revocation:**

NCCS hereby appeals/protests the proposed revocation of NCCS's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, retroactive to January 1, 2000, as is proposed in the 30 Day Letter.

3.    **Date and symbol of letter of transmittal (copy attached):**

> Date:      January 15, 2005
> Symbols:   Letter 3618 (04-2002)

4.    **Tax periods involved:**

The tax periods involved are the tax years ended December 31, 2000, 2001 and 2002.

5.    **Statement of facts:**

While some of the facts represented in the 30 Day Letter appear accurate, some information is inaccurate or missing.  The information provided below discusses the facts relevant to this matter.

A brief timeline of relevant events relating to NCCS's "history" before and during the audit periods, and the events focused on in the 30 Day Letter, is provided below for reference:

| | | |
|---|---|---|
| 1992 | - | NCCS is formed as a Maryland nonstock corporation |
| 1993 | - | Internal Revenue Service ("IRS") issues a favorable determination letter, under Section 501(c)(3), to NCCS based on its Form 1023 Application |
| 1996-1997 | - | IRS conducts an audit of NCCS and its activities; no adverse changes or assessments are made as a result of that audit |

US01246

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 3

| | | |
|---|---|---|
| 1997 | - | NCCS receives its final determination letter from the IRS confirming its status as a non-private foundation under Section 509(a)(1) |
| 1998 | - | NCCS receives a letter from the IRS confirming its exempt status is continuing after review of submitted charter amendment (copy attached at Tab 2) |
| 1998 | | NCCS begins exploring possible methods to provide credit counseling and financial education services to consumers in bankruptcy related situations as may be required under proposed changes to bankruptcy laws in the federal bankruptcy reform bill legislation (the "Bankruptcy Reform Bill") |
| 1998 | - | NCCS's management determines that it can better focus its efforts on education related programs and activities for the public and financially distressed persons if it can transition some of the capital and labor intensive components relating to its credit counseling and debt management programs to a third-party service provider; as a part of this initiative, NCCS pursues a plan to explore viable options for outsourcing certain services related to its credit counseling and debt management programs to a qualified service provider, which included engaging Arthur Anderson to conduct a pricing study and solicit proposals and bids from qualified providers |
| 1998 | - | NCCS obtains a study from the accounting firm of Arthur Anderson regarding contractors that could provide call center and processing services relating to debt management plans and pricing for those services; the Arthur Anderson study demonstrates that the financial arrangements provided in the service agreement were fair and reasonable to NCCS, and that the best choice for the provider of the needed services was Amerix Corporation ("Amerix") |
| 1998 | - | NCCS enters into agreements relating to the sale of certain assets to a third-party service provider, Amerix; NCCS negotiates and executes a new three (3) year service agreement with Amerix, which was (i) fair and reasonable from NCCS's perspective, (ii) reflected a market rate for the services (as demonstrated by the Arthur Anderson |

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 4

study), (iii) was negotiated independently and at arms-length, and (iv) reflected that NCCS maintained control over its activities and programs

| | | |
|---|---|---|
| 1st Quarter 1999 | - | NCCS becomes affiliated with Concord Credit, la Fundacion Hispana de Credito (which later changed its name to Profina Debt Solutions) |
| 1st Quarter 1999 | - | In order to facilitate NCCS's new affiliation with Concord Credit, provide access to a new pool of potential counselors and other employees needed to further the purposes and goals of NCCS and Concord Credit, and accomplish other organizational goals, NCCS moves its operations from Columbia, Maryland to Orlando, Florida |
| 4th Quarter 1999 | - | NCCS negotiated an amendment to the service agreement; the amendment provided for a one (1) year transition period to terminate material aspects of the services detailed under the service agreement (including placement of public awareness announcements and the provision of initial counseling services); the amendment was fair and reasonable from NCCS's perspective, was negotiated independently and at arms-length, and further demonstrated that NCCS continued to maintain control over its activities and programs |
| 2nd Quarter 2000 | - | NCCS ceases new spending on public awareness and service announcements associated with credit counseling services; planning for bankruptcy related counseling and the Bankruptcy Reform Bill continues |
| 4th Quarter 2000 | - | In accordance with the 1999 amendment to the service agreement, Amerix stops taking counseling calls from financially distressed consumers seeking help from NCCS; NCCS continues to provide education and counseling to its debt management program participants |
| 2nd Quarter 2001 | - | NCCS transfers its rights to service consumers on its debt management program, and its operating name "Genus," to North Seattle Community College Foundation (a/k/a American Financial Services ("AFS")), a tax-exempt credit counseling agency under Section 501(c)(3) |

US01248

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 5

| | | |
|---|---|---|
| 2nd Quarter 2001 | | A request for "Proposal for Advice on Standards for Financial Management Education" is received from the Executive Office for the United States Trustee ("EOUST"), relating to the then pending Bankruptcy Reform Bill; a proposal was prepared and submitted in August 2001 and it was one of only four proposals selected by EOUST |
| 3rd and 4th Q 2001 | - | NCCS continues to pursue a plan to position itself as a provider of credit counseling and other services to people who might have no other alternative but to seek protection in bankruptcy and would have to comply with new rules under proposed changes contained in the Bankruptcy Reform Bill |
| 3rd and 4th Q 2001 | - | NCCS continues funding financial education activities, performing mortgage counseling services and conducts some credit counseling activities for people on its program not yet transferred to AFS because AFS is awaiting licensing in some states |
| 2002 | - | NCCS continues funding financial education activities, mortgage counseling, and planning for bankruptcy credit counseling services for financially distressed people |
| 2nd Quarter 2002 | - | NCCS receives a letter from the IRS (dated April 13, 2002) confirming that amendments to NCCS's charter were reviewed and that the favorable determination letter issued to NCCS in April of 1993 is still in effect (copy attached at Tab 3). |

## I.    Form 1023 Application

In February, 1993, NCCS filed a Form 1023, Application for Recognition of Exemption, with the IRS in which it detailed its proposed activities and operations.  In response to its Application for Exemption, in April, 1993, the IRS issued a determination letter in which it recognized NCCS as being exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code (the "Code").  Additionally, the IRS determined that NCCS was not a private foundation because it was described in Sections 509(a)(1) and 170 (b)(1)(A)(vi) of the Code.

Specifically, in its Form 1023, NCCS represented its purposes as follows:

US01249

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 6

- educate the public on a variety of financial issues, with special attention to educating families and individuals on personal budgeting and the wise use of credit;

- help families and individuals with current financial difficulties, through sound budget or spending planning, and educate them on how to avoid future financial difficulties; and

- if a family or an individual is having financial problems that are beyond the scope of sound budgeting techniques, a counselor will set up a debt management plan for the orderly liquidation of the debt; as a viable alternative to bankruptcy.

In connection with carrying out these purposes, the Form 1023 stated that NCCS intended to:

- provide group advisory instruction to all age groups when there is a need for credit, budget, and financial counseling services with particular attention, but not exclusive reference, to those in special and pressing need thereof, through money management workshops in schools, businesses, and community organizations; and

- cooperate with public and private agencies, organizations and associations engaged in the same and similar educational counseling programs.

It must be emphasized that the activities of NCCS during the audit period were substantially similar to those activities upon which the IRS based its favorable determination letter for tax-exempt status. In addition, NCCS reported its activities on Form 990 for the tax years under audit as well as the preceding years.

In this regard, it also is important to note that the service agreement with Amerix and the sale of certain assets to Amerix (which are the main focus of the "reasoning" in the 30 Day Letter to explain the agent's recommendation that NCCS's status should be revoked) were reported on NCCS's Form 990s for tax years 1998 and 1999, which predate the audit years.

US01250

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 7

## II.    Education and Counseling Activities

As described above, NCCS's educational and charitable mission was to help educate people on financial issues and assist those in financial distress.   NCCS offered a debt management program to financially distressed people who could benefit from such help, but that program was only a part of its overall activities.   NCCS also focused on making financial education and counseling available to the public and assisting people in financial distress.   No facts set forth in the 30 Day Letter dispute this.

It is noted that NCCS did not charge fees to consumers for counseling or for participation in its debt management program.   NCCS did request a reasonable monthly contribution from debt management program participants (based on the number of creditors included in a participant's plan, and capped at a reasonable amount).   All such contributions were voluntary and services were provided whether or not contributions were made.   NCCS did not request, bill participants for, or receive any "initial" contributions or fees relating to creating a debt management plan for a consumer.   To support its operations, NCCS did request and receive fair-share contributions from some creditors participating in the plans.

Of course, with all its programs and activities, NCCS's goal was to make each contact it had with a financially distressed person an opportunity to provide an educational benefit.   NCCS also desired to reach as many financially distressed people as possible.   All those who contacted NCCS were provided an opportunity to receive counseling to help them with household finance and budgeting issues.   This help was made available whether or not a person was seeking to join or actually did join NCCS's debt management program.   Additional counseling was also available to people who joined NCCS's debt management program.

NCCS also fulfilled its educational and charitable mission in a number of other important ways.   For example, NCCS created and made available financial education materials and seminars geared toward helping consumers with various topics related to family finances, budgeting and the use of credit.   NCCS also supported special counseling and assistance programs, such as its Mortgage Services program which sought to help people with financial difficulties improve their financial situations so they could eventually buy a home, or retain an existing home.   Further, NCCS provided substantial contributions to support a number of consumer financial education and financial counseling efforts, including making educational materials and counseling available to an underserved minority segment of society.   No facts set forth in the 30 Day Letter dispute these efforts.

During the periods of the audit years in which NCCS made credit counseling services available to consumers, NCCS offered financially distressed individuals a broad range of financial counseling and educational support regarding consumer credit and personal finance. No facts set forth in the 30 Day Letter dispute this.

US01251

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 8

For the period of January 1, 2000 to June 29, 2001, NCCS focused its counseling and education efforts towards three primary areas.  The specific areas were:

- education products and activities to the public and its clients;

- counseling and educating people participating in its debt management program with their debt problems; and

- counseling and educating people with respect to financial issues related to the purchase of a home (this was provided by a 13 person Mortgage Services Department; the Mortgage Services Department provided mortgage education services for people who were about to buy a home and assistance with foreclosure intervention).

At the start of this period NCCS's education department already had a significant history of producing educational materials and reaching out to the public with assistance in credit and financial education.  The education department, which had up to 10 people, was moved on or about January, 2000, into NCCS's supporting organization, InCharge Institute of America, Inc. ("ICI").  Many of the current ICI educational materials, such Credit Compass (an award winning item) began their development in NCCS.  NCCS funded education activities and programs at ICI for the next several years.

**Exhibit A** attached hereto, outlines some of the various financial education activities that were accomplished.  A copy of Exhibit A was provided to the IRS during the audit.  Also, note that during the audit, samples of the following educational materials that were used for NCCS clients were provided to the IRS for review:

- sample pages from the NCCS Website that provided interactive educational information for clients;

- Charting A Course to Home Ownership Binder;

- samples of Monthly Horizon newsletters that went out to clients;

- sample of the NCCS Credit Calculator that was distributed widely;

- information regarding Money Mentor, which was an educational program conducted with Howard County, Maryland schools;

- various articles regarding debt and credit cards;

- report entitled "Trends in the Dependency Ratio of Financially Distressed Persons;" and

Internal Revenue Service
Attn:    Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 9

- issues of "The Journey of Fergus" - a series of financial educational stories.

In addition to the items noted above, the following initiatives (while not an exhaustive list) were also accomplished during the audit period:

- the Mortgage Services Department developed a web-based homebuyer's education website;

- an electronic newsletter was distributed;

- the Mike Schiano radio show (which had an educational format) was started in 2000 and it ran for three successive years;

- NCCS serves as a board member of Jump$tart Coalition for Personal Financial Literacy;

- NCCS serves as a board member of American Savings Education Council; and

- seminars were conducted as a social service on a regular basis to worthy groups such as churches and the Maryland State prison system.

Although NCCS's primary purpose is to educate and counsel people, it also felt that its debt management program was a valuable part of helping consumers recover from their debt problems.  The NCCS debt management program was NCCS's property, and it was managed by NCCS.  During the period under examination, NCCS's role in the debt management program was that of the contracting party with financially distressed people who decided to participate in the program, and therefore it had the ultimate responsibility for ensuring that participant's payments were:

- properly received and credited to the appropriate accounts;

- properly paid to the participants' creditors;

- safeguarded throughout this process; and

- within the State laws throughout the program process.

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 10

In addition, it was NCCS's responsibility to:

- determine and approve topics discussed and information provided in counseling sessions;

- determine and approve form of client agreements; and

- ensure availability of financial education opportunities and materials to the public and participants.

At the start of 2000 NCCS had been providing the public and people participating in the debt management program financial counseling in a variety of ways.  However, the process of adding new consumers to the debt management program began to be eliminated in 2000.  Public awareness and service announcements were discontinued in mid-2000.  Accordingly, relatively few clients were added to the program after that time.  NCCS and its counselors would focus for the next two years on counseling and assisting consumers that were already on the debt management program.

After 2001, NCCS also continued to create educational materials through funding provided to other tax-exempt educational organizations.  NCCS also continued its mortgage counseling and foreclosure prevention counseling services during the first two years of the audit period and through early 2002.  During 2002, NCCS began the process of closing of the NCCS Trust that was used to hold funds of people participating in the debt management program.  This process included the escheating of unclaimed funds.

Importantly, NCCS also continued the process of preparing a program for offering counseling to financially distressed consumers in connection with the then impending Bankruptcy Reform Bill.  At that time, Congress was aggressively seeking to reform the federal bankruptcy laws to require certain steps in credit counseling prior to an individual completing the bankruptcy process.  The proposed bankruptcy law did not take into consideration that a system to accomplish the counseling had not yet been established.  Moreover, no other organization or governmental agency was working to set up procedures or structures to ensure that there would not be a significant disruption to consumers already at risk if the new law passed quickly.  NCCS believed this would negatively impact consumers since there was the potential of a major delay for consumers in the bankruptcy process during the establishment of systems to handle the task required under the proposed law.  The overall legal system, including the judicial system, needed to be educated about credit counseling and contacted about procedures and systems to establish a smooth transition into this new act.

NCCS (in conjunction with ICI) was selected by the Executive Office for The United States Trustee to give advice on standards for personal finance education.  This work pertained to education program provisions in the proposed Bankruptcy Reform Bill.  A two page description

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 11

of NCCS's development activities and initiatives in this regard is attached as **Exhibit B** hereto. A copy of Exhibit B was provided to the IRS during the audit.

### III.    <u>Service Agreement and "Relationship" to Amerix</u>

In 1998, NCCS's management recognized that NCCS was at a crossroads with regard to the debt management program it provided to financially distressed consumers in need of that type of assistance.  Management envisioned that there were more people who needed NCCS's assistance. In order to service more people, NCCS recognized that the infrastructure that would be necessary to be able to competently assist those people needed to be developed.  To develop the support systems necessary (software, hardware and other intellectual property assets) requires a significant amount of capital.  It is difficult, if not impossible, for a non-profit organization to access the capital markets (and history has shown that the philanthropists of the world are not making any significant gifts to credit counseling organizations).  NCCS wanted to use its limited financial and human resources to locate and offer assistance to the ever-increasing population that was in need of those services.  NCCS knew that if it was successful in reaching people, NCCS would not have the infrastructure to service the increasing number of consumers in need of help.  Amerix, on the other hand, had access to the capital necessary to develop the technology to service a large number of people.  Amerix had the ability to raise the capital, which NCCS did not have.  In order for NCCS to help more people, and to allow it to pursue its other educational activities with greater focus, NCCS needed a much more cost efficient structure by which to provide services once it successfully located those people in need.

NCCS wanted to devote more time and resources to other financial counseling and education activities to help people.  It had decided that it needed to outsource the administrative servicing side of its debt management program.  NCCS was concerned about engaging any company to provide services related to its credit counseling program that did not have experience and knowledge in the area.  NCCS believed that it made sense to contract with a company that understood credit counseling and related services, NCCS, its goals, and the method by which financially distressed consumers needed assistance.

Because NCCS decided that outsourcing theses services was the best course of action to allow it to pursue its educational and charitable mission, NCCS determined that it would not need many of the assets required to do the processing.  Amerix was willing to purchase these assets all at one time at a cost that ensured that NCCS would not have to sell them at a loss.  In order to make the transaction acceptable to both parties, NCCS agreed to take back financing for the amount of the purchase price in the form of promissory notes, with interest.  It was believed that had the assets been sold piecemeal on the open market, a significant loss would have resulted.  NCCS knew that Amerix would be willing to pay more than any other buyer and accordingly NCCS received the highest value for the assets by selling them to Amerix.  All amounts due to NCCS in connection with the transactions described above were paid in full.  No facts set forth in the 30 Day Letter dispute this.

Internal Revenue Service
Attn:    Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:   National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 12

The totality of the administrative services that Amerix performed under the service agreement warranted the fees that were paid to Amerix, and the amount paid to Amerix under the service agreement was fair market value. The Arthur Andersen study reviewed the services that were being provided by Amerix in determining whether the fee paid to Amerix was competitive. In a free market society such as in the United States, a fee is reasonable if it is competitive in the market. Accordingly, the fact that a fee is competitive deems it to be reasonable. Arthur Andersen was very careful in describing the nature of the services so that it could obtain bids from other servicing companies in order to determine the market (and, therefore, reasonable) value for the services. In fact, in addition to the Amerix bid, Arthur Anderson also obtained proposals/bids from companies other than Amerix offering to provide some or all of the services.

Also, while there may have been a limited number of contractors available to provide services, it was clear that NCCS faced two choices. The first choice was to continue its then current resource allocation structure and only assist a small portion of the persons in our society that needed financial counseling and debt management assistance. The second choice was for NCCS to reorganize how it devoted its resources so that it could assist many more people who were in financial distress and in need of help. Consistent with NCCS's charitable and educational mission, NCCS chose the latter. By entering into the service agreement with Amerix, NCCS was able to maximize its intellectual, human and limited financial resources to assist people in financial distress. Even if it is believed that there was a limited number of contractors available to provide the services at the time of the Arthur Anderson study, that does not mean that prices in the market would not be reasonable and competitive.

It is also important to understand that the service agreement did not provide Amerix an opportunity for "unlimited" compensation. Amerix's compensation was limited to the volume of service provided to NCCS. Because NCCS had no self-imposed limit on the number of people it could help with its programs, there could be no "cap" on the amount of services NCCS could require of Amerix under the service agreement. It is not reasonable to expect that a service provider in any kind of business would provide unlimited services for a fee that was capped. Clearly as the need for services rises, and the service provider's costs also rise, it is an economic necessity for the associated fee for the services to increase. Moreover, it must be understood that the negotiated amendments to the service agreement in 1999 effectively "capped" the fees payable to Amerix after that time because the amendments provided that NCCS would stop spending on public awareness announcements in 2000, and Amerix would stop taking initial counseling calls at the end of 2000. Essentially, the amount of fees Amerix could charge could not grow because the number of consumers participating in NCCS's debt management program (with regard to which Amerix provided services) would not increase after these changes went into effect. Of course, the volume of services Amerix would be required to provide would not increase either. In fact, prior to the transfer to AFS in 2001, the number of consumers on NCCS's debt management program had begun to decline through natural attrition. Thus, there was, in reality, a "cap" on the fees Amerix could earn under the service agreement during the audit years.

Internal Revenue Service
Attn:  Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 13

For example, if NCCS required Amerix to provide administrative services for 300,000 clients, it could not expect that a cap (which, for example, could have been based on 200,000 clients) would provide any incentive for Amerix to provide services for an additional 100,000 clients. NCCS never wanted to be in a circumstance where it had to turn down the opportunity to assist people in need, nor be in a circumstance where people would not receive competent service.

In fact, NCCS's ability to exercise authority over the relationship was clearly demonstrated when at the end of 1999 NCCS negotiated an amendment to the service agreement, pursuant to which NCCS decided to cease in 2000 all new expenditures on public awareness and service announcements associated with enlightening the public about the availability of credit counseling services. Accordingly, one of the most significant events during the examination period in fact had a major impact on limiting Amerix's compensation, and clearly demonstrates that Amerix had no control over NCCS or the service relationship.

NCCS also oversaw the incoming call activities of Amerix. All talking points and guidelines as to what was to be said by Amerix employed counselors that assisted financially distressed people were approved by NCCS management. Calls were periodically monitored by NCCS management through visits to the Amerix call center, and discussions with the counselors, and along with live call monitoring. The existence of having a support service organization (like Amerix) which had more capacity to provide certain services than NCCS gave NCCS the opportunity to devote more of its resources to education activities and trying to locate other people in financial distress who needed NCCS's assistance.

It is also critical to understand that during the examination period the number of new people electing to participate in NCCS's debt management program was relatively low. For example, pursuant to revisions to the service agreement signed in 1999 (which was prior to the start of the audit period), NCCS had already begun to de-emphasize its debt management program, which in effect began the termination of its relationship with Amerix, and was involved in exploring methods to provide needed counseling services to consumers in connection with bankruptcy. Moreover, only a relatively small number of people were added to the NCCS debt management program in 2000, as compared to prior years, and no new participants were added to that program after 2000. Accordingly, any concerns about NCCS's relationship with Amerix during the examination period must be considered in the light of the fact that enrolling people on the NCCS debt management program was not a significant activity during that period. In fact, NCCS's significant activities during that period were counseling, education and planning for how to help people receive credit counseling services under the Bankruptcy Reform Bill.

Regarding the terms of the service agreement, it is important to note that many of the agreement's provisions were included at NCCS's insistence to protect its interests. In fact, the agreement included provisions allowing NCCS to terminate the agreement in part to protect NCCS and to help it maintain control over its debt management program and participants' level of satisfaction. It is clear that people on the program were always the NCCS's clients, and not

US01257

Internal Revenue Service
Attn:  Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 14

clients of Amerix.  If the level of service from Amerix to the participants was not satisfactory, it would have been reflected in these performance related provisions.  Therefore, NCCS always had the ability to terminate the contract if the indicators reflected unsatisfactory performance by Amerix.

The December 1999 amendment to the service agreement also provided that there would be a transition period in which NCCS would be responsible for counseling calls from program participants after 2000.  NCCS had already been conducting a significant number of counseling call sessions with clients each month through its "outbound" counseling department (for example, in July 1999 NCCS employees conducted 1,220 outbound counseling sessions), and it would once again handle the "inbound" counseling calls as well without Amerix's assistance.  A second amendment to the service agreement was made in August 2000.  This amendment provided that all electronic mail inquiries (other than payment processing issues) would be directed to NCCS to be handled by its counselors.

Also note that, based on certain information available to NCCS and NCCS's belief, NCCS understands that the IRS was approving Form 1023 applications for credit counseling agencies seeking exempt status under Section 501(c)(3) on which Form 1023 applications it was disclosed that the applicants had arrangements for outside service companies to provide debt management program processing and related services.  It is believed that such arrangements were similar to the arrangement between Amerix and NCCS.  It is also understood that such Form 1023 applications were previously approved by the IRS during the audit period.

6.     **Statement of law and reasons why proposed revocation is not warranted or appropriate:**

I.     <u>**NCCS has Operated in Accordance with the Information Provided in Its Form 1023, Application for Recognition of Exemption, which was Approved by the Internal Revenue Service in 1993.**</u>

The conclusion in the 30 Day Letter that NCCS's tax-exempt status under Section 501(c)(3) of the Code for years 2000, 2001 and 2002 should be revoked is in error because it would be an arbitrary, unreasonable, and invalid administrative action.  Revocation would be an arbitrary, unreasonable, and invalid administrative action because NCCS's activities and operations during the period at issue were conducted substantially in accordance with the activities and operations outlined in NCCS's Form 1023, Application for Recognition of Tax-Exempt Status (the "Form 1023").  Based on the information submitted in February, 1993 on the Form 1023, the IRS issued a favorable determination letter to NCCS in April, 1993 in which the IRS stated that NCCS is recognized as a tax-exempt organization under Section 501(c)(3) of the Code (the "Determination Letter").  Subsequently, in 1997, the IRS confirmed NCCS's tax-exempt status under Section 501(c)(3) of the Code and its status as a non-private foundation under Section 509(a) of the Code.

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 15

Further, as discussed above, NCCS detailed its proposed activities in its Form 1023. These activities were substantially similar to those activities during the IRS's audit, but curiously, the IRS reached a wholly different conclusion on audit than that reached by the National Office on review of NCCS's Form 1023.  Moreover, with respect to the service agreement and asset sale entered into with Amerix, both activities were properly reported to the IRS on NCCS's Form 990 for tax years 1998 and 1999; all without prompting IRS scrutiny or disagreement.

Since the issuance of the determination letter in 1993, NCCS has operated in a manner which is substantially in accordance with the activities described in the Form 1023.  Also, to the extent that NCCS's activities have changed in relation to those described in the Form 1023, such changes have been in furtherance of NCCS's educational and charitable purposes.  For example, NCCS undertook substantial efforts to track proposed federal laws in an effort to meet counseling needs for individuals facing bankruptcy.  This is clearly consistent with NCCS's charitable purpose of aiding those in financial distress.  Additionally, NCCS has accomplished its stated goals by providing credit counseling services to hundreds of thousands of people and, when needed, helping financially distressed people who qualify address problems by offering them the opportunity to participate in a debt management program.  There are no contrary findings of fact in this regard noted in the 30 Day Letter.

Accordingly, any suggestion that NCCS's tax-exempt status should be revoked is completely inconsistent with the facts.  The proposed action in the 30 Day Letter to revoke NCCS's tax-exempt status should be rejected.

Further, even assuming arguendo that the IRS has developed new standards with regard to determining the tax-exempt status of credit counseling organizations and desires to apply such standards to NCCS, the IRS is prohibited from revoking NCCS's tax-exempt status as proposed in the 30 Day Letter.  It must be recognized that the treasury regulations under Section 501(c)(3) of the Code provide that once the IRS has issued a determination letter recognizing the tax-exempt status of an organization, the organization "may rely upon such determination so long as there are no substantial changes in the organization's character, purposes, or methods of operation."  Reg. § 1.501(a)-1(a)(2); see also Treas. Reg. § 601.201.  This is also clear in the case law.  For example, in Lesavoy Found. v. Comm'r, 238 F.2d 589 (3d Cir. 1957), rev'g 25 T.C. 924 (1956), the court held that the IRS could not arbitrarily revoke the organization's exemption based on a previously issued ruling.  The IRS also has explained these regulations as assuring an organization that it can rely on a "determination letter unless there is a material change in its operations or a change in the applicable law."  See General Counsel Memorandum 39866, fn. 3 (1991).

Further, it should be noted that the second sentence of treasury regulation Section 601.201 provides that a revocation of exempt status may be retroactive only under the following circumstances: (a) if the subject organization omitted or misstated a material fact, (b) operated in a manner materially different from that originally represented, or (c) engaged in a prohibited

US01259

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:   National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 16

transaction for the purpose of diverting corpus or income from its exempt purpose, and if the transaction involved a substantial part of the corpus or income of the organization. Treas. Reg. § 601.201. Id. Recognizing these limitations, Rev. Proc. 90-27, 1990-1 CB 514 explains that revocation or modification of exempt status should only be "retroactive if the organization omitted or misstated a material fact [or] operated in a manner materially different from that originally represented…" The 30 Day Letter does not describe any such circumstances with regard to NCCS.

The IRS's suggestion to retroactively revoke NCCS's exempt status demonstrates a failure by the IRS to recognize that NCCS has been operated in substantially the same manner as was described in its Form 1023, pursuant to which Form 990s were prepared and filed since that date. The facts described in the 30 Day Letter, and the facts described in this appeal/protest and other information provided to the IRS during the audit demonstrate that NCCS has operated in a manner that is substantially consistent with the information provided in the Form 1023.

It is clear that an attempted revocation of NCCS's tax-exempt status is not permissible under applicable law within which the IRS must comply. Such an action would be an arbitrary, unreasonable, and invalid administrative action.

## II.    NCCS's Conducted Educational Activities And Programs.

In a cursory fashion, the 30 Day Letter asserts that "NCCS lacks the required educational activities to be an organization described in section 501(c)(3)." 30 Day Letter, p. 11. To the contrary, however, as explained herein, NCCS is organized and operated for educational purposes that satisfy the requirements of Section 501(c)(3) of the Code. The facts and information presented during the audit and described in the Statement of Facts section above demonstrates that NCCS engaged in and supported substantial educational and counseling activities during the audit period. In fact, it is admitted in the 30 Day Letter that educational and counseling activities occurred, but that NCCS's contract with Amerix somehow negated the educational activities being conducted. Id. No authority or analysis is provided in the 30 Day Letter which would support such a conclusion.

NCCS has created, distributed and made available a substantial amount of educational materials and programs designed to help consumers better handle their personal and family financial affairs. A discussion of the educational materials and programs is more fully set forth in the discussion of facts, above. It is clear that these materials and programs were substantial and beneficial to both individuals and the public in general. Additionally, much of the materials and programs discussed above were provided free-of-charge.

In addition, during the period that NCCS offered credit counseling and a debt management program, people contacted NCCS for help because they were in financial distress. People that needed help were provided counseling and other services whether or not they were in need of debt management assistance and whether or not they were qualified for, or wanted to

US01260

Internal Revenue Service
Attn:  Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 17

participate in, a debt management program.  In this regard, NCCS made available counseling, budget and educational materials to all people who contacted NCCS for help.  The IRS has presented no authority to support its position that the mere existence of the service agreement with Amerix acts to negate the importance of such activities or convert them into something else.

Also, NCCS's debt management program provided educational and training benefits to financially distressed people.  For example, financially distressed people learned, by virtue of participating in the program, individual skills for credit management, money management, personal savings and budgeting.  Additionally, participants were provided special educational materials designed to enhance their skills in the areas of understanding personal finance management, responsible record keeping and wise use of credit, and to help them successfully participate in and eventually "graduate" from the program.  Consequently, NCCS's activities were charitable and educational activities under 501(c)(3) of the Code and sufficient for NCCS to maintain its tax-exempt status under 501(c)(3) of the Code.[2]

Further, the facts relative to NCCS are comparable to those in the case of Consumer Credit Counseling Service of Alabama, Inc. v. U.S., 78-2 USTC (US Dist. Ct., Dist. of Col., Civ. No. 78-0081, 8/18/1978) (hereinafter "CCCS of Alabama").  CCCS of Alabama was a consolidated case involving 24 credit counseling agency plaintiffs (the "Agencies"), all of which were organized and operated in a virtually identical manner.  The Agencies had two programs: (i) provide information to the general public through speakers, films, and publications on subjects of budgeting, buying practices and the sound use of consumer credit, and (ii) provide counseling on budgeting and appropriate use of credit to debt distressed individuals and families.

In connection with counseling activities, the Agencies would also provide consumers with advice as to debt proration and payment when a monthly program of distributing money to creditors was developed and implemented.  Agencies would intercede with creditors to cause them to agree to a monthly payment schedule in these cases.  A "nominal" fee was generally charged for debt management services, which fee would be waived where it would work a financial hardship.

The court found the IRS in error for denying exempt status to the Agencies, in part, because they provided a service to the general public.  Specifically, the court found that:

1.  the Agencies' programs were charitable because they advanced education and promoted social welfare;

2.  the Agencies' programs were educational because they served to instruct the public on subjects useful to individuals and beneficial to the community;

---

[2]  If the IRS's logic were followed, non-profit hospitals could not be serving a charitable purpose because they contract with their doctors and nurses.  Moreover, joint ventures with non-profit and for-profit hospital entities would be wholly impermissible; this is simply not the state of the law.  See e.g., Rev. Rul. 98-15, 1998-1 C.B. 718.

US01261

Internal Revenue Service
Attn:  Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 18

3.    the Agencies' counseling programs were charitable and educational in nature; and

4.    the debt management activities were an "integral" part of the counseling function, so they were also charitable and educational.

In its holding, the court granted retroactive relief to the Agencies, finding that the Agencies were all tax-exempt charitable organizations under Section 501(c)(3) of the Code. This holding was followed in a second decision, Credit Counseling Centers of Oklahoma, Inc. v. USA, (US Dist. Ct., Dist. of Col., No. 78-1958, 6/13/70). In the CCC of Oklahoma case, the court noted that the facts were virtually the same as in the CCCS of Alabama case. The court in the Oklahoma case found for the taxpayers on a motion for summary judgment, holding that the taxpayers qualified, retroactively, for tax-exempt status.

The similarities of NCCS's activities to those of the Agencies in CCCS of Alabama and CCC of Oklahoma are compelling.  CCCS of Alabama is the seminal case regarding what activities qualify an organization as a tax-exempt credit counseling agency. The following facts of the Agencies in the CCCS of Alabama case are substantially similar to the facts regarding NCCS:

1.    both provided a variety of educational materials and programs on financial matters to the general public through various sources, without charge;

2.    both enabled people to receive counseling on financial issues, without charge;

3.    both made a debt management plan option available to people in financial distress and in need of such a program;

4.    program participants could pay a fee (CCCS of Alabama) to the agency while participating in the debt management program, which is waived in certain cases (however, it is important to reiterate that NCCS did not charge fees – contributions were requested and assistance was provided whether or not a contribution is made); and

5.    the programs were not limited to low-income persons.

Moreover, in a subsequent IRS General Counsel Memorandum (GCM 38881, May 28, 1982), it was concluded that the IRS should not continue to litigate cases against credit counseling agencies. It was stated in GCM 38881 that the agency at issue was "not significantly different" from those involved in the CCCS of Alabama and the CCC of Oklahoma cases even though the subject agency's debt management activities were more than double the amount of the Agencies' debt management activities in the cases. The Chief Counsel's Office conceded that further litigation of this issue would be "futile."

Consequently, the holdings in the CCCS of Alabama and the CCC of Oklahoma cases support the conclusion that NCCS did operate for exempt purposes. The only "fact" that

US01262

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 19

separates NCCS from the Agencies in these established cases is that during a portion of the audit period, NCCS entered into an arms-length and fair market value contract with Amerix to provide needed services which furthered the exempt purpose of NCCS. Nothing in the 30 Day Letter disputes this conclusion.   As discussed above, the service agreement did not amount to transferring "control" of NCCS to Amerix or providing Amerix with an impermissible private benefit.  Thus, it cannot be considered as a factor supporting revocation of NCCS's exempt status.

III.    **NCCS Did Not Waiver From Its Educational And Charitable Purpose During The Audit Period, And Continued to Engage in Substantial Exempt Activities after June 2001.**

Throughout the audit period NCCS continued to focus on its charitable purpose of providing education and assistance to those in financial distress.   Accordingly, revocation of NCCS's exempt status is not inappropriate.

The 30 Day Letter correctly recounts Section 1.501(c)(3)-1(c)(1) of the regulations as providing that an organization will be regarded as operating exclusively for one or more exempt purposes only if it engages primarily in activities that accomplish one or more of such exempt purposes.  Clearly, organizations will not be so regarded if more than an insubstantial part of their activities are not in furtherance of their exempt purpose.

In an attempt to demonstrate that NCCS is not operating for an exempt purpose, the 30 Day Letter cites Better Business Bureau of Washington, D.C., Inc. v. United States, 326 US 279 (1945), and American Institute for Economic Research v. Unites States, 302 F.2d 934 (Ct. Cl. 1962).   However, both of these cases addressed organizations whose stated purpose was commercial in nature, rather than charitable.   Such arguments are inapplicable in NCCS's case.

In Better Business Bureau, the Supreme Court addressed whether the Better Business Bureau of Washington, D.C., Inc. was exempt from social security taxes as a corporation organized and operated exclusively for scientific or educational purposes.  The focus of this case was on the subject of the organization's Articles of Incorporation, which stated that it is formed for the "education and scientific advancements of business methods among persons, corporations...and...to enable such [businesses]...to successfully and profitably conduct their business..." Id. at 281.

In this context, the Court articulated that this "means that the presence of a single non-educational purpose, if substantial in nature, will destroy the exemption..." Id. at 283. Importantly, the non-educational *purpose* on which the Court focused was the pursuit of a profitable business.  Id. at 283.  In contrast, NCCS has, at all times, been operated for the purpose of educating and helping people in financial distress.

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 20

Similarly, in American Institute for Economic Research v. U.S., the taxpayer ("AIER") was organized to conduct scientific research in the general economics field and to disseminate the results in order to educate individual students and the general public.  AIER published two periodicals, *The Investment Bulletin* and *The Research Reports*, both of which were provided for a fee and advised readers on investment programs and recommended particular investments.  *The Research Reports* and many of the books dealing with various economic problems were distributed free to approximately 2,000 libraries.  However, for an additional fee, AIER provided an investment management service in which it would give members specific recommendations for sales and purchases of securities in the particular member's portfolios.  Additionally, AIER provided an analysis service of specific securities for a fee of $1.00 per security.

The IRS argued that AIER's publications, specifically the semi-monthly *Investment Bulletin* and the *Quarterly List of Recommended Securities* merely provided advice, for a fee, to individual subscribers, toward achieving a sound investment program.  The IRS also argued that AIER's "continuous supervising service" and its analysis for a fee of specific securities were of a similar nature.  As a result, the IRS argued that the totality of these activities was indicative of a business, and therefore AIER's purpose was commercial in nature.  In analyzing the business activities, the court applied its analysis from Scripture Press Foundation v. United States, 285 F.2d 800 (1961), in which it found the dispositive test to be "whether the business activities of the taxpayer are incidental to its charitable or educational objectives, or whether, in fact, the converse is true."  302 F.2d at 937-938.  In the case of AIER, the activities were clearly more analogous to commerce than education.

On the other hand, in the case of NCCS there were no "business activities."  Instead, NCCS consistently pursued its objective of ameliorating the problems faced by financially distressed individuals through education, credit and financial counseling, and other methods to avoid bankruptcy.  Thus, the holdings in Better Business Bureau and American Institute for Economic Research are inapposite to NCCS – those cases addressed organizations whose "purpose" was not charitable in nature.

Curiously, aside from the argument that the service agreement with Amerix requires revocation of NCCS's exempt status, the 30 Day Letter also argues that NCCS should be revoked for the period after June 2001 because "it ended its credit counseling activities, and it did not have sufficient charitable or educational activities to be described under Section 501(c)(3) of the Code."  See 30 Day Letter, at p. 10.  Such a conclusion is particularly troubling because, as the IRS knows from the information gathered during the audit, NCCS was involved in a number of education and financial counseling activities after June 2001, including extensive preparatory work and research to provide counseling to individuals in bankruptcy pursuant to the proposed Bankruptcy Reform Bill that NCCS believed would be enacted.  See 30 Day Letter, at p. 12.  NCCS's efforts to continue its charitable and educational endeavors by counseling individuals who are experiencing a bankruptcy is clearly consistent with the requirements of Section 501(c)(3).  The other substantial educational and counseling activities, such as mortgage

US01264

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 21

and foreclosure intervention counseling, that continued after June 2001 are more fully discussed in the statement of facts above.

In addition, although after 2002 NCCS had ceased most of its prior activities concerning bankruptcy counseling because the Bankruptcy Reform Bill was not enacted, NCCS still used its funds to support educational endeavors through other charitable organizations. Importantly, none of these monies were diverted to private use. As a result, the IRS's position that NCCS should be revoked with respect to the period after June 29, 2001 is not supportable.

The argument that NCCS's status should be revoked for perceived inactivity after June 2001 is also troubling given the analysis in Caracci, et al. v. Commissioner that the dormant status of organizations precluded calling into question whether such organizations were functioning as tax-exempt entities. Caracci, et al. v. Commissioner, 118 T.C. 379, 417-18 (2002); see also Frances R. Hill and Douglas M. Mancino, Taxation of Exempt Organizations ¶ 4.04 (2005); Lloyd H. Mayer, The Tax Court Decides The Opening Skirmish In Intermediate Sanctions Litigation, 14 Taxation of Exempts 99, 110 (November/December, 2002).

Caracci involved the transfer of the entire assets of three charities to three corresponding for-profit entities owned and controlled by insiders of the charities. The petitioners were composed of the individual insiders, their family members, and the for-profit companies. Additionally, petitioners included the charities themselves, as the IRS had proposed not only to impose excess benefit sanctions, but also to revoke the tax-exempt status of each participating charity (the "Sta-Home" entities).

With respect to the IRS's proposed revocation of exempt status, the court found that with the enactment of Section 4958, "the issue whether the tax-exempt status of the Sta-Home tax-exempt entities should be revoked must now be considered in the context of the 'intermediate sanction' provisions." 118 T.C., 417. After an extensive review of the legislative history, the court noted that "the intermediate sanction regime was enacted in order to provide a less drastic deterrent to the misuse of a charity than revocation of that charity's exempt status." Id. citing H. Rept. 104-506, at 56, 59, 1996-3 C.B. 49, 104, 107. The Court continued that

[a] footnote to this statement explains: 'in general, the intermediate sanctions are the sole sanction imposed in those cases in which the excess benefit does not rise to a level where it calls into question whether, on the whole, the organization functions as a charitable or other tax-exempt organization'.

Id. quoting H. Rept. 104-105, supra at n.15, 1996-3 C.B. at 107. (emphasis added).

The Caracci court found that the legislative history considered that it would be a rare case where both revocation and the imposition of sanctions existed. Id. In this case, the court refused to find that this was such an unusual case. Instead, the court noted that the dormant state of the

US01265

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 22

Sta-Home entities precluded calling into question whether they were functioning as tax-exempt entities.

Applied to the present matter with NCCS, it is clear that even if NCCS were found to be "dormant" for part of the audit period, that should not operate as a reason to revoke its exempt status.

## IV.    NCCS Did Not Confer An Impermissible Private Benefit On Amerix.

It should be noted that published guidance on how or when the private benefit doctrine should be applied to suggest that revocation of an organization's tax-exempt status is appropriate is very limited.[3]  Further, a review of the available case law addressing the application of the private benefit doctrine reveals that there are relatively few reported decisions, demonstrating that this doctrine has been sparsely used or relied upon by the IRS as a reason to deny or revoke an organization's exempt status.

In any event, it is clear that an organization that is exempt under Section 501(c)(3) of the Code may enter into a contract with a third party to conduct activities on its behalf, provided the organization maintains ultimate authority over the activity, the terms of the agreement are reasonable and the compensation is reasonable.[4]  NCCS has clearly demonstrated that it maintained the ultimate authority regarding its credit counseling and debt management program services,[5] the service agreement was reasonable with regard to NCCS, and the fees payable under the service agreement were fair and reasonable, and ultimately such fees were limited during the audit period, as discussed in the Statement of Facts section above.[6]  Further, any service fee

---

[3]  See, Hill and Mancino, Taxation of Exempt Organizations, ¶4.02 (2003).

[4]  See, Rev. Rul. 98-15, 1998-1 CB 718, and Broadway Theatre League of Lynchburg, Virginia, Inc., 293 F. Supp. 346 (W.D. Va. 1968).

[5]  The 30 Day Letter asserts that "Amerix can exert considerable control over NCCS through the service and loan agreements." See 30 Day Letter, pg. 11.  This simply is not true and is not supported by the facts referenced in the 30 Day Letter.  The 30 Day Letter attempts to support this assertion with the claim that Amerix could terminate the service agreement, but NCCS could not.  Id.  This clearly was not the case as the service agreement did provide NCCS the right to terminate the agreement if various performance standards were not satisfied.  In fact, this is recognized on page 3 of the 30 Day Letter.  Also, the 30 Day Letter infers that because NCCS might be obligated to pay a residual fee in connection with a termination of the agreement, Amerix somehow had some control over NCCS.  In fact, the purpose of any residual fee that might be due to Amerix upon termination of the agreement was an economic term intended to reflect a fair payment for services Amerix would have already provided to that point, but for which it would not have yet received fair compensation.  The fact that this term was reasonable is further supported by the Arthur Anderson study.

[6]  The 30 Day Letter infers that the fee due to Amerix under the service agreement was somehow not warranted because it was based on a percentage of amounts received from consumers participating in the debt management program and their creditors, which the 30 Day Letter seems to argue represents impermissible fee sharing and provided Amerix "no incentives not to sign up clients who may not be best suited for a DMP plan."  See, 30 Day Letter, at pg. 10.  Further, even if the fee arrangement with Amerix constituted a fee based on gross revenue, such is clearly permissible under the current applicable tax laws.  See, Rev. Rul. 98-15, supra, Situation 1.  Regarding Situation 1 in Rev. Rul. 98-15, the ruling provides as follows:

"The management company will be paid a management fee for its services based on C's gross revenues.  The terms and conditions of the management agreement, including the fee structure and contract term, are

US01266

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 23

payments due to Amerix in connection with the service agreement were incidental to the
accomplishment of NCCS's exempt purpose.  Accordingly, there is no reasonable basis to assert
that NCCS conferred an impermissible private benefit on Amerix or that NCCS's exempt status
should be revoked because it had a service agreement with Amerix.

Nevertheless, the 30 Day Letter suggests that NCCS's tax-exempt status should be
revoked beginning January 1, 2000 "due to excessive private benefit."  The crux of the IRS's
argument appears to be that NCCS conferred impermissible private benefits on a third party,
(i.e., Amerix).  However, the information facts noted, cases cited, and reasoning applied in the 30
Day Letter simply do not establish by any reasonable standard that NCCS conferred any
impermissible private benefit.  Moreover, the 30 Day Letter cites substantially inapposite
authorities to reach its conclusions.  The following sections address the problems associated with
the cases cited and reasoning applied in the 30 Day Letter on this issue.

    A.    The IRS Has Misconstrued the Meaning of "Private Benefit."

The 30 Day Letter asserts that "[p]rivate benefits include an 'advantage; profit;
fruit; privilege; gain; or interest.'"  See, 30 Day Letter at p. 6, citing Retired Teacher's Legal
Fund v. Commissioner, 78 T.C. 280, 286 (1982).  Certainly, if the definition of private benefits
were, in fact, as broad as asserted in the Retired Teacher's Legal Fund case, then many tax-
exempt organizations throughout the country would lose exempt status.  For example, if such a
standard were applied to universities, how could they be exempt because faculty, administrators
and others "benefit" from the university's operations because they make a living from their work
associated with the university?  Of course, the definition is not so broad.

In Retired Teacher's Legal Fund, one of the issues was whether the term
"benefit," as used in the Treasury Regulations, was unconstitutionally vague.  The court found
that the term "benefit" was not unconstitutionally vague, and further explained that "the
definitions supplied in Black's Law Dictionary ('advantage; profit; fruit; privilege; gain;
interest,' Black's Law Dictionary 143 'rev. 5th ed. 1979') and quoted in petitioner's brief, when
applied to the context of the other language in the regulation, satisfied constitutional
requirements."  78 T.C. 280, 286.  Clearly, this court was not, in this context, attempting to
define the term "private benefits" as used in the Treasury Regulations.  Instead, it was merely

---

reasonable and comparable to what other management firms receive for similar services at similarly situated
hospitals.  C may terminate the agreement for cause."

Situation 1 was "approved" in the ruling as an acceptable structure for purposes of Section 501(c)(3) of the Code.  It is
important to recognize that the facts regarding NCCS's service agreement with Amerix are substantially similar to the facts
regarding the management agreement in Situation 1 of Rev. Rul. 98-15, which was approved – the terms were reasonable, the
revenue structure was based on gross revenues, the fee structure was reasonable, and the agreement could be terminated for
cause.  The citation of the People of God case in the 30 Day Letter on this issue is inapplicable and erroneous.  Further, the
inference that the agreement's fee structure may have provided some kind of improper incentive with regard to consumers
joining the program is pure speculation and is not supported by any facts offered in the 30 Day Letter.  Clearly such inferences
are not supported by the applicable facts or law and must be wholly disregarded.

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:   National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 24

addressing the taxpayer's "constitutionally vague" argument. Consequently, the expansive definition of "private benefits" used in the 30 Day Letter cannot be properly applied to NCCS.

B.     The Authorities Cited in the 30 Day Letter Do Not Support A Finding That Impermissible Private Benefit Occurred.

The 30 Day Letter cites Christian Stewardship Assistance, Inc. v. Commissioner, 70 T.C. 1037 (1978) and American Campaign Academy v. Commissioner, 92 T.C. 1053 (1989) in support of the position that impermissible private benefit occurred in connection with NCCS's service agreement with Amerix.   However, both of these cases involve situations and organizations with purposes and activities that are clearly distinguishable from the present matter and the purposes and activities of NCCS.

In Christian Stewardship Assistance, the taxpayer was formed as a nonprofit corporation to engage in financial counseling and provide financial planning services to wealthy individuals who had contributed to various Christian organizations and whose net worth exceeded one-half million dollars.   Id. at 1039.   The taxpayer prepared financial plans, taking into account personal goals and applicable income and estate tax savings in connection with making charitable contributions.   The taxpayer maintained that it should be entitled to tax-exempt status because its activities amounted to fundraising activities for the charitable organizations.   Id. at 1041.   However, the court found that the organization's "sole financial planning activity… has a non-exempt purpose of offering advice to individuals on tax matters that reduces an individual's personal and estate tax liabilities."   Consequently, the court found that the organization was serving private interests by advising individuals about methods to decrease federal income and estate taxes, and that this non-exempt purpose was greater than the exempt purpose for which the organization claimed exempt status.

Unlike Christian Stewardship Assistance, NCCS's activities served the exempt purpose of assisting people in financial distress.   That NCCS outsourced some of its service activities to Amerix during part of the audit period under a fair market value service contract does not change the fact that many people in financial distress received help during that period. Thus, unlike the organization in Christian Stewardship Assistance, at no point did NCCS engage in efforts to benefit private individuals.

Similarly, American Campaign Academy, supra, is equally distinguishable.   In American Campaign Academy, the nonprofit organization ("taxpayer") was formed as a direct outgrowth of sponsored programs and courses of instruction supported by the National Republican Congressional Committee ("NRCC") to train candidates and to train and subsequently place campaign professionals in Republican campaigns.   Id. at 1056.   One of the taxpayer's initial directors was an executive director of the NRCC and another of the directors was a member of the Republican National Committee.   The IRS did not dispute that the taxpayer was organized exclusively for an exempt purpose (i.e., educational purposes), but asserted that

US01268

the taxpayer was operated for a substantial non-exempt private purpose because it specifically benefited the Republican party entities and candidates. Id. at 1063.

In upholding the decision of the IRS, the court applied the analysis in Aid to Artisans, Inc. v. Commissioner, 71 T.C. 202 (1978). In that case, the court explained that:

> The questions whether an organization serves private interests within the meaning of [Section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs.] and whether an organization's activities are conducted for private gain *** may be resolved *** by examining the definiteness and charitable nature of the class to be benefited and the overall purpose for which the organization is operated.

Id. at 1075 quoting 71 T.C. at 215 (alteration in original). Based on this analysis, the court found that those being benefited by the organization's activities were not a "charitable class." Contrary to this case, it is clear from the facts presented that NCCS's activities were charitable, educational, and beneficial to the public at-large and to financially distressed individuals and families, which are clearly a charitable class. Nothing in the 30 Day Letter disputes this conclusion.

The 30 Day Letter also cites est of Hawaii v. Commissioner, 71 T.C. 1067 (1979) to support the contention that NCCS conferred an impermissible private benefit on Amerix. In est, three for-profit corporations were set up and entered into a "standard est royalty agreement" with the sole objective of establishing a system for the presentation of "est" to the public through tax-exempt organizations. Est, Inc. was a for-profit corporation which, in December 1971, acquired all rights in the United States to the body of knowledge developed by Werner Erhard constituting the "est" training.

Based on the overwhelming control that the for-profit entities had over the nonprofit entities, among other factors, the IRS denied exempt status. In detailing the control exerted by the for-profit entities, the court found that

> [The for-profit] sets the tuition ... and requires a minimum number of such trainings. It requires [the tax exempt organization] to conduct regular seminars and to host special events. It controls the programs conducted by [the tax exempt organization] by providing trainers who are salaried by and responsible to est, Inc., and it further controls petitioners' operations by providing management personnel who are paid by and responsible to est, Inc. In short, petitioners' only function is to present to the public for a fee ideas that are owned by [the for-profit entities]

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re: National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 26

with materials and trainers that are supplied and controlled
by [for-profit entities].

The est of Hawaii court also found that the taxpayer's income producing activities
were "not incidental to its educational activities, but [were] the very justification for its
existence." Id. at 1082 (emphasis added). As a result, the court found that the taxpayer "was
simply the instrument to subsidize the for-profit corporations and not vise versa and had no life
independent of those corporations." Id.

The circumstances involving NCCS are wholly different from those described in
est of Hawaii. In fact, unlike est of Hawaii, NCCS began its operations as a nonprofit
organization to help the financially distressed and continued operations after it terminated the
service agreement at issue. Unlike est of Hawaii, there are no royalty agreements requiring
NCCS to meet income-producing standards of the for-profit entity. Additionally, NCCS owned
all of its intellectual property, unlike the nonprofit organization in est of Hawaii. Further, it has
been demonstrated (as described in the facts outlined above) that NCCS engaged in several
substantial educational and counseling activities outside of and in addition to the credit
counseling assistance provided to the financially distressed which Amerix assisted with pursuant
to the service agreement.

In fact, the only similarity between the organization in the est of Hawaii case and
the present matter is that NCCS had an agreement with a for-profit entity (which in NCCS's case
was to purchase certain services, and not a royalty agreement as was the case in est of Hawaii).
Moreover, there was no overwhelming control exerted by a for-profit entity in the relationship
between NCCS and Amerix, as was the case in est of Hawaii.

Instead, NCCS paid a market rate to Amerix to perform services for NCCS which
were related to furthering NCCS's exempt purpose. As the IRS has already conceded,
"[r]easonable compensation does not constitute inurement." 30 Day Letter, at p. 8 (citing
Birmingham Business College v. Commissioner, 276 F.2d 476, 480 (5th Cir. 1960)).
Consequently, the payment of reasonable fees by NCCS for services to further NCCS's exempt
purpose cannot be considered an impermissible benefit under the analysis of est of Hawaii. In
addition, the facts in NCCS's case clearly demonstrate that NCCS was able to and did act
independently of Amerix, and that Amerix did not "control" NCCS or dictate to NCCS how it
would operate. Further, it is clear that NCCS had the ability to alter its relationship with Amerix,
and that it did so in various ways on several occasions (such as, for example, when it decided to
cease additional spending on pubic awareness and service announcements in 2000, and when it
decided to transfer its rights to service people participating in the debt management program to
AFS in 2001). Such would not be the case if Amerix truly "controlled" NCCS. Further, NCCS
clearly had purposes and activities it carried out and pursued independent of any dealings with
Amerix (see listing of education and other financial counseling activities described above).

US01270

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 27

C.   <u>IRS Improperly Concludes That A Private Benefit Has Been Conferred</u>.

As established above by a brief review of the cited authorities in the 30 Day Letter discussing private benefits and an explanation of the factually gross abuses upon which those cases were decided, NCCS does not fit the mold of an organization conferring an impermissible private benefit on another.

Apparently recognizing that the position in the 30 Day Letter that impermissible private benefits were conferred is, at best, strained, the 30 Day Letter also relies upon <u>People of God Community v. Commissioner</u>, 75 T.C. 127 (1980), a private inurement case, to support the conclusion that the exempt status of NCCS should be revoked.  The 30 Day Letter compares the fee owed by NCCS to the income arrangement that the church in <u>People of God</u> had with its ministers.  However, the paramount difference between <u>People of God</u> and the present matter is that <u>People of God</u> was specifically decided on a *private inurement* analysis because the ministers were "insiders."  In fact, the church's three ministers were also its three directors, and were the only corporate members of the organization.  "In other words, petitioner's ministers completely control its affairs."  <u>Id</u>. at 129.  In the case of NCCS, there is no assertion that Amerix was an "insider" with regard to NCCS, and the argument that NCCS was controlled by Amerix is not supported in the 30 Day Letter or consistent with the facts.

On the other hand, the 30 Day Letter does cite another case, <u>United Cancer Counsel v. Commissioner</u>, 165 F.3d 1173 (7th Cir. 1999), in a cursory manner on page 8.  There are, however, many important findings in this case which necessitate further review and discussion.  In <u>United Cancer Counsel</u>, the IRS argued to revoke the exempt status of United Cancer Counsel ("UCC") based on the fundraising business relationship UCC had with a for-profit entity ("W&H").  The IRS claimed that UCC (which was defunct at the time of the court's ruling) "was not operated exclusively for charitable purposes, but rather was operated for, or also for, the private benefit of the fundraising company that UCC had hired…" 165 F.3d at 1175.  Further, the IRS argued that "the contract was so advantageous to W&H and so disadvantageous to UCC that the charity must be deemed to have surrendered the control of its operations and earnings to the non-charitable enterprise that it had hired to raise money for it."  165 F.3d at 1175.  For example, the five-year contract gave co-ownership of the list of prospective donors generated by W&H's fundraising efforts to W&H, and prohibited UCC from selling or leasing the list; all while placing no restriction on W&H's use of the list.  <u>Id</u>.

Although the IRS argued that this amounted to W&H's control over the charity, and impermissible private inurement to W&H, the appellant court disagreed.  The court explained that these points may "go to UCC's sound judgment, [but do not determine] whether W&H succeeded in wrestling control over UCC from the charity's board."  <u>Id</u>. at 1178.  Further, the court admonished the IRS and the tax court for "using 'control' in a special sense not used elsewhere, so far as we can determine, in the law, including federal tax law."  <u>Id</u>.

US01271

Internal Revenue Service
Attn:    Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:   National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 28

Ultimately, the court was concerned about the effects of interpreting 'control' in the IRS's favor.  The court acknowledged that such an interpretation would empower the IRS "to yank a charity's tax exemption simply because the Service thinks its contract with its major fundraiser too one-sided in favor of the fundraiser..."  Id. at 1179.  Lastly, the court was particularly struck by the IRS's suggestion that the guide to determine this issue should be a "facts and circumstances" test.  Id.  The court noted that "[t]hat is no standard at all, and makes the tax status of charitable organizations and their donors a matter of the whim of the IRS."  Id.

While the court was forced to remand the case to the tax court to decide the "private benefit" issue that it had previously ignored, the court offered that

The usual "private benefit" case is one in which the charity has dual public and private goals, see *e.g., Better Business Bureau v. United States*, 326 U.S. 279, 283, 90 L.Ed. 67, 66 S.Ct. 112 (1945); *Living Faith, Inc. v. Commissioner*, 950 F.2d 365 (7th Cir. 1991); *American Campaign Academy v. Commissioner, supra*, 92 T.C. at 1064-65, and that is not involved here.

Id. (emphasis added).  The facts regarding NCCS and its "relationship" with Amerix are far more favorable than those presented in the United Cancer Council case to argue that UCC was "controlled" by W&H and that an impermissible benefit was created.  Consequently, the fact that NCCS negotiated a contract with Amerix does not rise to the level of conferring an impermissible private benefit upon a for-profit entity.  Further, the IRS is clearly attempting to apply a "facts and circumstances" test in this matter to try and demonstrate impermissible "control," but such a standard was rejected by the court in United Cancer Council.

7.    **NCCS disagrees with the proposed revocation:**

Based on the facts and law set forth above, NCCS disagrees with proposed revocation of NCCS's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code retroactive to January 1, 2000.  Additionally, NCCS disagrees with the following findings and conclusions in the 30 Day Letter: (i) NCCS provided excessive or impermissible private benefit; (ii) that NCCS lacked the required education activities to be exempt under Section 501(c)(3); and (iii) that after June, 2001 NCCS lacked sufficient charitable and educational activities to maintain its tax-exempt status.  Further, NCCS disagrees that it is required to file a Form 1120 for any of the tax years at issue and that any tax, interest or penalty is due with respect to any of the tax years at issue (i.e., 2000, 2001 and 2002).

8.    **Hearing/conference request:**

A hearing/conference with the Appeals Office on this appeal/protest is requested.

\*        \*        \*        \*        \*        \*        \*

Internal Revenue Service
Attn:   Messrs. George Poskitt, Group Manager, and Eric B. Thomas, Agent - EO Specialist
Re:  National Credit Counseling Services, Inc. (EIN 52-1799746)
March 14, 2005
Page 29

     I have prepared the foregoing appeal for NCCS, but I do not know that the statements of fact contained in the appeal and accompanying documents are true and correct.

     A copy of the Power of Attorney (Form 2848) authorizing the undersigned to represent NCCS in this matter is attached hereto at Tab 4.

Sincerely,

Jonathan Z. May

JZM:jss

Enclosures

cc:    Ford Allen (IRS) (Badge #52-03832) (via regular mail)
       National Credit Counseling Services, Inc.
       Lonnie M. Ritzer, Esq.
       David A. Jones, CPA

*4405v4*

US01273

**National Credit Counseling Services, Inc. (EIN 52-1799746) ("NCCS")**
**Appeal/Protest of Proposed Revocation of Tax-Exempt Status**

Declaration

Under penalties of perjury, I declare that I have examined this appeal/protest (including any accompanying schedules, exhibits, affidavits, and statements) and, to the best of my knowledge and belief, it is true, correct and complete.

By: _Robert W. Closs_ _____

Robert W. Closs, Jr., President
National Credit Counseling Services, Inc.

Date: March 14, 2005



**TAX EXEMPT AND
GOVERNMENT ENTITIES
DIVISION**

**DEPARTMENT OF THE TREASURY**
Internal Revenue Service

January 15, 2005

National Credit Counseling
  Services, Inc.
1768 Park Center Drive
Orlando, FL  32835

Taxpayer Identification Number:
  52-1799746
Form:
  990
Tax Year(s) Ended:
  200012, 200112, 200212
Person to Contact/ID Number:
  Ford Allen / Badge #52-03832
Contact Numbers:
  Telephone: (410) 962-2856
  Fax:        (410) 962-0132

Certified Mail - Return Receipt Requested

Dear Sir or Madam:

We have enclosed a copy of our report of examination explaining why we believe revocation of your exempt status under section 501(c)(3) of the Internal Revenue Code (Code) is necessary.

If you accept our findings, take no further action.  We will issue a final revocation letter.

If you do not agree with our proposed revocation, you must submit to us a written request for Appeals Office consideration within 30 days from the date of this letter to protest our decision.  Your protest should include a statement of the facts, the applicable law, and arguments in support of your position.

An Appeals officer will review your case.  The Appeals office is independent of the Director, EO Examinations. The Appeals Office resolves most disputes informally and promptly.  The enclosed Publication 3498, *The Examination Process,* and Publication 892, *Exempt Organizations Appeal Procedures for Unagreed Issues,* explain how to appeal an Internal Revenue Service (IRS) decision.  Publication 3498 also includes information on your rights as a taxpayer and the IRS collection process.

You may also request that we refer this matter for technical advice as explained in Publication 892.  If we issue a determination letter to you based on technical advice, no further administrative appeal is available to you within the IRS regarding the issue that was the subject of the technical advice.

Letter 3618 (04-2002)
Catalog Number 34809F

2

If we do not hear from you within 30 days from the date of this letter, we will process your case based on the recommendations shown in the report of examination. If you do not protest this proposed determination within 30 days from the date of this letter, the IRS will consider it to be a failure to exhaust your available administrative remedies. Section 7428(b)(2) of the Code provides, in part: "A declaratory judgment or decree under this section shall not be issued in any proceeding unless the Tax Court, the Claims Court, or the District Court of the United States for the District of Columbia determines that the organization involved has exhausted its administrative remedies within the Internal Revenue Service." We will then issue a final revocation letter. We will also notify the appropriate state officials of the revocation in accordance with section 6104(c) of the Code.

You have the right to contact the office of the Taxpayer Advocate. Taxpayer Advocate assistance is not a substitute for established IRS procedures, such as the formal appeals process. The Taxpayer Advocate cannot reverse a legally correct tax determination, or extend the time fixed by law that you have to file a petition in a United States court. The Taxpayer Advocate can, however, see that a tax matter that may not have been resolved through normal channels gets prompt and proper handling. You may call toll-free 1-877-777-4778 and ask for Taxpayer Advocate Assistance. If you prefer, you may contact your local Taxpayer Advocate at:

841 Prudential Drive, Suite 1508
Jacksonville, FL 32207

Telephone (904) 665-1000
FAX        (904) 665-1817

If you have any questions, please call the contact person at the telephone number shown in the heading of this letter. If you write, please provide a telephone number and the most convenient time to call if we need to contact you.

Thank you for your cooperation.

Sincerely,

Ron Prowler

Ron Prowler
Group Manager

Enclosures:
Publication 892
Publication 3498
Report of Examination

Letter 3618 (04-2002)
Catalog Number 34809F

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| Name of Taxpayer | National Credit Counseling Services, Inc | Year Ended 200012, 200112, 200212 |

## Facts:

This report presents the results of our examination of the Forms 990, Return of Organization Exempt from Income Tax, filed by National Credit Counseling Services, Inc. (formerly Genus Credit Management Corporation) for the tax years ending December 31, 2000, 2001 and 2002. Some of the facts in this document precede the examination years however, they are relevant to examination issues that are being raised as a result of our examination.

On December 18, 1992 National Credit Counseling Services Inc (NCCS), a corporation located in Maryland, was founded by Mr. Bernaldo Dancel. Their purpose was to provide educational activities to inform financially distressed individuals who through lack of education on financial matters find themselves in debt beyond their ability to pay. On February 17, 1993, NCCS filed a Form 1023, Application for Recognition of Exemption, with the Internal Revenue Service. In a determination letter dated April 12, 1993, NCCS was recognized as exempt from Federal income tax as an organization described in section 501(C)(3) of the Internal Revenue Code. The Service also determined that NCCS was not a private foundation because it was described in sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code.

In its Form 1023 application, NCCS provides the following in Part II, Activities and Operational Information:

"The organization's purpose is to educate the public on a variety of financial issues, with special attention to educating families and individuals on personal budgeting and the wise use of credit." We will use trained professional counselors to help families and individuals with current financial difficulties, through sound budget or spending planning, and educate them on how to avoid future financial difficulties. The counselors will help the clients complete a comprehensive budget analysis, examining items such as gross household income, employment tenure, mortgage/rent payments, automobile payments and unsecured debt levels. Using this information, the counselor will try to establish a realistic and well-disciplined budget. If a family or an individual is having financial problems that are beyond the scope of sound budgeting techniques, a counselor will set up a debt management plan for the orderly liquidation of the debt; as a visible alternative to bankruptcy."

The application also describes other educational activities such as videos and workshops that NCCS would conduct.

Form 1023 provides the following regarding NCCS' sources of income,

"During the first year of operation the organization's primary source of support will be derived from the general public for fees paid to defray the costs of providing services related to our exempt function. Fees have not been set, but will be closely related to the services provided. In addition, when a client is unable to meet his current financial obligation he will be offered a voluntary debt management program. The organization will manage these plans, arranging reduced payments with creditors and acting as trustee. The organization will solicit donations from these creditors to offset the cost of administering this plan. As the number of creditors (supporters) that we deal with increases, the number of clients and amount of debt management increases, the monies derived from the supporters will be our primary source of revenue."

The application lists three initial trustees: (1) Jose A. Dancel Jr., President, (2) Preston O. Duppins, Jr., Secretary, and (3) Constance M. Dancel. Bernaldo J Dancel, Jose A. Dancel's brother, is not listed as an officer but he will later become NCCS' president. He is not directly mentioned in the organization's application for exemption, but

page

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| Name of Taxpayer | National Credit Counseling Services, Inc | Year Ended 200012, 200112, 200212 |

on a contract with Mitchell & Associates contained in the application his signature appears as NCCS representative.  The contract is dated February 15, 1993.

On December 1, 1993 NCCS filed Amended Articles of Incorporation changing their name to United Credit Management, Inc. (UCM).  Bernaldo J. Dancel is listed on the articles as UCM's president, and Constance J. Dancel is listed as Secretary.  On October 2, 1997 UCM filed Amended Articles of Incorporation changing their name to Genus Credit Management Corporation (Genus).  No officers are listed in these articles.

Under Bernaldo J Dancel's leadership Genus became the nation's largest non-profit credit counseling organization.  Genus' client base was national in scope.  These clients contacted Genus by telephone and the internet.  Genus counselors spoke to clients one on one over the telephone, and mailed them publications.  The printed materials were used to educate clients on financial matters and the wise use of debt.  Many of Genus' clients were enrolled in debt management plans (DMP).  Genus developed a sophisticated information technology system in their back office (processing operations used to support DMP activities) to administer these debt management plans.

In 1997 Bernaldo J. Dancel left Genus and founded Amerix Corporation, a for-profit corporation that would provide back office services to credit counseling organizations.  Amerix was located in the same building as Genus, but in separate offices.  Mr. Dancel's knowledge of back office operations was considerable, and his leaving of Genus was the loss of an important resource.  In addition to Mr. Dancel, several of Genus's key information technology employees and other personnel left Genus to work for Amerix.

On August 5, 1998 Genus sold computer hardware and software used for DMP processing and client servicing to Amerix.  They also agreed to reimbursement by Amerix for the cost of training the departing employees who had decided to work for Amerix.  Since Amerix was a new organization, Genus loaned them $3,638,084, the value of the assets and employee training.  Four separate loans were given to Amerix, each containing a market rate of interest.  Amerix has made regular payments to Genus on these loans, and they were paid off in 2003.

On November 20, 1998 Genus entered into a service agreement with Amerix for back office operations.  In the service agreement, Exhibit A summarizes the scope of services provided by Amerix.  They would answer intake calls from clients, contact the credit card companies to set up DMPs, and process the clients' payments.  If a potential client called Genus' phone number, they would speak to an Amerix counselor.  All talking points and guidelines as to what was said by Amerix counselors were approved by Genus Management.  Genus was not directly involved with the management of Amerix counselors, but they indicated they monitored their activities by management visits and live call monitoring.  Genus was not directly involved in paying the counselors compensation, but they believe Amerix did have a bonus or incentive system for signing up clients in the DMP program.  A trust account was setup by Genus to receive the clients' DMP payments and contributions, as well as all fair share amounts paid by credit card companies.

The service agreement indicated Amerix's service fee would be seventy percent (70%) of the "FSDP" collected each month.  Section 16, "Other Definitions", of the service agreement defines "FSDP".

   " "FSD" shall mean the Fair Share payment plus all other sums received by and/or payable to the Organization (and/or to the Servicer for the amount of the Organization) from all debtors who have received any of the

US01278

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| **Name of Taxpayer** National Credit Counseling Services, Inc | | **Year Ended** 200012, 200112, 200212 |

Servicer's origination services, ongoing customer services, and/or other services performed in accordance with this Agreement, including in such sums any donations and/or charges (it being herby agreed that the Organization shall establish any applicable charges and/or requested donation amounts, all in accordance with applicable laws) received by and/or payable to the Organization (and/or to the Servicer for the account of the Organization) from all such debtors, but excluding any sums payable by debtors to their creditors (unless creditors authorize the deduction of payments and/or donations from such sums."

The service agreement also defines "fair share payment".

" "Fair Share Payment" shall mean the entire amount of any donation and/or other payments received by and/or otherwise payable (directly and/or by deduction from Client payments) to the Organization (and/or to the Servicer for the account of the Organization) from creditors in connection with the performance of any debtor servicing, account origination and/or other Services performed in accordance with this agreement including all sums customarily paid by creditors to debt counseling services as "fair share payments"."

Amerix would receive 70% of the contributions paid by clients, and the fair share payments paid by credit card companies. This amount was determined through negotiations by Amerix and Genus. Genus was also to pay Amerix a monthly marketing fee to reimburse them for their marketing budget. This marketing budget was used to pay for media advertising such as television commercials and yellow page ads.

In section 6, "Termination and Default", of the service agreement there are several "performance" deficiencies under which either party could terminate the contract;

- the conversion rate of clients entering into a DMP is less then 13%,
- the attrition rate of clients in DMP programs is greater then 9%,
- and the average monthly revenue per account is less that $30.

This section of the service agreement then discusses the "Residual Fees" Genus would owe Amerix in the event of the expiration of the contracts 3 year term, or the sooner termination of the Agreement. One year before the termination date, Genus must chose to either pay Amerix ten dollars per month for each month in which a client who existed as of the termination date makes a debt management payment to Genus, or allow Amerix to continue to provide services with respect to clients existing as of the termination date.

In a report dated August 18, 1998 Arthur Anderson presented the results of a study for Genus to identify and receive bids from contractors who would provide call center and back office services. The study found few companies that could provide both a call center and payment processing. Only one company bid on providing the same services as Amerix. The pricing of this company yielded a 4.0% annual saving over Amerix's pricing, but they did not have the customized services Amerix provided. It was concluded that the 4.0% differential is understandable and reasonable, and Amerix was the best vender to provide Genus back office services.

In 1998 Genus had over 100,000 active customers, and 30 total employees. As part of the origination services it provided to Genus, Amerix received all initial telephone calls from clients, and Genus would make follow up telephone calls to the clients at a later point in time. Genus put the clients on their mailing list, and sent them educational materials. Its representative estimated Genus was making 1,500 to 2,000 calls per month, and all of these were follow-up calls.

US01279

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| Name of Taxpayer | National Credit Counseling Services, Inc | Year Ended 200012, 200112, 200212 |

In 1999 Genus moved to Orlando, Florida. It started an affiliation with Concord Credit Solutions (Concord), an existing small tax exempt credit counseling service in California that specialized in providing services to Hispanic clients. The affiliation began when Genus agreed to provide DMP processing for Concord. When applying for tax exempt status Concord indicated in their Form 1023 they had a service agreement with Genus Corporation providing DMP processing for a set fee per client. The affiliation grew when Concord and Genus would later become members of the same management organization, InCharge Institute of America, Inc.

In 2000 Concord and Genus became members of In Charge Institute of America (ICIA), a newly created tax exempt organization described in section 501(c)(3) of the Code. ICIA is further described in section 509(a)(3) of the Code as a "supporting organization." ICIA would be used to better determine what activities each member would conduct, and centralize some educational, management, and staff activities. ICIA changed Concord's name to Profina Debt Solutions, Inc (Profina), and determined that Profina would become the primary credit counseling organization. Profina would internally conduct all of its credit counseling and related activities, including DMP processing. Profina had no relationship to Amerix.

ICIA planned for Genus to become a counseling organization specializing in bankruptcy. During this time period there were bankruptcy bills pending in Congress that would require individuals to receive credit counseling prior to filing for bankruptcy. At this time Genus had employees who conducted both credit and mortgage counseling. Mortgage counseling was provided to clients who were potential homeowners required to have counseling by the Department of Housing and Urban Development (HUD). Genus had 29 employees engaged in client credit counseling services, and 11 in mortgage counseling.

After the first quarter of 2000 Genus stopped advertising for new credit counseling clients. They continued to service their old accounts since it takes an average of 5 years to complete the program, but few new clients called. Some new clients were still added because Genus' advertising remained in the public domain, and existing clients were making referrals. Since Genus had more clients than Profina, both the Profina and Genus call center employees in Florida handled Genus' customer account and follow-up calls. Amerix continued to process intake calls, and all of Genus' DMP activities.

In 2001 Genus' credit counseling activities continued to decrease. No new DMP clients were added. All intake calls were switched from Amerix to Genus, and Profina counselors handled these calls. Genus had 7 employees who all provided mortgage counseling, and no employees providing credit counseling. Officers of ICIA allocated some of their time to Genus and continued planning activities, including the idea that Genus would become a bankruptcy counseling organization.

Since ICIA planned for Genus to discontinue their credit counseling activities, Genus sold approximately 215,000 DMP clients and the rights to the "Genus Credit Management" brand to North Seattle Community College Foundation (NSCCF), d/b/a/ American Financial Solutions (AFS). Subsequent to the sale, Genus changed its name back to National Credit Counseling Services, Inc. Genus closed on the sale to AFS on June 29, 2001. AFS paid NCCS $17 million consisting of $11 million cash, and a $6 million note. AFS borrowed the $11 million paid to NCCS from Amerix.

In the preliminary stages of negotiations of the sale to AFS, Amerix had some involvement since it had a relationship with AFS (AFS later signed a back office service agreement with Amerix), and they were very

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| Name of Taxpayer | National Credit Counseling Services, Inc | Year Ended 200012, 200112, 200212 |

knowledgeable about Gems DMP, but the final sale price was determined by the principals of AFS and NCCS. The $17 million price was determined by analyzing the present value of the expected cash flow of the debt management program.

After June 29, 2001, NCCS activities consisted of mortgage counseling, planning for building a bankruptcy counseling organization, and receiving loan payments from Amerix and AFS. For a short period after the sale NCCS conducted some credit counseling activities for AFS because AFS was not yet licensed in all states. As time passed (and no bankruptcy bill was passed by Congress), NCCS abandoned plans to become a bankruptcy counseling organization. In the year 2002 NCCS did not have any employees.

After the sale to AFS, NCCS began distributing all of their excess revenues to Profina and ICIA. These amounts have decreased as their activities and revenues have diminished. In 2003 Amerix paid off its loans to NCCS, and in 2004 AFS paid off its loans. NCCS only remaining assets are approximately $50,000 in unclaimed funds in the DMP trust account. These funds are subject to state law, but generally must be kept for a number of years before they can be turned over to the states. Most states will immediately accept unclaimed funds if an organization terminates.

Currently NCCS has no activities or assets, and its board of trustees wishes to dissolve its corporate status, and terminate its tax exempt status.

**Law:**

Section 501(a) of the Internal Revenue Code provides that an organization described in section 501(c)(3) is exempt from income tax. Section 501(c)(3) of the Code exempts from federal income tax corporations organized and operated exclusively for charitable, educational, and other purposes, provided that no part of the net earnings inure to the benefit of any private shareholder or individual. The term charitable includes relief of the poor and distressed. Section 1.501(c)(3)-1(d)(2), Income Tax Regulations.

The term educational includes (a) instruction or training of the individual for the purpose of improving or developing his capabilities and (b) instruction of the public on subjects useful to the individual and beneficial to the community. Treas. Reg. § 1.501(c)(3)-1(d)(3). In other words, the two components of education are public education and individual training.

Section 1.501(c)(3)-1(a)(1) of the regulations provides that, in order to be exempt as an organization described in section 501(c)(3), an organization must be both organized and operated exclusively for one or more of the purposes specified in such section. If an organization fails to meet either the organizational test or the operational test, it is not exempt.

Section 1.501(c)(3)-1(c)(1) of the regulations provides that an organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities that accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. The existence of a

US01281

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| Name of Taxpayer | National Credit Counseling Services, Inc | Year Ended 200012, 200112, 200212 |

substantial nonexempt purpose, regardless of the number or importance of exempt purposes, will cause failure of the operational test. Better Business Bureau of Washington, D.C. v. U.S., 326 U.S. 279 (1945).

Educational purposes include instruction or training of the individual for the purpose of improving or developing his capabilities and instruction of the public on useful and beneficial subjects. Treas. Reg. § 1.501(c)(3)-1(d)(3). In Better Business Bureau of Washington D.C., Inc. v. United States, 326 U.S. 279 (1945), the Supreme Court held that the presence of a single non-exempt purposes, if substantial in nature, will destroy the exemption regardless of the number or importance of truly exempt purposes. The Court found that the trade association had an "underlying commercial motive" that distinguished its educational program from that carried out by a university.

In American Institute for Economic Research v. United States, 302 F. 2d 934 (Ct. Cl. 1962), the Court considered the status of an organization that provided analyses of securities and industries and of the economic climate in general. The organization sold subscriptions to various periodicals and services providing advice for purchases of individual securities. Although the court noted that education is a broad concept, and assumed for the sake of argument that the organization had an educational purpose, it held that the organization had a significant non-exempt commercial purpose that was not incidental to the educational purpose and was not entitled to be regarded as exempt.

An organization must establish that it serves a public rather than a private interest and "that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests." Treas. Reg. § 1.501(c)(3)-1(d)(1)(ii). Prohibited private interests include those of unrelated third parties as well as insiders. Christian Stewardship Assistance, Inc. v. Commissioner, 70 T.C. 1037 (1978); American Campaign Academy v. Commissioner, 92 T.C. 1053 (1989). Private benefits include an "advantage; profit; fruit; privilege; gain; [or] interest." Retired Teachers Legal Fund v. Commissioner, 78 T.C. 280, 286 (1982).

The private benefit rule was articulated in American Campaign Academy V. Commissioner, 92 T.C. 1053 (1989). The case concerned an otherwise qualifying school that trained individuals for careers as political campaign professionals. Because of the benefit that accrued to entities of the Republican Party and its candidates, since nearly all of the school's graduates became employed by or consultants to these entities or candidates, the court concluded that the school was not primarily engaging in activities that accomplish educational purposes. They concluded the organization substantially benefited the private interests of the Republican Party entities and candidates to more that an insubstantial extent.

An organization formed to educate people in Hawaii in the theory and practice of "est" was determined by the Tax Court to a part of a "franchise system which is operated for private benefit," and, therefore, should not be recognized as exempt under section 501(c)(3) of the Code. est of Hawaii v. Commissioner, 71 T.C. 1067, 1080 (1979). Although the organization was not formally controlled by the same individuals who controlled the for-profit entity that owned the license to the "est" body of knowledge, publications, and methods, the for-profit entity exerted considerable control over the applicant's activities by setting pricing, the number and frequency of different kinds of seminars and training, and providing the trainers and management personnel who are responsible to it in addition to setting price for the training. The court stated that the fact that the organization's rights were dependent upon its tax-exempt status showed the likelihood that the for-profit entities were trading on

US01282

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| **Name of Taxpayer** National Credit Counseling Services, Inc | | **Year Ended** 200012, 200112, 200212 |

that status. The question for the court was not whether the payments made to the for-profit were excessive, but whether the for-profit entity benefited substantially from the operation of the organization. The court determined that there was a substantial private benefit because the organization "was simply the instrument to subsidize the for-profit corporations and not vice versa and had no life independent of those corporations."

The Service has issued two rulings holding credit counseling organizations to be tax exempt. Rev. Rul. 65-299, 1965-2 C.B. 165, granted exemption to a 501(c)(4) organization whose purpose was to assist families and individuals with financial problems and to help reduce the incidence of personal bankruptcy. Its primary activity appears to have been meeting with people in financial difficulties to "analyze the specific problems involved and counsel on the payment of their debts." The organization also advised applicants on proration and payment of debts, negotiated with creditors and set up debt repayment plans. It did not restrict its services to the needy. It made no charge for the counseling services, indicating they were separate from the debt repayment arrangements. It made "a nominal charge" for monthly prorating services to cover postage and supplies. For financial support, it relied upon voluntary contributions from local businesses, lending agencies, and labor unions.

Rev. Rul. 69-441, 1969-2 C.B. 115, granted 501(c)(3) status to an organization with two functions: it educated the public on personal money management, using films, speakers, and publications, and provided individual counseling to "low-income individuals and families." As part of its counseling, it established budget plans, i.e., debt management plans, for some of its clients. The debt management services were provided without charge. The organization was supported by contributions primarily from creditors. By virtue of aiding low income people, without charge, as well as providing education to the public, the organization qualified for section 501(c)(3) status.

In the case of Consumer Credit Counseling Service of Alabama, Inc. v. U.S., 44 A.F.T.R.2d 78-5052 (D.D.C. 1978), the District Court for the District of Columbia held that a credit counseling organization qualified as charitable and educational under section 501(c)(3). It fulfilled charitable purposes by educating the public on subjects useful to the individual and beneficial to the community. Treas. Reg. § 1.501(c)(3)-1(d)(3)(i)(b). For this, it charged no fee. The court found that the counseling programs were also educational and charitable; the debt management and creditor intercession activities were "an integral part" of the agencies' counseling function and thus were charitable and educational. Even if this were not the case, the court viewed the debt management and creditor intercession activities as incidental to the agencies' principal functions, as only approximately 12 percent of the counselors' time was applied to debt management programs and the charge for the service was "nominal." The court also considered the facts that the agency was publicly supported and that it had a board dominated by members of the general public as factors indicating a charitable operation. See also, Credit Counseling Centers of Oklahoma, Inc. v. United States, 79-2 U.S.T.C. 9468 (D.D.C. 1979), in which the facts and legal analysis were virtually identical to those in Consumer Credit Counseling Centers of Alabama, Inc. v. United States, discussed immediately above.

The organizations included in the above decision waived the monthly fees when the payments would work a financial hardship. The professional counselors employed by the organizations spent about 88 percent of their time in activities such as information dissemination and counseling assistance rather than those connected with the debt management programs. The primary sources of revenue for these organizations were provided by government and private foundation grants, contributions, and assistance from labor agencies and United Way.

---

US01283

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| Name of Taxpayer | National Credit Counseling Services, Inc | Year Ended 200012, 200112, 200212 |

Outside the context of credit counseling, individual counseling has, in a number of instances, been held to be a tax-exempt charitable activity. Rev. Rul. 78-99, 1978-1 C.B. 152 (free individual and group counseling of widows); Rev. Rul. 76-205, 1976-1 C.B. 154 (free counseling and English instruction for immigrants); Rev. Rul. 73-569, 1973-2 C.B. 179 (free counseling to pregnant women); Rev. Rul. 70-590, 1970-2 C.B. 116 (clinic to help users of mind-altering drugs); Rev. Rul. 70-640, 1970-2 C.B. 117 (free marriage counseling); Rev. Rul. 68-71, 1968-1 C.B.249 (career planning education through free vocational counseling and publications sold at a nominal charge). Overwhelmingly, the counseling activities described in these rulings were provided free, and the organizations were supported by contributions from the public.

Internal Revenue Code section 501(c)(3) specifies that an exempt organization described therein is one in which "no part of the net of earnings inures to the benefit of any private shareholder or individual." The words "private shareholder or individual" in section 501 to refer to persons having a personal and private interest in the activities of the organization. Treas. Reg. § 1.501(a)-1(c). The inurement prohibition provision "is designed to prevent the siphoning of charitable receipts to insiders of the charity . . . ." United Cancer Council v. Commissioner, 165 F.3d 1173 (7th Cir. 1999). Reasonable compensation does not constitute inurement. Birmingham Business College v. Commissioner, 276 F.2d 476, 480 (5th Cir. 1960).

The meaning of the term "net earnings" is undefined in the statute, but it has been framed in the courts. In a technical accounting sense the meaning of the term "net earnings" refers to gross earnings less expenses. However, in the tax-exempt organization setting, the technical meaning of the term never caught on as its sole meaning. Most court decisions on the point reflect the contemporary approach that there can be inurement of "net earnings" in the absence of transfers of net equity. Gemological Institute of America V. Riddell, 149 F. Supp 128, 130 (S.D. Cal. 1957); Edward Orton, Jr. Ceramic Foundation v. Commissioner, 9 T.C. 53 (1947).

The reference in the statute to "net earnings" was largely obliterated by a court in People of God Community V. Commissioner, 75 T.C. 127, 132 (1980). In this case the petitioner, a newly formed Christian organization, paid each of their ministers a predetermined percentage of the gross tithes and offerings received. The court held that paying over a portion of gross earnings to those vested with the control of a charitable organization constitutes private inurment as well, adding that "all in all, taking a slice off the top should be no less prohibited than a slice of the net."

Where an organization provided a source of credit to companies of which a private shareholder was either an employee or an owner, the court found that a portion of the organization's net earnings inured to the benefit of that private shareholder. Easter House v. United States, 12 Cl. Ct. 476 (1987). That such loans were made showed that the companies controlled by the private shareholder had a "source of loan credit" in the organization.

The Credit Repair Organizations Act (CROA), 15 U.S.C. § 1679 et seq., effective April 1, 1997, imposes restrictions on credit repair organizations, including forbidding the making of untrue or misleading statements and forbidding advance payment, before services are fully performed. 15 U.S.C. § 1679b. Significantly, section 501(c)(3) organizations are excluded from regulation under the CROA.

The CROA defines a credit repair organization as:

> (A) any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or

---

Department of the Treasury - Internal Revenue Service                    Form 886-A

US01284

| Form 886-A | EXPLANATION OF ITEMS | Schedule or Exhibit No.<br>1 |
|---|---|---|
| Name of Taxpayer<br>National Credit Counseling Services, Inc | | Year Ended<br>200012, 200112, 200212 |

represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

(i) improving any consumer's credit record, credit history, or credit rating, or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i).

15 U.S.C. § 1679a(3). The courts have interpreted this definition broadly to apply to credit counseling agencies. The Federal Trade Commission's policy is that if an entity communicates with consumers in any way about the consumers' credit situation, it is providing a service covered by the CROA. In Re National Credit Management Group, LLC, 21 F. Supp. 2d 424, 458 (N.D.N.J. 1998). Businesses are prohibited from cold-calling consumers who have put their phone numbers on the National Do-Not-Call Registry, which is maintained by the Federal Trade Commission. 16 C.F.R. § 310.4(b)(1)(iii)(B); 47 C.F.R. § 64.1200(c)(2). Section 501(c)(3) organizations are not subject to this rule against cold-calling. Because 501(c)(3) organizations are exempt from regulation under the CROA and the cold-calling restrictions, organizations that are involved in credit repair have added incentives to be recognized as section 501(c)(3) organizations even if they do not intend to operate primarily for exempt purposes.

**Taxpayers Position:**

The taxpayer has indicated it disagrees with all adverse conclusions. A letter dated November 30, 2004 states:

"The conclusion in the Form 5701 that NCCS' tax exempt status under IRC Section 501(c)(3) "should be revoked due to excess private benefit, and a lack of charitable and educational activities" is conclusory, not supported by the facts set forth or law cited in Form 5701 and does not appear to have been done on an objective basis. Further, based on our review, the recitation of facts in the Form 5701 appears incomplete and the statement of applicable "law" in the Form 5701 appears incomplete."

In a meeting on December 9, 2004 the taxpayer discussed their position, and indicated they were open to alternate resolutions.

**Conclusion:**

NCCS tax exempt status should be revoked beginning January 1, 2000 due to excessive private benefit, and a lack of charitable and educational activities. The years ending December 31, 2000, 2001 and 2002 were examined, and all years contain sufficient facts to warrant revocation. The facts are materially different for each year under examination, but in all periods the organization fails to qualify for tax exempt status as described by section 501(c)(3) of the Code..

During the period from January 1, 2000 to June 29, 2001 NCCS' tax exempt status should be revoked because Amerix, a for-profit company that administered NCCS' DMP plan, and received all intake calls from NCCS clients, received impermissible private benefit. After June 29, 2001, NCCS' tax exempt status should be revoked

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| Name of Taxpayer | National Credit Counseling Services, Inc | Year Ended 200012, 200112, 200212 |

because it ended its credit counseling activities, and it did not have sufficient charitable or educational activates to be described under section 501(c)(3) of the Code..

NCCS fails the operational test contained in section 1.501(c)(3)-1(a)(1) because it was operated for the purpose of serving a private benefit. Amerix, a for-profit organization, received impermissible private benefits from their relationship with NCCS. This relationship between NCCS and Amerix was formed when NCCS sold assets to Amerix, and financing the sale with loans. The relationship continued when NCCS entered into a service agreement with Amerix. Under this agreement Amerix would receive all initial phone calls from clients, and administer NCCS' DMP. In return NCCS agreed to pay Amerix 70% of the revenues associated with their DMP. The amount of fees paid to Amerix was both substantial in amount, and as a percentage of NCCS's total revenues.

The concept of private benefit stems from the operational test. It is separate from and broader than the inurement doctrine. In American Campaign Academy V. Commissioner, the court determined that the prohibition against private benefit is not limited to situations where the benefits accrue to an organization's "insiders" with respect to it (as in the case with the private inurement rule). That is, the court held that this prohibition is not limited to persons having a personal and private interest in the activities of the organization, and embraces benefits to what the court labeled "disinterested persons".

The organization has indicated Amerix's fee was originally going to be based on a dollar amount on a per client bases, but at some point it was determined that that a per client amount did not allow NCCS to share in the economies of scale that Amerix would realize in a growth situation. It was felt that in a growth situation rather than constantly renegotiating the price, a simpler and fairer way was to base the price on volume. While it true using a percentage allowed NCCS to "share" the gross profits, it also allowed Amerix to "share" the profits.

Section 501(c)(3) of the Code exempts from federal income tax "corporations organized and operated exclusively for charitable, educational, and other purposes, provided that no part of the net earnings inure to the benefit of any private shareholder or individual." In this case a percentage of gross earning, not net earnings, are going to Amerix, but the concept remains that Amerix is sharing in Genus' growth in earnings with no limit on the amounts it may receive. This is very different than paying a company a set fee for providing a service. As in People of God Community V. Commissioner, "taking a slice off the top should be not less prohibited than a slice of the net".

Since there was no cap on the amount of compensation Amerix may receive, the arrangement of sharing in the growth of the DMP's revenues would not give Amerix any incentives not to sign up clients who may not be best suited for a DMP plan. The more individuals who were signed up for DMP, the more income Amerix would receive. Since Amerix took all initial calls, they had the authority to enroll clients in a DMP. NCCS provided management visits and live call monitoring, but these internal controls would be limited due to the large number of phone calls Amerix received.

NCCS indicates the totality of the administrative services that were being performed by Amerix warranted the fee. They indicate the fee was competitive and reasonable. Given the limited number of respondents to the Arthur Anderson study who could compete for the service agreement, the market was not competitive. NCCS argues the fee is fair market value because it was negotiated by independent parties. The two organizations do not share any

---

**Department of the Treasury - Internal Revenue Service**                    **Form 886-A**

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| Name of Taxpayer | National Credit Counseling Services, Inc | Year Ended 200012, 200112, 200212 |

officers, but they are not independent.  Their relationship began when NCCS sold assets to Amerix and continued by the loans given to Amerix.

Amerix benefited substantially from the operations of NCCS.  Like the organization in est of Hawaii v. Commissioner, NCCS is not formally controlled by the same individuals who control Amerix, but Amerix can exert considerable control over NCCS through the service and loan agreements.  The service agreement contains restrictive clauses where Amerix can terminate their relationship with NCCS if several performance standards are not met, but NCCS does not have any such clauses giving them control.  If NCCS wanted to terminate or not renew the service agreement they would have to pay Amerix residual fees.  In the loan agreements NCCS sold assets to Amerix they would need for their continued operations.  They were dependent on Amerix to process the DMP clients, and they were dependent on Amerix's financial solvency to receive a repayment of the loans.  Also like est of Hawaii V. Commissioner Amerix depends on NCCS tax exempt status, since an organization must be described in section 501(c)(3) of the Code to conduct credit counseling and DMP activities in several states. A section 501(c)(3) organization is also exempt from the restrictive regulations imposed by the Credit Repair Organizations Act.   The interdependency of Amerix and NCCS caused NCCS to have no independent life from Amerix.

NCCS lacks the required educational activities to be an organization described in section 501(c)(3).  Section 1.501(c)(3)-1(d)(3) of the Regulations states the term educational included (a) instruction or training of the individual for the purpose of improving or developing his capabilities and (b) instruction of the public on subjects useful to the individual and beneficial to the community.  NCCS did conduct educational activities such as printing educational materials and making follow up calls to clients, but their limited number of counselors could not provide the required counseling needed to counsel their large number of clients.  If a client called NCCS' phone number an Amerix employee would answer the call.  All client intake and most service calls were answered by Amerix counselors.  NCCS attempted to provide follow up counseling to clients, but most clients spoke to Amerix counselors when they called NCCS.  In addition NCCS had no daily control over Amerix's counselor's conversations with NCCS clients.  The Amerix counselors were at the Amerix facility in Maryland, and the NCCS counselors and staff were located in Florida.

NCCS conducted education activities, but like the organization in American Institute for Economic Research v. United States they have a substantial non-exempt commercial purpose.  NCCS had a substantial amount of DMP activities.  In Rev Rul. 69-441 the organization established budget plans, and in Consumer Credit Counseling Services of Alabama, Inc. v. U.S.  the organization administered a DMP, but neither of these organization's DMP activities were close to the scope and size of NCCS DMP activities.  In Consumer Credit Counseling Services of Alabama, Inc. v. U.S.  only 12% of the counselor's time was applied to debt management plans, and the charge for the service was nominal.  NCCS differs from this organization in that their DMP activities are much larger than 12%.  Amerix had over 200,000 of NCCS' DMP clients on their data base at the time of sale to AFS.  This large number of DMP clients indicated a large percentage of NCCS' activities involved debt management and creditor intercession.

NCCS is similar to the organization in Consumer Credit Counseling Services of Alabama, Inc. v. U.S. in that both organizations added a monthly contribution to the clients DMP bill.  The monthly contribution was based on the amount of the clients' bill, and how many creditors were involved in the payment.  It was capped at what appears

---

US01287

| Form 886-A | EXPLAINATION OF ITEMS | Schedule or Exhibit No. 1 |
|---|---|---|
| Name of Taxpayer    National Credit Counseling Services, Inc | | Year Ended 200012, 200112, 200212 |

to be a reasonable amount. No data exists as to how many clients did not pay this contribution, but NCCS's DMP application states this is a voluntary contribution, and they verified some clients had this contribution waived.

NCCS did not include any initial or setup contributions on the client's application or first DMP bill. One reason NCCS did not have to charge a setup fee was that they received fair share payments from credit card companies. These fair share payments were larger during the time period NCCS operated that they are today. In 2000 fair share payment were almost always 15% of the amount of debt collected.

After NCCS sold its DMP portfolio to American Financial Solutions (AFS) in 2001, their educational activity reduced each subsequent year. NCCS presently has no educational activity. In the years after the sale their primary activities included planning to become a bankruptcy counseling organization, and collecting loan payments from Amerix and AFS. Collecting loan payments does not further NCCS IRC section 501(c)(3) tax exempt purposes. As in Better Business Bureau of Washington, D.C. v. US more than an insubstantial part of their activities is not in furtherance of an exempt activity, and the existence of a substantial nonexempt purpose will cause failure of the operational test.

NCCS has argued that during the years under examination their DMP activities and service agreement relationship with Amerix declined to the point where it ended in July 2001. After the sale of their DMP clients to AFS, NCCS did not have any DMP revenues. Service agreement payments were no longer paid to Amerix, but because of the loans between Amerix and NCCS, their relationship lasted until 2003. At that time Amerix finished paying off the loans that originated when NCCS sold Amerix assets and financed the sale. NCCS' DMP activities did decrease in the periods under audit, but their educational activities also decreased. NCCS educational activities decreased to the point where they only had 7 counselors in 2001 and no counselors in 2002.

In the case of revocation NCCS will be required to file a Form 1120, Corporate Income Tax Return. The basis for this return would be the financial data included on their Forms 990, Return of Organization Exempt from Income Tax. Some items expensed on the Forms 990, such as contributions, would not be allowed under section 162 of the Code as ordinary and necessary business expenses. The contributions paid to Profina and The InCharge Institute may be charitable deductions under section 170 of the Code. The deduction of a corporation for a charitable contribution is limited to 10% of its taxable income for the year (Reg. 1.170A-11(a)).

US01288

**Internal Revenue Service**
Appeals Office
409 Silverside Rd.
Wilmington, DE, 19809

Date: **SEP 0 5 2006**

National Credit Counseling Services, Inc.
2101 Park Center Drive, Suite 300
Orlando, FL 32835

**Department of the Treasury**

**Person to Contact:**
  Sanford Robbins
  Employee ID Number: 95-00671
  Tel:  (213) 576-4826
  Fax:  (213) 576-4803
**Refer Reply to:**
  AP:FW:LA:
**In Re:**
  EO Revocation
**Tax Period(s) Ended:**
  12/31/2000; 12/31/2001; 12/31/2002
**Form Number**
  1120
**Employer Identification Number**
  52-1799746

**CERTIFIED MAIL**

Last Day to File a Petition with the
United States Tax Court: **NOV 0 3 2006**

This is a final adverse determination as to your exempt status under section 501(c)(3) of the Internal Revenue Code. It is determined that you are no longer recognized as exempt from Federal income tax under Section 501(c)(3) of the Internal Revenue Code, effective January 1, 2000.

Our adverse determination was made for the following reason(s):

You are not operated exclusively for charitable, educational, or other exempt purposes. You did not engage primarily in activities which accomplish one or more of the exempt purposes specified in section 501(c)(3). More than an insubstantial part of your activities were in furtherance of a non-exempt purpose and you were operated for the purpose of serving a private benefit rather than public interests.

Contributions to your organization are not deductible under code section 170.

You are required to file Federal income tax returns on the form indicated above.

If you decide to contest this determination under the declaratory judgment provisions of code section 7428, a petition to the United States Tax Court, the United States Court of Claims, or the district court of the United States for the District of Columbia must be filed before the 91st (ninety-first) day after the date this determination was mailed to you. Contact the clerk of the appropriate court for rules for filing petitions for declaratory judgment. To secure a petition from the United States Tax Court, write to United States Tax Court, 400 Second Street, NW, Washington, D.C. 20217.



GOVERNMENT
EXHIBIT
*B*

The last day for filing a petition for declaratory judgment is _____.

We will notify the appropriate State officials of this action, as required by Code section 6104(c).

If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter.

You also have the right to contact the office of the Taxpayer Advocate. Taxpayer Advocate assistance is not a substitute for established IRS procedures such as the formal appeals process. The Taxpayer Advocate is not able to reverse legally correct tax determinations, nor extend the time fixed by law that you have to file a petition in the U.S. Tax Court. The Taxpayer Advocate can, however, see that a tax matter that may not have been resolved through normal channels gets prompt and proper handling. If you want Taxpayer Advocate assistance, please contact the Taxpayer Advocate for the IRS office that issued this notice of deficiency. See the enclosed Notice 1214, *Helpful Contacts for Your "Notice of Deficiency"*, for Taxpayer Advocate telephone numbers and addresses.

Thank you for your cooperation.

Sincerely,

Charles F. Fisher
Appeals Team Manager

Enclosure:
    Notice 1214

CC: David A. Jones, CPA
    Jonathan Z. May, Esq.

**Internal Revenue Service**
Appeals Office
300 North Los Angeles Street
MS LA-8000 Room 3054
LOS ANGELES, CA  90012

Date:  September 26, 2006

NATIONAL CREDIT COUNSELING
SERVICES, INC
2101 PARK CENTER DRIVE, SUITE 300
ORLANDO FL  32835

:

**Department of the Treasury**

**Person to Contact:**
  Sanford Robbins
  Employee ID Number: 95-00671
  Tel:  (213) 576-4826
  Fax:  (213) 576-4803
**Refer Reply to:**
  AP:FE:LA:
**In Re:**
  EO Revocation
**Tax Period(s) Ended:**
  12/2000 12/2001 12/2002

The letter sent to you on September 5, 2006 had an incorrect Last Day to file a Petition with the United States Tax Court. The correct date should be December 4, 2006 instead of November 3, 2006.

Thank you for your cooperation.

Sincerely,

CHARLES FISHER
TEAM MANAGER

cc: Jonathan Z. May Esq /David A. Jones CPA

Office Letter Head Letter (Rev. )

 **IRS**

Department of the Treasury
**Internal Revenue Service**

Notice 1214 (Rev. 3-2006)
Catalog Number 26162Z

# Helpful Contacts for Your
# "Notice of Deficiency"

Do you have questions/concerns about this *"Notice of Deficiency?"* **First contact the person whose name and telephone number appear at the top of your letter.** This person can directly access your tax information and help you get answers.

Do you want assistance by a Taxpayer Advocate? This assistance is not a substitute for established IRS procedures, formal Appeals processes, etc. The Taxpayer Advocate **cannot** reverse legal or technically correct tax determinations, nor extend the time allowed by law to file a petition in the U.S. Tax Court. However, the Taxpayer Advocate **can** give your tax matter proper and prompt handling when unresolved through normal channels. You can call toll-free 1-877-777-4778 and ask for Taxpayer Advocate assistance, or call the telephone number of the Taxpayer Advocate for the IRS office listed below that issued this *"Notice of Deficiency."*

**ALABAMA**
**Birmingham Office**
Taxpayer Advocate
801 Tom Martin Dr.
Birmingham, AL 35211
(205) 912-5631

**ALASKA**
**Anchorage Office**
Taxpayer Advocate
949 East 36th Ave., Stop A-405
Anchorage, AK 99508
(907) 271-6877

**ARIZONA**
**Phoenix Office**
Taxpayer Advocate
210 E. Earll Drive, Stop 1005-PHX
Phoenix, AZ 85012
(602) 207-8240

**ARKANSAS**
**Little Rock Office**
Taxpayer Advocate
700 West Capitol St., Stop 1005-LIT
Little Rock, AR 72201
(501) 324-6269

**CALIFORNIA**
**Laguna Niguel Office**
Taxpayer Advocate
24000 Avila Road-Room 3362
Laguna Niguel, CA 92677
(949) 389-4804

**Los Angeles Office**
Taxpayer Advocate
300 N. Los Angeles St.
Stop 6710 Room 5109
Los Angeles, CA 90012
(213) 576-3140

**Oakland Office**
Taxpayer Advocate
1301 Clay St. # 1540S
Oakland, CA 94612
(510) 637-2703

**Sacramento Office**
Taxpayer Advocate
4330 Watt Ave. Stop SA-5043
Sacramento, CA 95821
(916) 974-5007

**San Jose Office**
Taxpayer Advocate
55 S. Market St., Stop HQ000-4
San Jose, CA 95113
(408) 817-6850

**COLORADO**
**Denver Office**
Taxpayer Advocate
600 17th St., Stop 1005-DEN
Denver, CO 80202-2490
(303) 446-1012

**CONNECTICUT**
**Hartford Office**
Taxpayer Advocate
135 High St., Stop 219
Hartford, CT 06103
(860) 756-4555

**DELAWARE**
**Wilmington Office**
Taxpayer Advocate
409 Silverside Rd.
Wilmington, DE 19809
(302) 792-6679

**DISTRICT OF COLUMBIA**
**Baltimore Office**
Taxpayer Advocate
31 Hopkins Plaza  Room 940
Baltimore, MD 21201
(410) 962-2082

**FLORIDA**
**Ft. Lauderdale Office**
Taxpayer Advocate
7850 SW 6th Court
Plantation, FL 33324
(954) 423-7677

**Jacksonville Office**
Taxpayer Advocate
841 Prudential Dr., Suite 100
Stop: TA:Atlanta/Intl: JAX
Jacksonville, FL 32207
(904) 665-1000

**GEORGIA**
**Atlanta Office**
Taxpayer Advocate
401 W. Peachtree St., NW,
Summit Building
Stop 202-D
Atlanta, GA 30308
(404) 338-8099

**HAWAII**
**Honolulu Office**
Taxpayer Advocate
Stop H-405
300 Ala Moana Blvd., #50089
Honolulu, HI 96850
(808) 539-2870

**IDAHO**
**Boise Office**
Taxpayer Advocate
550 West Fort St., Box 041
Boise, ID 83724
(208) 387-2827

**ILLINOIS**
**Chicago Office**
Taxpayer Advocate
230 S. Dearborn St.
Stop 1005-CHI
Chicago, IL 60604
(312) 566-3800

**Springfield Office**
Taxpayer Advocate
3101 Constitution Dr.
Stop 1005-SPD
Springfield, IL 62704
(217) 862-6382

**INDIANA**
**Indianapolis Office**
Taxpayer Advocate
575 N. Pennsylvania St., Stop TA770
Indianapolis, IN 46204
(317) 685-7840

**IOWA**
**Des Moines Office**
Taxpayer Advocate
210 Walnut St., Stop 1005- DSM
Des Moines, IA 50309
(515) 284-4780

**KANSAS**
**Wichita Office**
Taxpayer Advocate
271 W. 3rd St., North
Stop 1005-WIC
Wichita, KS 67202
(316) 352-7506

**KENTUCKY**
**Louisville Office**
Taxpayer Advocate
600 Dr. MLK Jr. Place
Federal Building-Room 325
Louisville, KY 40202
(502) 582-6030

**LOUISIANA**
**New Orleans Office**
Taxpayer Advocate
1555 Poydras Suite 220 Stop 2
New Orleans, LA 70112
(504) 558-3001

**MAINE**
**Augusta Office**
Taxpayer Advocate
68 Sewall St., Room 313
Augusta, ME 04330
(207) 622-8528

**MARYLAND**
**Baltimore Office**
Taxpayer Advocate
31 Hopkins Plaza  Room 940
Baltimore, MD 21201
(410) 962-2082

**MASSACHUSETTS**
**Boston Office**
Taxpayer Advocate
15 New Sudbury St.
Boston, MA 02203
(617) 316-2690

**MICHIGAN**
**Detroit Office**
Taxpayer Advocate
McNamara Federal Building
477 Michigan Ave. - Room 1745
Detroit, MI 48226
(313) 628-3670

**MINNESOTA**
**St. Paul Office**
Taxpayer Advocate
Stop 1005-STP
30 E 7th St. Suite 817
St. Paul, MN 55101
(651) 312-7999

 **IRS**

Department of the Treasury
**Internal Revenue Service**

Notice 1214 (Rev. 3-2006)
Catalog Number 26162Z

**MISSISSIPPI**
**Jackson Office**
Taxpayer Advocate
100 W. Capitol St., Stop JK31
Jackson, MS 39269
(601) 292-4800

**MISSOURI**
**St. Louis Office**
Taxpayer Advocate
Robert A. Young Building
1222 Spruce Street, Stop 1005-STL
St. Louis, MO 63103
(314) 612-4610

**MONTANA**
**Helena Office**
Taxpayer Advocate
10 West 15th St., Suite 2319
Helena, MT 59626
(406) 441-1022

**NEBRASKA**
**Omaha Office**
Taxpayer Advocate
1313 Farnam St., Stop 1005-OMA
2nd Floor
Omaha, NE 68102
(402) 221-4181

**NEVADA**
**Las Vegas Office**
Taxpayer Advocate
110 City Parkway
Stop 1005-LVG
Las Vegas, NV 89106
(702) 455-1241

**NEW HAMPSHIRE**
**Portsmouth Office**
Taxpayer Advocate
Federal Office Building
80 Daniel St.
Portsmouth, NH 03801
(603) 433-0571

**NEW JERSEY**
**Springfield Office**
Taxpayer Advocate
955 S. Springfield Ave.
Springfield, NJ 07081
(973) 921-4043

**NEW MEXICO**
**Albuquerque Office**
Taxpayer Advocate
5338 Montgomery Blvd. N.E.
Stop 1005-ALB
Albuquerque, NM 87109
(505) 837-5505

**NEW YORK**
**Albany Office**
Taxpayer Advocate
Leo O'Brien Federal Building
1 Clinton Square
Albany, NY 12207
(518) 427-5413

**Brooklyn Office**
Taxpayer Advocate
10 Metro Tech Center
625 Fulton St.
Brooklyn, NY 11201
(718) 488-2080

**Buffalo Office**
Taxpayer Advocate
201 Como Park Blvd.
Buffalo, NY 14227
(716) 686-4850

**Manhattan Office**
Taxpayer Advocate
290 Broadway - 5th Floor
New York, NY 10007
(212) 436-1011

**NORTH CAROLINA**
**Greensboro Office**
Taxpayer Advocate
320 Federal Place, Room 125
Greensboro, NC 27401
(336) 378-2180

**NORTH DAKOTA**
**Fargo Office**
Taxpayer Advocate
657 2nd Ave, N., Stop 1005-FAR
Fargo, ND 58102
(701) 239-5141

**OHIO**
**Cincinnati Office**
Taxpayer Advocate
550 Main St., Room 3530
Cincinnati, OH 45202
(513) 263-3260

**Cleveland Office**
Taxpayer Advocate
1240 E. Ninth St., Room 423
Cleveland, OH 44199
(216) 522-7134

**OKLAHOMA**
**Oklahoma City Office**
Taxpayer Advocate
55 N. Robinson, Stop 1005-OKC
Oklahoma City, OK 73102
(405) 297-4055

**OREGON**
**Portland Office**
Taxpayer Advocate
1220 S.W. 3rd Ave., Stop O-405
Portland, OR 97204
(503) 326-2333

**PENNSYLVANIA**
**Philadelphia Office**
Taxpayer Advocate
600 Arch St., Room 7426
Philadelphia, PA 19106
(215) 861-1304

**Pittsburgh Office**
Taxpayer Advocate
1000 Liberty Ave., Room 366
Pittsburgh, PA 15222
(412) 395-5987

**RHODE ISLAND**
**Providence Office**
Taxpayer Advocate
380 Westminster St.
Providence, RI 02903
(401) 525-4200

**SOUTH CAROLINA**
**Columbia Office**
Taxpayer Advocate
1835 Assembly St.
466
Columbia, SC 29201
(803) 253-3029

**SOUTH DAKOTA**
**Aberdeen Office**
Taxpayer Advocate
115 4th Ave. Southeast
Stop 1005-ABE
Aberdeen, SD 57401
(605) 226-7248

**TENNESSEE**
**Nashville Office**
Taxpayer Advocate
801 Broadway, Stop 22
Nashville, TN 37203
(615) 250-5000

**TEXAS**
**Austin Office**
Taxpayer Advocate
300 E. 8th St., Stop 1005-AUS
Austin, TX 78701
(512) 499-5875

**Dallas Office**
Taxpayer Advocate
1114 Commerce St.
10th Floor MC1005
Dallas, TX 75242
(214)413-6500

**Houston Office**
Taxpayer Advocate
1919 Smith St., Stop 1005-HOU
Houston, TX 77002
(713) 209-3660

**UTAH**
**Salt Lake City Office**
Taxpayer Advocate
50 South 200 East, Stop 1005-SLC
Salt Lake City, UT 84111
(801) 799-6958

**VERMONT**
**Burlington Office**
Taxpayer Advocate
Courthouse Plaza
199 Main St.
Burlington, VT 05401
(802) 860-2089

**VIRGINIA**
**Richmond Office**
Taxpayer Advocate
400 North 8th St., Room 916
Richmond, VA 23240
(804) 916-3501

**WASHINGTON**
**Seattle Office**
Taxpayer Advocate
915 2nd Ave., Stop W-405
Seattle, WA 98174
(206) 220-6037

**WEST VIRGINIA**
**Parkersburg Office**
Taxpayer Advocate
425 Juliana St. RM 3012
Parkersburg, WV 26101
(304) 420-8695

**WISCONSIN**
**Milwaukee Office**
Taxpayer Advocate
310 West Wisconsin Ave.
Stop 1005-MIL
Milwaukee, WI 53203
(414) 297-3046

**WYOMING**
**Cheyenne Office**
Taxpayer Advocate
5353 Yellowstone Rd.
Stop 1005-CHE
Cheyenne, WY 82009
(307) 633-0800

**TAXPAYERS LIVING ABROAD OR IN U.S. TERRITORIES**
**International**
Taxpayer Advocate
7 Tabonuco Street
San Patricio Office Building
Room 200
Guaynabo, Puerto Rico 00966
or
P.O. Box 193479
San Juan, Puerto Rico 00919-3479
(787) 622-8930 English
(787) 622-8940 Spanish

**Campuses**
**Andover**
Taxpayer Advocate
P.O. Box 9055, Stop 120
Andover, MA 01810-9055
(978) 474-5549

**Atlanta**
Taxpayer Advocate
P.O. Box 48-549, Stop 29A
Doraville, GA 30362
(770) 936-4500

**Austin**
Taxpayer Advocate
P.O. Box 934, Stop 1005-AUSC
Austin, TX 78767
(512) 460-8300

**Brookhaven**
Taxpayer Advocate
P.O. Box 960, Stop 02
Holtsville, NY 11742
(631) 654-6686

**Cincinnati**
Taxpayer Advocate
P.O. Box 1235, Stop 11-G
Cincinnati, OH 45201-1235
(859) 669-5316

**Fresno**
Taxpayer Advocate
P.O. Box 12161, Stop 1394
Fresno, CA 93776
(559) 442-6400

**Kansas City**
Taxpayer Advocate
P.O. Box 24551
Stop 1005 - ROE
Kansas City, MO 64131
(816) 926-2493

**Memphis**
Taxpayer Advocate
P.O. Box 30309AMF, Stop 13M
Memphis, TN 38130
(901) 395-1900

**Ogden**
Taxpayer Advocate
P.O. Box 1640
Stop 1005
Ogden, UT 84402
(801) 620-7168

**Philadelphia**
Taxpayer Advocate
P.O. Box 16053, DP #1300
Philadelphia, PA 19114
(215) 516-2499

Page 2

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NATIONAL CREDIT COUNSELING          )
SERVICES, INC.,                     )
                                    )
                 Plaintiff,         )
                                    )
        v.                          )          No. 1:06cv02028 (RBW)
                                    )
UNITED STATES,                      )
                                    )
                 Defendant.         )

**UNITED STATES' STATEMENT OF GENUINE ISSUES SETTING FORTH
MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE**

The United States responds to the paragraphs of plaintiff's statement of undisputed facts

as follows:

1. The United States admits the plaintiff was formed as a Maryland nonstock corporation

on December 18, 1992, and the United States requires further discovery concerning the

remaining allegation of paragraph 1.  (See United States' Motion for Further Discovery.)

2. The United States admits the first sentence of paragraph 2, it denies the second

sentence (see plaintiff's memorandum fn. 2), and it denies the remainder of paragraph 2, and the

United States avers that the plaintiff stated what its purposes were on part II B of

Attachment I of Form 1023.  (See Pl.'s Ex. 2.)

3. The United States admits paragraph 3.

4. The United States denies paragraph 4.  Given that plaintiff's support for its statement

is Money's affidavit, and given that Money states her knowledge consists of NCCS's operations

beginning in 1997, it does not seem that she has personal knowledge of whether the Service

examined plaintiff's Form 990 for the period ending December 31, 1993 during late 1996 and early 1997.

5. The United States admits that the Service issued a letter to NCCS dated March 18, 1997, and it denies the remainder of paragraph 5. The United States also avers that the plaintiff's statement is not material.

6. The United States admits that the Service issued a letter to NCCS dated January 8, 1998, and it denies the remainder of paragraph 6. The United States also avers that the plaintiff's statement is not material.

7. The United States admits the plaintiff obtained a study from Arthur Andersen regarding contractors that could provide certain services relating to NCCS's operations and pricing for those services, asserts that the study is objectionable under Fed. R. Evid. 802, and the United States requires further discovery before responding to the remainder of paragraph 7. (See United States' Motion for Further Discovery.)

8. The United States admits the plaintiff executed a three year service agreement with Amerix on November 20, 1998, and the United States requires further discovery before responding to the remainder of paragraph 8. (See United States' Motion for Further Discovery.)

9. The United States denies paragraph 9. On its form 990, NCCS listed Bernardo Dancel as its president during 1997. It stated in an attachment that Amerix was owned by a former officer of NCCS. (Pl.'s Ex. 6.) Amerix's relationship with NCCS was the subject of a Senate Report. *See Profiteering in a Non-Profit Industry: Abusive Practices in Credit Counseling: Hearing Before the Senate Governmental Affairs Subcommittee on Investigations,* S.Rept. 109-55 (2005). This Report stated that Dancel, who is reported on NCCS's Form 990 as NCCS's

president, was Amerix's owner. *Id.* at 18. The United States also requires further discovery concerning whether NCCS filed an accurate and complete form 990 for its 1997 tax year. (See United States' Motion for Further Discovery.)

10. The United States denies paragraph 10 for the reasons set forth in its response to paragraph 9.

11. The United States denies paragraph 11. The plaintiff did not disclose that Amerix's owner received a higher salary from the plaintiff than all but two other persons affiliated with the plaintiff. (See response to paragraph 9.) The plaintiff also did not disclose the full nature of the services Amerix provided to the plaintiff. (See United States Rule 56(f) Motion for Further Discovery.)

12. The United States denies paragraph 12 for the reasons set forth in its response to paragraph 11.

13. The United States requires further discovery concerning the statement set forth in paragraph 13. (See United States Rule 56(f) Motion for Further Discovery.)

14. The United States denies paragraph 14. The form 990 did not fully disclose the plaintiff's contractual relationship with Amerix. (See United States' Rule 56(f) Motion for Further Discovery.)

15. The United States denies paragraph 15 for the reasons set forth in its response to paragraph 14.

16. The United States requires further discovery concerning the statement set forth in paragraph 16. (See United States Rule 56(f) Motion for Further Discovery.)

3056595.2

17. The United States denies paragraph 17.  The form 990 did not fully disclose the plaintiff's contractual relationship with Amerix.  (See United States' Rule 56(f) Motion for Further Discovery.)

18. The United States denies paragraph 18 for the reasons set forth in its response to paragraph 17.

19. The United States denies paragraph 19.  The form 990 did not fully disclose the plaintiff's contractual relationship with Amerix.  (See United States' Rule 56(f) Motion and Supporting Declaration.)

20.  The United States denies paragraph 20 for the reasons set forth in its response to paragraph 19.

21. The United States admits that exhibit 11 is a true and accurate copy of the letter dated April 13, 2002 that the plaintiff received from the Internal Revenue Service, and it denies the remaining allegations in paragraph 21.  The United States further avers that paragraph 21 is not a material fact.

22. The United States denies paragraph 22 on the basis of its Rule 56(f) Motion and Supporting Declaration.

23. The United States admits that exhibit 12 is a true and accurate copy of the letter dated November 3, 2004 that the plaintiff received from the Internal Revenue Service, and it denies the remaining allegations in paragraph 23.

24. The United States admits the allegations contained in paragraph 24, but such allegations are not material to the plaintiff's motion.

25. The United States admits the allegations contained in paragraph 25, but such allegations are not material to the plaintiff's motion.

26. The United States admits that exhibit 13 is a copy of a workpaper summary of an agent of the Internal Revenue Service, it denies the remainder of paragraph 26, and it avers that the Service's position concerning the plaintiff's activities and operations is set forth in the Service's Report of Examination.  (Blaskopf Decl. Ex. A.)

27. The United States admits that exhibit 14 is a copy of a workpaper summary of an agent of the Internal Revenue Service, that exhibit 14 pertains to financial information the plaintiff reported on its forms 990, and it denies the remainder of paragraph 27, and the United States avers that the Service's position concerning the plaintiff's activities and operations is set forth in the Service's Report of Examination.  (Blaskopf Decl. Ex. A.)

28. The United States admits that exhibit 15 is a copy of a workpaper summary of an agent of the Internal Revenue Service, and it denies the remainder of paragraph 28, and avers that the Service's position concerning the plaintiff's activities and operations is set forth in the Service's Report of Examination.  (Blaskopf Decl. Ex. A.)

29. The United States admits that exhibit 16 is a copy of a workpaper summary of an agent of the Internal Revenue Service, and it denies the remainder of paragraph 29, and avers that the Service's position concerning the plaintiff's activities and operations is set forth in the Service's Report of Examination.  (Blaskopf Decl. Ex. A.)

30. The United States admits that exhibit 17 is a copy of a workpaper summary of an agent of the Internal Revenue Service, and it denies the remainder of paragraph 30, and it avers

that the Service's position concerning the plaintiff's activities and operations is set forth in the Service's Notice Report of Examination.  (Blaskopf Decl. Ex. A.)

31. The United States admits that exhibit 18 is a copy of a workpaper summary of an agent of the Internal Revenue Service, and it denies the remainder of paragraph 31, and it avers that the Service's position concerning the plaintiff's activities and operations is set forth in the Service's Notice Report of Examination.  (Blaskopf Decl. Ex. A.)

32. The United States denies the averments contained in paragraph 32.  (See United States' Rule 56(f) Motion for Further Discovery.)

33.  The United States denies the averments contained in paragraph 33.  (See United States' Rule 56(f) Motion for Further Discovery.)

34. The United States requires further discovery concerning the statement set forth in paragraph 34.  (See United States Rule 56(f) Motion for Further Discovery.)

**Additional Material Facts**

35. The plaintiff never notified the Service that it was seeking to limit the retroactive

effect of the Service's determination of revocation of the plaintiff's tax-exempt status under

section 7805(b)(26 U.S.C.).  (Blaskopf Dec. Ex. A.)

Date: February 15, 2008.

Respectfully submitted,

 /s/Lawrence P. Blaskopf
LAWRENCE P. BLASKOPF
BENJAMIN J. WEIR
Trial Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 227
Washington, DC  20044
Telephone:  (202) 514-9642
                      (202) 307-0855
Fax:          (202) 514-6866
E-mail: Lawrence.P.Blaskopf@usdoj.gov

OF COUNSEL:

JEFFREY A. TAYLOR
United States Attorney

3056595.2

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NATIONAL CREDIT COUNSELING            )
SERVICES, INC.,                                        )
                                                                    )
                          Plaintiff,                         )
                                                                    )
          v.                                                      )          No. 1:06cv02028 (RBW)
                                                                    )
UNITED STATES,                                       )
                                                                    )
                          Defendant.                      )

## ORDER

Upon consideration of the plaintiff's motion for partial summary judgment and the

United States' response,

It Is ORDERED that the plaintiff's motion for partial summary judgment is DENIED.


_____                                        _____
          Date                                                               REGGIE B. WALTON
                                                                             United States District Judge

3060406.1

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NATIONAL CREDIT COUNSELING          )
SERVICES, INC.,                     )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )          No. 1:06cv02028 (RBW)
                                    )
UNITED STATES,                      )
                                    )
                    Defendant.      )

CERTIFICATE OF SERVICE

        IT IS CERTIFIED that service of the foregoing UNITED STATES' MEMORANDUM

OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR

PARTIAL SUMMARY JUDGMENT, DECLARATION OF LAWRENCE P. BLASKOPF,

UNITED STATES' STATEMENT OF GENUINE ISSUES SETTING FORTH MATERIAL

FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE, and proposed ORDER has been

made this 15th day of February, 2008 by mailing, postage prepaid, addressed to:

        Gary S. Posner
        Whiteford, Taylor & Preston, L.L.P.
        7 Saint Paul St.
        Baltimore, Md. 21202-1626

        Jonathan Z. May
        Robert D. Earle
        Whiteford, Taylor & Preston, L.L.P.
        50 Corporate Center
        10500 Little Patuxent Parkway, Ste. 750
        Columbia, Md. 21044-3585

2189845.1

　/s/ Lawrence P. Blaskopf
Lawrence P. Blaskopf
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 227
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-9642

2189845.1